# 25-2108-cv(L), 25-2109-cv(XAP)

## United States Court of Appeals

*for the*

## Second Circuit

SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC,
SIXTY HOTEL MANAGER, LLC,

*Defendants-Appellants-Cross-Appellees,*

– v. –

MARGARET BETTS,

*Plaintiff-Appellee-Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### APPENDIX
**Volume 2 of 6 (Pages A-301 to A-600)**

MICHAEL J. CURTIS
KAHANA & FELD LLP
*Attorneys for Defendants-Appellants-
Cross-Appellees*
800 Third Avenue, 16th Floor
New York, New York 10033
(914) 787-9239

CP COUNSEL PRESS    (800) 4-APPEAL • (388908)

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... A-1

Complaint, filed June 22, 2020.................................. A-34

Verified Answer, dated August 20, 2020 .................. A-47

Order of the Honorable Naomi Reice Buchwald,
    dated November 7, 2022 ...................................... A-58

Notice of Motion, by Plaintiff, for an Order granting
    Partial Summary Judgment, dated
    December 15, 2022 ............................................... A-60

Plaintiff's Statement of Material Facts, dated
    December 15, 2022 ............................................... A-62

Declaration of Joseph Napoli, for Plaintiff, in
    Support of Motion for Partial Summary
    Judgment, dated December 15, 2022 .................... A-73

    Exhibit 1 to Napoli Declaration -
    Complaint, filed June 22, 2020
    (Reproduced herein at pp. A-34-A-46)

    Exhibit 2 to Napoli Declaration -
    Expert Report of Lloyd W. Williams, dated
    December 23, 2021 ............................................... A-76

    Exhibit 3 to Napoli Declaration -
    Expert Affidavit of Lloyd W. Williams, dated
    December 14, 2022 ............................................... A-88

    Exhibit 4 to Napoli Declaration -
    Defendants' Response to Plaintiff's First Request
    for Production of Documents, dated
    November 10, 2020............................................... A-96

**ii**

                                                                    **Page**

Exhibit 5 to Napoli Declaration -
Defendants' Response to Plaintiff's Request for
Admission, dated April 1, 2021 ............................   A-113

Exhibit 6 to Napoli Declaration -
Excerpts from the Deposition Transcript of
Margaret Betts, dated January 8, 2021 ..................   A-128

Exhibit 7 to Napoli Declaration -
Excerpts from the Deposition Transcript of Ben
Edwards, dated February 3, 2021 ..........................   A-144

Exhibit 8 to Napoli Declaration -
Excerpts from the Deposition Transcript of
Samara Fares, dated January 20, 2021 ..................   A-164

Exhibit 9 to Napoli Declaration -
Excerpts from the Deposition Transcript of
William Grotheer, dated January 15, 2021 ...........   A-174

Exhibit 10 to Napoli Declaration -
Excerpts from the Deposition Transcript of
Christopher Horn, dated February 3, 2021 ............   A-191

Exhibit 11 to Napoli Declaration -
Excerpts from the Deposition Transcript of
Edward Maynard, dated March 1, 2021 ................   A-196

Exhibit 12 to Napoli Declaration -
Excerpts from the Deposition Transcript of
Nicholas Riley, dated January 13, 2021 ................   A-202

Exhibit 13 to Napoli Declaration -
Excerpts from the Deposition Transcript of
Felecia Stuart-Husain, dated January 11, 2021 .....   A-226

Exhibit 14 to Napoli Declaration -
Excerpts from the Deposition Transcript of
Jennifer Villanueva, dated January 21, 2021 ........   A-233

**iii**

|  | Page |
|---|---|
| Exhibit 15 to Napoli Declaration - Printout from Office of the Professions website ... | A-243 |
| Exhibit 16 to Napoli Declaration - Invoices ................................................. | A-247 |
| Declaration of Curtis Sobel, for Defendants, in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated January 12, 2023 ........ | A-251 |
| Exhibit A to Sobel Declaration – Printout from the New York State Department of Education Government Website ............................ | A-253 |
| Exhibit B to Sobel Declaration – Deposition Transcript of Ben Edwards, dated February 3, 2021 ..................................... | A-257 |
| Defendants' Response to Plaintiff's Statement of Material Facts, dated January 12, 2023 ................. | A-415 |
| Notice of Motion, by Defendants, for an Order granting Summary Judgment, dated January 12, 2023 .................................... | A-435 |
| Defendants' Statement of Material Facts, dated January 12, 2023 .................................... | A-437 |
| Declaration of Curtis Sobel, for Defendants, in Support of Motion for Summary Judgment, dated January 12, 2023 .................................... | A-446 |
| Exhibit A to Sobel Declaration – Complaint, filed June 22, 2020 (Reproduced herein at pp. A-34-A-46) | |
| Exhibit B to Sobel Declaration – Verified Answer, dated August 20, 2020 .............. | A-449 |
| Exhibit C to Sobel Declaration – Plaintiffs Request for Admissions, dated February 16, 2021 ................................. | A-464 |

**iv**

|  | Page |
|---|---|
| Exhibit D to Sobel Declaration – Defendants' Response to Plaintiffs Request for Admissions, dated April 1, 2021 | A-474 |
| Exhibit E to Sobel Declaration – Deposition Transcript of Edward Maynard, dated March 1, 2021 | A-490 |
| Exhibit F to Sobel Declaration – Deposition Transcript of Brenton Krumpfes, dated January 19, 2021 | A-543 |
| Exhibit G to Sobel Declaration – Deposition Transcript of Hephzibah Strmic-Pawl dated February 4, 2021 | A-635 |
| Exhibit H to Sobel Declaration – Sixty LES Spa Menu | A-674 |
| Exhibit I to Sobel Declaration – Deposition Transcript of Valeryia Vasilets, dated February 8, 2021 | A-677 |
| Exhibit J to Sobel Declaration – Deposition Transcript of Ben Edwards, dated February 3, 2021 (Reproduced herein at pp. A-257-A-414) | |
| Exhibit K to Sobel Declaration – Printout from the New York State Department of Education Government Website | A-756 |
| Exhibit L to Sobel Declaration – Deposition Transcript of Samara Fares, dated January 20, 2021 | A-760 |
| Exhibit M to Sobel Declaration – Deposition Transcript of Felicia Stuart-Husain, dated January 11 , 2021 | A-830 |

v

Page

Exhibit N to Sobel Declaration –
Deposition Transcript of Jennifer Villanueva,
dated January 13, 2021 ......................................... A-908

Exhibit O to Sobel Declaration –
Deposition Transcript of Nicholas Riley, dated
January 13, 2021 .................................................. A-973

Exhibit P to Sobel Declaration –
Deposition Transcript of Christopher Hom, dated
February 3, 2021 .................................................. A-1067

Plaintiff's Response to Defendants' Statement of
Material Facts, dated January 26, 2022 ................. A-1121

Memorandum and Order of the Honorable Naomi
Reice Buchwald, dated August 21, 2023 .............. A-1138

Notice of Appeal, dated September 19, 2023 ............ A-1177

Letter from Curtis Sobel to the Honorable Naomi
Reice Buchwald, dated January 19, 2024 ............. A-1179

Mandate, dated January 22, 2024 ............................. A-1181

Letter from Joseph Napoli to the Honorable Naomi
Reice Buchwald, dated April 9, 2025 ................... A-1182

Memorandum and Order of the Honorable Naomi
Reice Buchwald, dated June 30, 2025................... A-1183

Plaintiffs' Proposed Verdict Sheet, filed
July 2, 2025 .................................................. A-1204

Plaintiffs' Proposed Request to Charge, filed
July 2, 2025 ........................................................ A-1209

Memorandum and Order of the Honorable Naomi
Reice Buchwald, dated July 7, 2025 .................... A-1224

Letter from Joseph Napoli to the Honorable Naomi
Reice Buchwald, dated July 8, 2025 .................... A-1232

Defendants' Proposed Preliminary and Final Jury
Instructions, dated July 9, 2025............................ A-1233

**vi**

Page

Defendants' Proposed Verdict Questionaire, filed
July 9, 2025 ............................................................. A-1247

Mem Endorsement, dated July 10, 2025..................... A-1251

Letter from the Honorable Naomi Reice Buchwald
to Counsel, dated July 12, 2025 ............................ A-1253

Verdict, filed July 17, 2025 ...................................... A-1255

Final Judgment, dated July 22, 2025 ......................... A-1261

Memorandum and Order of the Honorable Naomi
Reice Buchwald, dated July 31, 2025 ................... A-1264

Notice of Motion, by Defendants, to Vacate the
Judgment, dated August 1, 2025 .......................... A-1267

Declaration of Michael J. Curtis, for Defendants, in
Support of Motion, dated August 1, 2025............. A-1269

Exhibit A to Curtis Declaration –
Memorandum and Order of the Honorable
Naomi Reice Buchwald, dated August 21, 2023
(Reproduced herein at pp. A-1138-A-1176)

Exhibit B to Curtis Declaration –
So-Ordered Letter from Curtis Sobel to the
Honorable Naomi Reice Buchwald, dated
July 3, 2025 .......................................................... A-1272

Exhibit C to Curtis Declaration –
(i) Trial Transcript, dated July 15, 2025................. A-1276

(ii) Trial Transcript, dated July 16, 2025 .............. A-1406

(iii) Trial Transcript, dated July 17, 2025 ............. A-1580

Exhibit D to Curtis Declaration –
Verdict Sheet......................................................... A-1687

**vii**

|  | Page |
|---|---|

Notice of Motion, by Plaintiff, to Increase the
Award for Future Damages, dated
August 6, 2025 ...................................................... A-1693

Notice of Appeal, by Defendants, dated
August 21, 2025 .................................................... A-1696

Notice of Cross-Appeal, by Plaintiff, dated
August 21, 225 ...................................................... A-1700

Declaration of Joseph P. Napoli, for Plaintiff, in
Opposition to Defendants' Post-Trial Moton to
Vacate the Judgment, dated September 8, 2025.... A-1704

Memorandum and Order of the Honorable Naomi
Reice Buchwald, dated November 24, 2025 ......... A-1706

Amended Notice of Appeal, by Defendants, dated
November 24, 2025 ............................................... A-1739

A-301

Page 44

MR. MARIOTTI:  Okay.  I'm going to take a short break.  I actually have to run to the washroom.

THE WITNESS:  Oh, sure.

MR. MARIOTTI:  If we can go off for a few minutes.

THE VIDEOGRAPHER:  Going off the record.  The time is 11:46 a.m.

(A break was taken from 11:46 a.m. until 12:04 p.m.)

THE VIDEOGRAPHER:  Going back on the record.  The time is 12:04 p.m.

BY MR. MARIOTTI:

Q.    Okay.  So a moment ago before we took a break, Mr. Edwards, we were talking about the various massage therapists who are on the lists that the hotel had.

A.    Right.

Q.    And you had mentioned that at some point you were asked to get licenses for some of the -- do you recall that?

A.    Yes.  I think it was around the end of 2018.  I imagine it was -- it was, yeah, late 2018.  And I was asked to look into third-party kind of massage companies such as Zeel I think one

A-302

Page 45

of them was and Nomi.

Q.    Do you -- do you know why you were asked to obtain the licenses of massage therapists at that time?

A.    No.

Q.    And did you obtain licenses for all the massage therapists on the list that you -- you had at Sixty?

A.    No.

Q.    Why not?

A.    Because we started trying out Nomi instead of using, you know, the old list.

Q.    And who told you to look for the licenses or obtain the licenses of the massage therapists?

A.    It was -- I think it was the general manager.  I think it was Nick Riley.

Q.    And do you know why he ended up deciding to use Nomi as opposed to prior therapists that were --

A.    No, I don't know why it was particularly Nomi, no.

Q.    And do you know who made the decision to use Nomi going forward?

A.    No.

A-303

Page 46

Q.    Did you notice a difference in the service that was provided once Nomi was used?

A.    Not really.  I'm trying to think were there any incidents with Nomi.  Not that I can think of off the top of my head, no.

Q.    What about was there any difference in the quality of the service provided by Nomi versus the prior massage therapists that were used?

A.    No, I don't think so.

Q.    What do you know about Nomi as a company?

A.    Not much.  I knew you could reserve, like, massages on, like, their website.  You had, like, a login I think where you could choose your day and it will -- and choose your time and it will tell you if they have something available rather than, you know, having to call them.

Q.    Was it a bigger operation than the massage therapists that Sixty had previously been using?

A.    I think so, yeah, 'cuz the ones we previously had been using weren't really an operation because I think they all just worked for themselves.

A-304

Case 1:20-cv-04772-NRB    Document 61-2    Filed 01/12/23    Page 48 of 158

Page 47

Q.    And after Nomi was used, did the hotel change its spa menu and other documents to reflect that Nomi was the one providing the service?

A.    I don't recall.  I don't recall.  Sorry.

Q.    To your -- when you left Sixty, were they still using Nomi?

A.    I believe so.  Yeah, I think they were.  Yeah.

Q.    Were you ever asked to do anything else out of the ordinary related to massage therapists in late 2018 or early 2019?

A.    Nothing out of the ordinary, no.

Q.    When you did receive those licenses for a -- for a few of the massage therapists, who did you provide them to, if anyone?

A.    Hmm.  I imagine I would have probably scanned them in and e-mailed them to all the managers and the general manager.

Q.    Who were the managers at that time?

A.    Gosh.  I think one was a lady called Edlira, Edlira Kuka, spelled E-d-l-i-r-a, last name K-u-k-a.  She was, I think, the front office manager at the time.  So it would have been her.  And it would have been Nick.  I think it was

Page 48

Nick Riley who was the GM at the time.  Yeah.

Q.   Was -- at any point during your time at Sixty, were there background checks performed on any of the massage therapists to your knowledge?

A.   Not to my knowledge, no.

Q.   Any other steps to vet the outside massage therapists during your time at Sixty to your knowledge?

A.   No, not to my knowledge.

Q.   And, you know, we spoke earlier about how there were certain documents that were provided to me recently.  What steps did you take to search for documents?

A.   So these ones, I searched I think the word "handover," all one word, because I think that was in every subject line.  And so if I searched the word "handover" in my gmail, I would see, you know, the results.

And I also searched the plaintiff's name to see if I made any notes about her or any incidents.  And nothing came up in my search history.  So I assumed that maybe it wasn't me who had booked her particular massage.  Maybe it was one of the managers or one of the front desk

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 50 of 158

Page 49

agents.

I also searched Yuri's name and provided all the instances I had in my e-mail where his name appeared.

Q.    Now, what -- you also produced these -- the spa menus --

A.    Oh, yeah.

Q.    Which searches did you perform that resulted in finding those spa menus?

A.    Yeah, I think I just typed in "spa menu."  As I said, I found I was taking my work home with me quite a bit.  So whenever we'd get an inquiry to an e-mail for the spa, I'd be able to reply to the e-mail and attach the spa menu.  So I think I just typed "spa menu" and just searched through until I saw there was an attachment and I looked at the attachment and it was the spa.

Q.    Were you able to access your hotel e-mail from your personal computer at home?

A.    From -- from my phone at the time, yeah.  I never set it up on my computer.  But whenever I'd respond to work e-mails, it would be on my phone.

Q.    Okay.  Did you when you -- when you were asked to book a massage therapist, what was

A-307

Page 50

that process like?  Can you walk us through that process?

MR. SOBEL:  You know, now I'm having trouble -- now I'm having trouble hearing you, Renato.  I'm sorry.

MR. MARIOTTI:  No problem.  I'll try to get closer to the microphone.

MR. SOBEL:  Thanks very much.  It could be my age.  I don't know, but who knows.

MR. MARIOTTI:  We're all getting up there versus the young person of our crew.

BY MR. MARIOTTI:

Q.    When you booked a massage therapist or were asked to book a massage therapist, what were the steps that you undertook to do so?

A.    Yeah.  Absolutely.  I would obviously get the name of the person calling, the guest, a call-back number, an e-mail address.  I would ask them if they were looking for a 60-minute or a 90-minute massage.  I was asking them if they wanted to have it in the spa treatment room or if they wanted to have it in their hotel room, if they were staying in a large-enough hotel room.  I was asking them if they had a particular type of massage they wanted.  I was asking them if they

A-308

Page 51

were pregnant if it was a female.  And I was asking them if they preferred a male or a female massage therapist and a particular time or day -- time and day that they wanted it and if they had any flexibility in regards to that.  And then I would say, "I will work on that request for you, and I will call you back to confirm."

And then I would reach out to -- it was often Laura or, you know, towards the end it was Nomi, and check their availability.

And then if they were available, I would call the guest back and say, "Yep, they're available for that time.  I will -- I will put you in their -- the calendar.  There is a 24-hour cancellation window," and that I would send them a confirmation e-mail with all that information in as well.

Q.    And, during those conversations with the guests, would you say anything to them to tell them that the service is being provided by, like, a third-party contractor?

A.    No.  I -- I just -- I think I was trained like to kind of keep how we do things kind of on our side of things so they only, like, see the end product, you know, not, like, how we kind

A-309

Page 52

of necessarily work.  The only times we'd have to
kind of explain that it was an unstaffed spa and
we used outside massage therapists was if they
wanted one immediately.  Yeah.  Yeah.

Q.    Would you say that guests could get
the impression that the spa services were provided
by Sixty employees?

MR. SOBEL:  Just note my --

THE WITNESS:  Yes.

MR. SOBEL:  -- objection to -- Listen,
note my objection to the form of the question.
Renato, I think you're asking him about --

MR. MARIOTTI:  You don't need to do a
speaking objection.  I understand your objection.

MR. SOBEL:  Okay.

MR. MARIOTTI:  But if you're
instructing the witness not to answer, I'm going
to -- he should answer the question.

THE VIDEOGRAPHER:  Your audio is very
faint, by the way.

MR. MARIOTTI:  Okay.  I'll try to --

MR. SOBEL:  Read the -- could you read
the question back for me, Debbie.

(The following question was

read back:

A-310

Page 53

"Q.  Would you say that guests could get the impression that the spa services were provided by Sixty employees?")

MR. SOBEL:  How does he answer that question?

MR. MARIOTTI:  Well, I'm not going to have a -- I'm not going to have a debate with you or give speeches back and forth.  You made an objection and --

MR. SOBEL:  Yeah, I know the rules as well as you do.  I will allow him to answer.

MR. MARIOTTI:  Okay.

MR. SOBEL:  Ben, you can go ahead and answer the question.

THE WITNESS:  Yeah.  It was something that I didn't really think about.  But there were a couple of occasions when somebody had taken the elevator down to the spa and had been -- like, sat in the waiting room waiting to book a massage and there was nobody there, so they came up and I was like the nearest kind of workstation to the elevator so they'd usually come to me first and say, "I've been waiting to try and reserve a massage, but there's nobody down there."

Page 54

And then I would, you know, explain to them that it's, like, upon request and we use outside massage therapists just in case that they'd, like, not seen the spa menu before where that information is on there.  Yeah.

BY MR. MARIOTTI:

Q.    Okay.  When massage therapists came to the hotel, did the massage therapists have to check in or sign in in some way?

A.    They would pick up the key to the private treatment room from myself or any of my co-workers from the house.

Q.    And did the hotel take any steps to verify the identity of the massage therapists before handing over the key?

A.    Well, myself, I knew them all.  And from my training, you know, they would turn up sometimes with a massage table and they would say, you know, "My name is Laura.  I'm here to give a massage in the spa at," you know, such-and-such a time.  But not like showing ID or anything.  But they knew that there was a service that was booked and they were there to perform.

Q.    Okay.  How did the massage therapists know which room to go to for an in -- for an

Page 55

in-room massage?

A.    Yeah.  For the in-room, they would check in with myself or, you know, towards the end, the agents at the front desk.

And usually the guest would charge the price of the massage to their hotel bill.  So the massage therapist took up a slip for them to sign, you know, saying that they would put in the charge on the room.  That was called a spa paid out.  So we would always prepare the paid outs with the guest's name, the guest's room number.  There were a few occasions where they would not want to charge it to their room and they would, you know, pay cash.

But that's how they knew if it was in the spa or if it was in the room because, on the paid out slip, it would have the guest's name and room number and it would say, you know, 90-minute massage in room or 90-minute massage in spa.  And we would hand that paid out slip to the massage therapist, along with the spa keys if they were going down to the spa, or we would have somebody escort them up in the elevator if they were going to a room.

Q.    So somebody, it would be a front desk

A-313

Page 56

employee then, would take them in the elevator?

A.    I had before, yeah.  Usually one of the bellmen, they handle kind of, you know, the scene going on in the lobby, yeah.

Q.    Who provided the massage table that was used for in-room massages?

A.    We had a spare one.  We had one that was like permanently set up in the spa treatment room.  And then we had a spare one in the closet. So we would use that.  And then if we had like a side-by-side massage in one of the rooms, we'd ask one of the massage therapists to bring their own so they could use their own and then they could use our spare one.

Q.    You mentioned there's a slip that was filled out regarding payment.  Can you just explain to me the payment process, how that worked?

A.    Yeah.  So the guest would sign it saying, you know, "I'm happy," which says, you know, it would be charged to their room.  And then all of us working front of house had -- had a bank, like each individual bank.  And then once the massage was finished, they would come down with the slip.  And we would look to see if the

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 58 of 158

Page 57

hotel guest had added any gratuity.  And then the final amount we would pay from our bank to the massage therapist in cash.

And then we would -- we would keep that slip in our banks so that it evened out.  And then we would submit -- submit them to I think accounting so that we can replenish the money in our banks.  We would take the spa paid out slips.

And, yeah, that's kind of how payment worked.

Q.    Do you know why the massage therapists were paid in cash versus some other form of payment?

A.    I don't know.

Q.    Okay.  After an in-room service like a massage, were guests -- did guests receive a call from someone on staff about the experience?

A.    No.  But that's a good idea.

Sometimes in the spa before the treatment started, we would ask them if they would like, like, an herbal tea at the end of their treatment.  And what we would do is, at the end of the massage, we would come down to the spa area with like this lovely little tray set up of a nice pot of tea, cup, and then the paid out slip for

A-315

Page 58

them to sign so that they could, you know, sit and relax in the spa area, drink some tea.  And then, you know, we could say to them then, you know, "How was everything," while they, you know, signing the form and having their tea.  So that was something we did, you know.  But not everybody wanted the tea at the end.

Q.   Okay.  That makes sense.

A.   Yeah.

Q.   Are you familiar with a hotel guest named Margaret Betts or Maggie Betts?

A.   Prior to this, no, yeah.

Q.   Do you know anything about an alleged sexual assault that Ms. Betts had reported?

A.   Prior to this, no.

Q.   To your knowledge, did you speak to Ms. Betts when she stayed at the hotel?

A.   No.  If I did, it was in passing and it was, you know, "hello" or something probably. But no.

Q.   Nothing you can recall really?

A.   Nothing I reported on a -- yeah, uh-huh, that I can recall.

Q.   Yeah.  And so it's also fair to say you have no knowledge of her in-room massage

A-316

Page 59

during her stay?

A.    That's correct.  Yeah.  I have no knowledge.

Q.    And, you know, we did talk earlier, we were talking about that spa menu.  You mentioned the other spa menu was form -- was the one that was formatted for print.

A.    Mm-hmm.

Q.    Other than the formatting, to your knowledge was there any difference between those two menus?

A.    No.  No.  It's just we tried to print the e-mail ones and it would always jam the printer.  Yeah.  So, yeah.

Q.    It's not like they had high-quality printers.

A.    Right.  Exactly.  Or high-quality paper.

Q.    Yeah, one of the two.

We talked earlier about Yuri as one of the massage therapists.  Can you describe what he looked like?

A.    Well, that's it, I can only picture this one male massage therapist, and I can't remember if it was Yuri or Victor.

A-317

Page 60

Q.    Mm-hmm.

A.    I've been trying to rack my brains [sic] to think of one -- or the two what they look like, and I can't.  But the one male masseuse kind of had very short hair, not like bald, but, you know, maybe bald but like kind of cut back/shaved kind of quite a lot.  Kind of shortish.  Kind of a little bit hunched when he -- he kind of looked like a, you know, kind of strong European guy, yeah.  But, again, I don't remember if that was Yuri or if that was Victor.  Yeah.

Q.    What was his height approximately, do you recall?

A.    Maybe a little shorter than me.  I'm 5'10".  So maybe like 5'9", 5'8".  Like I said, I think he kind of like maybe hunched a little when he walked, so maybe if he stood up straight he could have been 5'10", 5'11".  I don't know.  But, yeah, not like super tall or anything.  On the shorter side.

Q.    You mentioned that he was muscular.  Was he -- did he have a strong build?

A.    I wouldn't necessarily say like muscular like stocky, but he looked, you know, in shape, you know, in shape.  Yeah.  But not like a

A-318

Page 61

gym buff or anything, no.  But, yeah, in shape.  Yeah.

Q.    Was he friendly with any staff members of LES, Sixty LES, that you -- that you recall?

A.    No.  I mean he was friendly enough.  If -- you know, if it's not Victor I'm thinking about.  He was friendly enough, you know, with me, you know.

Q.    And do you know how many massages Yuri had provided at the hotel prior to October 2018?

A.    Oh, my gosh, I have no idea.  Especially as, like, the concierge work was being spread over to the front desk where, you know, they weren't logging stuff as they should be.  Like, we used to have to log everything we did as the concierge.  But they had enough on their plates at the front desk that they -- I don't think they appreciated having to do all the work the concierge kind of did.  So it's doubtful that a lot of that kind of stuff got logged if the concierge wasn't on duty.

So, but I think I probably remember seeing a male massage therapist that could have been Yuri, could have been Victor, at least like maybe a dozen times.  Yeah.

Page 62

Q.   Did you hear any complaints about either Yuri or Victor?

A.   No.  No.  I don't recall.  I would have known if I'd have received any kind of serious complaints, I would have definitely written a shift report, and it would have stayed with me.  The only kind of annoyances were when they were running late, you know.

Q.   What -- other than what we've talked about, do you remember anything else about Yuri?

A.   I guess he drove a car rather than taking the subway 'cuz he was late once because he couldn't find parking, yeah.  That's -- but, yeah, that's as much as I know.

Whenever I'd talk to the massage therapist, it was only about conversational.  It's not like we knew anything about each other's lives outside of that.

Q.   You had also mentioned someone named Victor.  Did he look --

A.   Mm-hmm.

Q.   -- lot like Yuri, do you recall?

A.   I don't even know.  I'm just coming up like 100 percent blank.  It's like -- you know, when something is on the tip of your tongue?  It's

A-320

Page 63

like on the tip of my brain.  But for the life of me, you know, I wish I could kind of see, see who I'm trying to think about.  So I don't know if they looked similar or not.  I really -- I'm kind of bad with faces.

Q.    And you -- well, you mentioned earlier you don't -- you don't know Victor's last name. Is that right?

A.    That's correct.

Q.    And you don't know how Victor came to provide massages at Sixty LES.  Correct?

A.    Correct.

Q.    Do you know anything else about Victor that we haven't already discussed?

A.    No.  No.

Again, we had like a staff appreciation week one time when massage therapists came in for the staff, just to give them like neck rubs for like ten minutes.  And we had males and females.  I think we had three, and one of them was the male and I -- it was either Yuri or Victor.  They came in, yeah, to help with the staff.  Yeah.  That's the only other kind of thing.

Q.    Do you know whether Victor was

A-321

Page 64

friendly with any particular staff members at Sixty LES?

        A.    No.

        Q.    And did you hear any complaints about Victor that you remember?

        A.    No.

        Q.    Okay.  I am going to show you another exhibit.  Give me one second.  All right.  I'm showing you what I will ask us to deem to be marked Exhibit 2.

        A.    Okay.

                    (Exhibit 0002 was marked.)

BY MR. MARIOTTI:

        Q.    And are you familiar with this document, sir?

        A.    Yes.

        Q.    What is it?

        A.    This is one of my end-of-shift handover shift reports e-mails that I would send to the managers on duty -- well, not on duty, all of the managers just so that we were all on the same page about what I had done that day and what was coming up that they should probably be in the know about in case I'm not there, you know, the next shift or the next day.

A-322

Page 65

Q.    And you did -- you did that every day?

A.    I did this at the end of every one of my shifts, apart from on my first day when I forgot, and then I never forgot again.

Q.    Were you reprimanded for forgetting your --

A.    Yeah.

Q.    Uh-huh.

A.    Yeah.  So, yeah, I did this at the end of every shift of mine.

And I think kind of halfway through my time there at Sixty LES I started also cc'ing or bcc'ing my -- my personal gmail because a co-worker of mine who started at the concierge desk, it was kind of like a tip of hers, that she started doing just because we used Outlook and whenever you tried to perform a search in Outlook your computer was pretty much out of service for the next ten minutes while it tried to search.  So she said, "I started forwarding the handovers to my gmail because the search there is really quick."  And if you need to, like, find something out, you know, kind of quickly relating to anything you needed to know, you know, for the day, it was a lot quicker searching through gmail

Page 66

than searching with Outlook that we used on the computers.

So, from that moment on, I can't remember exactly when she started and when she left, but that's when I kind of started also including my personal e-mail on the shift reports.

Q.   Got it.  And so you -- from that point on, were -- you included your personal e-mail in all the shift reports that you sent?

A.   Yeah.  Mm-hmm.  That's correct.

Q.   Did you include your personal e-mail in other e-mails and documents that you sent while you were at Sixty?

A.   I was trying to think.  No.  Just things that I would need to maybe attach to e-mails if I was sending an e-mail from home. Like the spa menu, for one example.

And I think I had like an e-mail template for people who were interested in, like, being picked up from a car service, like, from the airports just so that I could kind of include that in an e-mail and send that from home if need be.

Q.   So here I'm looking at this handover. And, at the top, it says concierge and hotel guest, and there's a variety of things listed

A-324

Page 67

there.  Is that a pretty typical list of things that you might do for guests during a day when you were working for Sixty LES?

A.    Yeah.  That seems like -- yeah, that's got a little bit of everything really.  Helicopter it looks like, helicopter tour, hop-on-hop-off bus tours, booking a restaurant, and booking a car service.  So, yeah, that's -- yeah, that's, you know, a good example of a usual-day-of-mine working, some of the things that I would be in charge of.

Q.    And, below that section, there's a section that's entitled "General Hotel and Hotel F+B."  What does that mean?

A.    If there's any, like, internal information that the staff should know about, you know, not relating necessarily to anyone staying at the hotel as a guest.  So it would often be like reminders for myself or just anything which staff might, you know, find interesting or should know about.  Yeah.

Q.    And, just to be clear, why is it that you knew the information that was in this section versus somebody else being in charge of relaying it to the staff?

A-325

Case 1:20-cv-04772-NRB    Document 61-2    Filed 01/12/23    Page 69 of 158

Page 68

A.    Well, maybe somebody else had already related to the staff.  I was just making sure, you know.  I would include that in my e-mail just so it was not missed, you know.

Q.    Okay.

A.    Yeah.

Q.    So, for example, at the bottom where it says, "I encourage you to provide your feedback as it assists us in continuous quality enhance- ments," were those your words?

A.    No.  That looks like something I have copied and pasted from an e-mail that probably everybody I'm sending this to has already received.  But, you know, just making sure and, again, like as a reminder for myself.

Q.    Got it.  And then it says "e-mails left over in inbox" after this.  What does that section mean?

A.    Yeah.  Sometimes if it's a crazy busy day and you're doing a lot like face-to-face with people already there, you can get behind on e-mails, people asking for information, asking for restaurants, asking, you know, for spa treatments or whatever.  So if there was something that we never got around to, that is -- this was a more

Page 69

kind of relevant section when there was more than one concierge because we had access to the shared concierge e-mail.  So the person I was handing over to, it was like, "Sorry, I didn't get around to these e-mails," you know, kind of thing.

But as I was the only one who had access at this time or who checked the concierge e-mail, that, again, was a note to myself, you know, pretty much at the end of my time there.

Q.   Got it.  Now, below that, there's a section that says "in the neighborhood, in the city, outside vendors."  What does that mean?

A.   Oh, yeah, like maybe if a new restaurant had opened up nearby in the neighbor-hood, I'd put that there so we could recommend it to people or, you know, just let them know to check it out.  Or if some had closed.  Just, yeah, things like that that we kind of had to also kind of stay up-to-date with so that we weren't sending kind of out-of-date information to hotel guests, you know, if someone is closed and you're trying to recommend it to them, it's, yeah.  It's --
yeah.

Q.   Now, below there, it looks like a big black box.  Has that been -- has that been

A-327

Page 70

redacted in some way?

A.    No.  I think that is --

MR. SOBEL:  We did not -- that's not a redaction.

MR. MARIOTTI:  Okay.

THE WITNESS:  I can see there's some -- it looks like some text.  Oh, yeah, this is -- it says "Alice handover."

BY MR. MARIOTTI:

Q.    Yeah.

A.    I can read that.

And that is a program we used to log all car services, to log all our restaurant reservations, to log all of our massages and facials and things like that.  That was the name of the program.

Q.    Hmm.

A.    So.  And shipments, yeah, like incoming packages, outgoing packages.  So I think it's just -- that dark blue kind of bar is just like a formatting, like a line break almost, you know, to say the stuff underneath here kind of relates to things in that program.

Q.    And --

MR. SOBEL:  And just for

Case 1:20-cv-04772-NRB    Document 61-2    Filed 01/12/23    Page 72 of 158

Page 71

clarification, counsel, the only redactions made are the names of the guests.  That's the only redactions that we made.

MR. MARIOTTI:  Okay.

MR. SOBEL:  Everything else is just coloration.

MR. MARIOTTI:  Understood.  That's helpful.  Thank you.

BY MR. MARIOTTI:

Q.    You mentioned this platform Alice.

A.    Yeah.

Q.    Would you communicate with massage therapists through Alice?

A.    Yeah.  We could, yeah.  There was a tab where you could, like, send an SMS text through.  I think, like, it came with, like, our own phone number so they would receive it, you know.  You could reach out to anybody that had a phone, you know, if you had their phone number. So, yeah, we could communicate with them that way. Or we -- yeah.  Or we could -- usually we would just pick up the phone and call them.  But, yeah, that was something that we could do.

Q.    Okay.  And did you do that yourself personally?

Page 72

A.    Yeah.  I think there was bound to be a few occasions where I sent a text through that program to a massage therapist, yeah.  I'm fairly certain there would have been occasions.

Q.    But usually you communicated over the phone?

A.    Yes.  Mm-hmm.

Q.    All right.  And then, below that, it says -- it says "concierge calendar" and "spa calendar."  What are the difference between those two seconds -- those two sections?

A.    Yeah.  So the top section, "concierge tasks for tomorrow," would be anything related to what we've got to do tomorrow, like call a restaurant as soon as it opens, you know, to try and reserve a table for such-and-such, things like that.

"Future concierge tasks to know about," again, if -- like this one here, yeah, somebody has a spa massage coming up on the weekend, you know, just, you know, to keep that in your mind.  So that section could relate to all of the tasks we do, whether it was, you know, spa, restaurant, theater tickets.

And then underneath the spa, where

Page 73

it says "spa calendar," that was just if there was any -- on the left-hand side, if there was any spa treatments from that day or, like, later that day after my shift, or if we reserved any spa services that day for a future date.  That's where they would go on that calendar -- I mean on that part of the handover e-mail.

Q.   I notice in this e-mail it says "guest has a 4:00 p.m. spa massage on Saturday with Yuri."  But that's not in the spa services section.  That's in the concierge tasks section.  Is there a reason for that?

A.   Because it obviously hadn't been booked that day.  If it was something that I'd have booked that day, I would have put it under-neath, you know, where it says "future spa services booked today."  But I guess that was already an existing task, you know, so I just put it there.  Yeah.

Q.   Got it.  Okay.  And then, at the bottom, I see it says "individual concierge notes" and it says "notes for Ben."

          At the time you were the only concierge.  Correct?

A.   Yeah.  I think, yeah.  2018, yeah.

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 75 of 158

Page 74

Uh-huh.

Q.   And it says "MID tomorrow."  What does that mean?

A.   Yeah.  That means I'm doing a mid shift, which is pretty much all I ever did when it was just me, yeah.  So I think I was usually 10:00 'til 6:30.

Q.   Got it.

A.   Yeah.

Q.   Meaning the time of day as opposed to --

A.   Yeah.  An early, middle, late, yeah.

Q.   Got it.  All right.  I'm going to go to the next -- well, actually, before I go here, before I move on, it says -- we went over this line before -- "Guest has a 4:00 p.m. spa massage on Saturday with Yuri."  Do you recall anything about that massage with Yuri other than what's listed here?

A.   If I'm remembering correctly, and the name has been redacted, but if I'm remembering the name from when I looked over these recently, I think that might be somebody who rebooked who asked for Yuri again.  I don't know if that was prior to this, what I'm looking at, or the next

A-332

Page 75

time she booked or he booked.  So, yeah, I think.
But I can't be 100 percent sure because it's been
redacted.

Q.    Got it.  And, just to be clear, this
indicates that the spa -- that the services of
Yuri were booked directly versus through a third
party?

A.    It would have still been the hotel who
reached out to Yuri to book it.  She would not
have called Yuri herself.  We would never give out
the contact information of the massage therapist
to the guests.  We would say, you know, if they
wanted a certain massage therapist we could
arrange that for them.  So, yeah, if they wanted
Yuri again, then, yeah, we would reach out
directly to Yuri.

Q.    But, just to be clear, when you were
booking a massage with Yuri, you would call Yuri
directly.  You weren't calling a third person or
company or something like that.  Correct?

A.    Correct.  Yeah.  He worked for
himself, yeah, from what I remember.  We'd call
him.  We had his number and we'd call him.

Q.    And, okay, one other question I should
ask before I move on about this packages inventory

Page 76

section.

    A.    Uh-huh.

    Q.    Can you tell me what that section is about?

    A.    Yeah.  It was because we handled all of the incoming packages for the guests and for any outgoing shipments as well from when -- you know, it happened every day, people would leave stuff behind by accident and we'd have to ship quite a lot of it back.  So that section "outgoing shipments" usually relates to that.

            And then the third section, outgoing/hold for pickup, is -- it's not the same as outgoing shipments.  Outgoing shipments was when it was like either via UPS or USPS or FedEx, whereas an outgoing/hold for pickup was when somebody staying at the hotel would leave us something like a jacket and say, "Oh, my friend such-and-such is going to come and pick this up," you know.  That's the out -- that's that section where it says "outgoing/hold for pickup," when things were left with us for somebody else to come and retrieve.

    Q.    Okay.  I'm going to go now to the next section -- or actually I should say the next page.

Page 77

This is page three of the exhibit.  And it says in this handover e-mail, which and I'll just note the subject says "concierge handover," it says: "Guest called me at noon asking to push back her 1:00 p.m. massage, which I knew nothing about, and hadn't actually been booked.  It turns out guest accidentally called Nautilus in Miami and scheduled the massage with them by mistake."

Is this something that happened to you prior to this or is this a one-time occasion?

A.    I think it was just a one-time occasion.  But, yeah, I think we looked into why that happened.  And I guess the Sixty Hotel's website had kind of been updated or kind of rebranded or, you know, and I think they copied and pasted like some parts of it from the Sixty LES and put it on the Nautilus information page as well.  So I think what happened was when they looked at -- or the other way around.  So when they looked at the Sixty LES page for the spa information, it said to call this number, and it was actually the Nautilus number because it had been copied and pasted but they forgot to, you know, change it to Sixty LES's phone number.  So we think that's what happened there.  I remember

A-335

Page 78

that.  Yeah.  That's funny.  Yeah.

Q.    Anything ever happen along those lines in other contexts at Sixty?

A.    I'm sure probably they did, funny things like that.  But none come to mind straight away.  Yeah, I'm sorry.

Q.    Okay.  This next -- next paragraph, it says:  "Purchased and placed Prosecco and box of sweets amenities in room prior to arrival today."  Was that for a VIP?

A.    No.  This looks like it would have been something else we've offered, which I've not talked about, is if somebody wanted to treat somebody staying at the hotel, we had like a menu of items.  Like we had a little wine list, chocolates, macaroons, just stuff from, like, local neighborhood kind of businesses.  We tried to, you know, support the local neighborhood.

So we'd often get people calling up saying, you know, "Hey, it's my wife's birthday, but I can't be there and I'd like to send her some flowers or something."  Or, you know, "Me and my husband are coming in on our honeymoon.  Can we get some champagne and like chocolate strawberries or something?"  You know, so we'd handle all that

Page 79

side of things as well.

So this -- this is going to be an example of that.  Somebody asked for Prosecco and a box of sweets to be put in their room before checking in.  Yeah.

Q.    I see below that whole section it says "Alice handover."  And you -- it's a little hard to read.

A.    Yeah.  That's what I was trying to read before, yeah.  It's kind of dark text, some dark background.

Q.    And then it says "what we need to know," something about Alice.  Do you recall what that says?

A.    Probably like what we need to know maybe about, like, upcoming tasks or pending tasks in Alice, something like that.

Q.    That's what it looks like.  Thank you for helping me --

A.    Yeah.  Sure.

Q.    -- understand that.

Below that, it says:  "Guest has arranged a 4:00 p.m. spa massage for his girl-friend next Saturday, September 30.  He would also like amenities of wine, roses, petals and candles

Page 80

to be set up in room during her massage. Signed --

A.    Mm-hmm.

Q.    -- "amenity form in drop file P."

What is the amenity form and what is drop pile -- file P?

A.    Drop file P, I imagine the last name of the guest or the last name of the person paying for it.  So this person's boyfriend would have started with P.  And that's how we filed our -- our signed amenity forms.

So, yeah, this person has called us or e-mailed us asking us to set up a 4:00 p.m. spa massage for his girlfriend the following Saturday and to almost -- and to also get wine, roses, rose petals, candles to be set up in the room for her massage.  Yeah.

Q.    Okay.  Below that, it says in the spa calendar:  "Guest had her 4:00 p.m. massage in the spa with Yuri.  All went well.  I restocked and remade the spa treatment room afterwards."

So how do you know that that massage went well?

A.    Because the massage therapist would come up after it's finished and to return the spa

Page 81

keys and the payment slip and exchange the payment slip for payment, and I would just, you know, ask them if everything was okay.  So, yeah, it was kind of relying on their word, what they told me.

So when I say "all went well," that's -- I mean there was no complaints, they were on time, and I spoke with the massage therapist afterwards and everything went well from what they told me.

Q.    And was it your practice to regularly ask the massage therapist after the appointment how the massage went?

A.    Yeah.  I would always, you know, just -- yeah, just to make sure everything was okay, at least myself I would always ask if everything was -- went okay.  And, yeah, almost always it was yes.  Yes.  Like I said, sometimes they were late and they'd say, "I'm really sorry."  But, yeah, I'd always ask.

Q.    And I think you testified earlier that your practice was not to call the guest afterward and ask them their views on the massage.  Correct?

A.    Right.  Correct.  Like if I knew what they looked like and then I saw them a little later if they were heading out and walking across

A-339

Page 82

the lobby and we'd smile and say hi, I'd say,
"Hey, how was your massage?  You know, was
everything okay."  If I knew who it was and I saw
them, I could put, like, their face to their name,
then, yeah, I would absolutely ask just out of,
you know, politeness and as a courtesy.  But it
was not a practice to actually call the room and
check.

Q.   Okay.  And, just to your knowledge,
there was no, like, e-mail form or other form sent
to the guests to get their comments regarding the
massage.  Correct?

A.   Correct.  I'm not sure if the hotel,
like, sends out any kind of generic survey
e-mails.  I'm not too sure how that kind of whole
side of things worked.  But, yeah, there was
nothing that I sent personally to that effect.

Q.   It says -- at the bottom, it says
"notes for Ben" and it says "off, back Tuesday."
Who would handle all of this while you were off?

A.   I know, right?  I guess the managers,
whoever was cc'd, basically the managers and the
front desk agents who were kind of starting to get
like the hang of, you know, kind of what I did and
things.  Yeah.

Page 83

Q.   All right.  Let's see here if there's anything else I want to ask about.  I apologize. I just recently received it, so I don't have my questions all written in advance for this.

A.   That's okay.  Take your time.

Q.   You know, on this, I'm looking now at page five of the exhibit, you know, here's another reference to restocking and remaking the spa treatment room --

A.   Okay.

Q.   -- where my cursor is here in the middle.  What was involved in restocking and remaking the spa treatment room?

A.   Yeah.  So that was one of our jobs, to make sure that the room was always stocked with towels and washcloths, to make sure that the massage table had fresh sheets on it and was made the way the massage therapists liked it to be made.  So sometimes -- well, most of the time, after a massage the massage therapists would remake the table with clean sheets.  But there were occasions where they had to rush off to their next massage at a different hotel, so the room was, you know, left with like a pile of used linens, you know, on the floor.

A-341

Page 84

So, yeah, we would just take out all the old, dirty linens, replace them with clean linens, make the massage table, set the lights down low, you know, so it looked like somewhere nice that you'd want to walk in to to get -- to get a massage.

Q.    Okay.

A.    Yeah.

Q.    It says, by the way, in the lower right:  "Still a few garment bags and tote bags to be picked up after Fashion Week."  Did Sixty LES do anything special in conjunction with Fashion Week?

A.    I don't -- it was always a crazy time. We had a lot of people staying there, a lot of groups.  So I imagine the sales department had some, you know, rates set up with these groups for Fashion Week.  So, yeah, that was something that was done through the sales team.  And, again, if it was like a VIP on my VIP list, a celebrity or something, then, yeah, I would arrange an amenity, you know, wine or something, yeah.

Q.    Sure.  Okay.  And one other thing here regarding the guest who booked Yuri and requested him again.  Do you recall anything about that

Case 1:20-cv-04772-NRB    Document 61-2    Filed 01/12/23    Page 86 of 158

Page 85

particular guest and that booking of a massage?

A.    No.  No.  Just because it was just another interaction in my day with lots of interactions.  And I would have maybe recognized who it was on the phone if I took this over the phone.  Or she may have come up to me straight after the massage and said, "Hey, that was great. I'd like to rebook him again same time next week," or whatever.  But, yeah, that's probably how that interaction would have gone.

I'd have said, "Yeah, no problem. Did you have a time and day in mind?  Male or female?"

And that's, you know, probably when she said, "Oh, I'd like to use Yuri again."

But I can't be 100 percent sure exactly how that happened on this particular occasion.  But that's like an example of how it could have gone.

Q.    So it's not uncommon for guests to request the same massage therapist a second or third time?

A.    Yeah, no, not uncommon.  Yeah.

Q.    Okay.  And then there have been some references in this document to the term "Paris."

A-343

Page 86

I'm now looking at page seven.  What does --

A.    Okay.

Q.    -- that mean in this context?

A.    Paris is a limousine and car service company that the hotel, I think, contracted with. So whenever we had any requests for a car service, whether it was in and around Manhattan or picking up or dropping off at any of the airports, that's who we used.

Q.    And in the spa calendar section it talks -- there's a discussion of a massage in the spa with Yuri, and it says:  "Yuri arrived late due to traffic/parking, but the guest was understanding."  You sent her an apology amenity. Do you recall what would typically be sent as an apology amenity?

A.    Probably a wine, like a red wine, yeah, 'cuz we had them on site.  It's not some- thing I'd have to head out to pick up.  So, yeah, unless, you know, there was something on my profile saying that she didn't drink or something, you know.  But, yeah, it was -- like probably 90 percent certain it was probably a red wine or a sparkling wine or something.

Q.    Got it.  I think you testified earlier

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 88 of 158

Page 87

it was a frequent issue that masseuses would be late due to traffic or parking, things like that?

A.    Fairly frequent, yeah.  And many of them came in on the subway as well.  And, yeah --

Q.    Okay.

A.    -- they probably arrived late as often as I did using the subway, you know, so.

Q.    Sure.

A.    Not every time.  But, yeah.

Q.    All right.

A.    It would happen.

Q.    I'm done with this exhibit.  I'm going to take another short break now, I promise --

A.    Okay.

Q.    -- and not as long as the last one.

A.    Okay.  No problem.

THE VIDEOGRAPHER:  Going off the record.  The time is 1:07 p.m.

(A break was taken from 1:07 p.m. until 1:16 p.m.)

THE VIDEOGRAPHER:  Going back on the record.  The time is 1:16 p.m.

MR. MARIOTTI:  Thank you.

BY MR. MARIOTTI:

Q.    All right.  I'm going to show you

Page 88

another exhibit.  Okay.  So do you recognize this exhibit?

A.    Yes.  This is a spa gift certificate coupon.

MR. MARIOTTI:  And I'll ask that we deem this to be marked as Exhibit 3.

(Exhibit 0003 was marked.)

BY MR. MARIOTTI:

Q.    Is this another document that you provided Mr. Sobel yesterday?

A.    That's correct.

Q.    And what search did this -- did this arise from?

A.    When I was searching my gmail, I think I must have put in "spa" as a key word when I found this spa menu.  And then this was also in there as well.  It was attached.  So, yeah, that's how I found it.

Q.    Were there any other spa documents or e-mails that came up that we haven't discussed today?

A.    Let me think.  Nope.

Q.    Okay.

A.    Yeah, just the menu and then this coupon.

A-346

Page 89

Q.    Were there any other documents that you provided to guests relating to the spa that you can recall other than the menu and this coupon?

A.    Yeah.  Just the paid out that they had to sign to have it charged to their room.  Yeah. That was in there.

Q.    Okay.  So it says here -- on this page, it says at the top:  "Alex Pall would love to offer you, with compliments."  Below that, it says "a 60-minute massage."  Who is Alex Pall?

A.    That would have been probably the last person who bought a spa certificate for a hotel guest.  So, yeah, we would just update the name and update if it was a 60- or 90-minute massage. So, yeah, this was just like a template that we would use and update and then print out on a -- on like a note card and provide to the guest, or we would e-mail it to the guest if they weren't at the hotel yet, you know.

Q.    So this was a -- almost like a gift card of sorts that would be gifted to a guest so that this way they could use that to obtain a massage at no charge?

A.    Correct.  Yeah.  Yeah.  So it would

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 91 of 158

Page 90

be, in this case, Alex Pall who would pay for it. So, yeah.

But this -- this rarely happened. It's not something that happened often.

Q. Okay. Yeah, in your time at Sixty LES from 2014 to 2019, how often do you recall this occurring?

A. Maybe two or three times, yeah.

Q. Now, I notice at the bottom it says: "Treatments are available daily between the hours of 10:00 a.m. and 8:00 p.m. but do require advance notice as we work with freelance massage therapists." Do you see that?

A. Yeah. Mm-hmm.

Q. Who wrote that language about the freelance massage therapists?

A. I can't remember if it was myself or if it was the person who trained me and kind of created all these menus and things originally, Noah Lemaich, Lemaich. Yeah.

Q. And this language didn't appear in the menu that we saw previously. Do you recall that?

A. Yeah. The word "freelance" is not in the menu and it is here in this one. Yeah.

Q. Do you know why that is?

A-348

Page 91

A.    I don't.  It was -- it probably should have been like the same verbiage.  But, yeah, I'm not sure why it's not exactly the same.

Q.    Do you -- do you know whether this -- this verbiage of "freelance massage therapists" was used anywhere else in writing by Sixty Hotels?

A.    I'm not sure.  I'm not sure.

Q.    Okay.  Okay.  I have nothing further on this one.

I'm going to show you another exhibit.

A.    Okay.

Q.    And this is -- so this you did not provide yesterday.  This is something else.

I'm going to ask that this is deemed to be marked as Exhibit 4.

(Exhibit 0004 was marked.)

BY MR. MARIOTTI:

Q.    And I will zoom in so that --

A.    Okay.

Q.    -- you're able to see it a little bit better.  Can you -- can you read it at this zoom or do you need me to zoom in further, sir?

A.    Yeah, I can make it out.  Yeah.

Q.    Okay.  I'm trying to -- let me see if

Page 92

I can find -- I could do a little better job on this.  That might be better.

A.    Okay.  Yeah, that's -- that's good.

Q.    Okay.  Are you -- are you familiar with this exhibit, sir?

A.    No, I'm not.

Q.    Okay.  Does the layout or in typing -- typeface of this exhibit look familiar to you?

A.    Yes, it does.  It's been a while since I've seen this program.  Yeah.  But, yeah, it looks familiar.  I understand it.

Q.    Is this somehow related to that Alice system that you discussed earlier?

A.    This looks exactly like a screenshot from Alice.

Q.    Okay.  And I -- did you -- did you see screens like this when you worked at Sixty LES?

A.    Every day.  Well, every day once we started using it.  Yeah.

Q.    Yeah.  When did that start?

A.    It was probably like around halfway through my time there, so maybe like 2016, 2017 probably.

Q.    Now, for a particular massage appointment, you talked about that paid out

Page 93

document that would be created.

A.    Yeah.

Q.    Other than the paid out document, would this be the only documentation that there would be of a particular massage appointment?

A.    Yes.  Unless it was something I also added to that handover shift report.  Yes. Sometimes as well maybe if something was booked on my day off, I'd have been e-mailed by whoever booked it just to say, heads up, this was booked while you were off and it's coming up, you know, in a couple of days, for example, or whatever.

And, you know, it should have been logged in Alice.  Like I said, not all the time it was.  But, yeah, this one looks like it was, it was logged.  So that's good.

Q.    Yeah.  Now, you did testify earlier that you searched your e-mail for Ms. Betts's name.  And --

A.    Right.

Q.    -- you did not receive any reply -- any results from that search.  Is that correct?

A.    That's correct.  There was zero search results.

Q.    Okay.  Would that indicate that your

A-351

Page 94

private e-mail doesn't contain any records related to her spa appointment?

A.   Correct.

Q.   Okay.  So in the center left of this document -- and I'll put my mouse there so you can see where I'm referring to -- there is a line that says "therapist" and then to the right it says "Laura" and then in parentheses it says "massage, female."  Do you see that?

A.   I do, yeah.

Q.   In this context what does "Laura, massage, female" mean?

A.   Well, if I did not know about this particular massage and I looked at this, to me that would tell me that Laura was the massage therapist who came in to give that massage.

Q.   Does this suggest that Laura was scheduled to handle the massage?

A.   That could have been.  It could have -- could have been just a general oversight by whoever logged it.  It could have maybe been that they tried to call Laura first and Laura couldn't do it so they tried to secure an alternative therapist and maybe just forgot to update it.  Yeah.  But, yeah, that should probably

Page 95

say "Yuri" there instead because, yeah, it was him who did the massage obviously.

Q.   Now, to the right where it says "massage, female," if Yuri's name was in that line or that entry, would it have said "massage, male"?

A.   Yes, it would.  Yeah.

Q.   Okay.  And when using Alice, would the person, the user, have had to type in the name "Laura" or would there have been a drop-down menu to select Laura or Yuri or another name?

A.   I can't remember.  I can't remember if there was a drop-down.

You could absolutely type it in and then it would appear, you know.  If you started typing "Laura," it would automatically, you know, choose everybody who's in the program called Laura.  I think we only had the one.  So, yeah, you would just start to type it and then choose it, you know, from what I recall.

Q.   And did you know any massage therapists named Laura who provided services to guests at Sixty LES?

A.   Yeah.

Q.   Do you know her last name?

A.   No.  I think I've seen it on her

Page 96

license.  I think she was one of the ones who provided the license 'cuz we used her the most for a while.  But, yeah, I don't recall what it was.  I think it was like a fairly long European name.

Q.   When you say we had the most for a while, what do you mean by that?

A.   Just because she was so reliable and she was kind of always available, she became our kind of number one person to call until, like, we started like using Nomi, you know.

Q.   Got it.  And was Nomi male or female?

A.   Nomi, they had male and they had female as well.

Q.   Got it.  Oh, that's right.  I apologize.  That was the name of the service.  Yes.

A.   Yeah.  Yes.  So, yeah, yeah, yeah.  The company Nomi, yeah.

Q.   To the right, I notice that it says "gender preference," and then that line is blank.  What, if anything, does that indicate?

A.   Yeah.  There would have been a little drop-down there if you clicked into it that said "male," "female," or "no preference," or you could leave it blank.

Page 97

So, yeah, ideally that should have been put in.  Even if it was no preference, we did prefer them to put "no preference" rather than leave it blank because it's still a little bit ambiguous.  But I can't really blame any front desk agent for not filling out this properly because they were never properly trained on it.

Q.    Got it.  And but what this would indicate to you is that there was no gender preference?

A.    It would indicate -- it would indicate there was either no gender preference or it just wasn't noted if there was a gender preference.  And I couldn't be 100 percent sure if there was no gender preference.

Q.    Okay.  Now, below that, it says "posted by" and then to the right it says "Shanel."  Do you see that?

A.    Yeah.

Q.    What does that mean?

A.    That means that Shanel was the person who provided the massage therapist with the payment with the cash from her -- her money 'cuz I don't think the front desk agents had a bank.  I think it was just the concierge and I think the

A-355

Page 98

individual managers had their own.  Because if I was not there to pay the massage therapist, it would have been Shanel who paid the massage therapist from her bank and then she would have posted the charge to Margaret's room bill, you know, Ms. Betts' room bill.

Q.    And, just for clarity, who is Shanel?

A.    Shanel was one of the managers at the time.  I think she was an assistant or an office manager.

Q.    And her last name was?

A.    I don't remember.

Q.    No problem.  Okay.

A.    Sorry.

Q.    And it says, by the way, above that it says "in-room spa massage" as "comments for guest."  What would that indicate to you?

A.    That it was not in the spa treatment room, that it was to be in the room.

Q.    All right.  I'm going to turn to the next exhibit.

Well, actually before I do that, in the lower left it says "price quoted, 150."  Do you see that?

A.    Yeah.

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 100 of 158

Page 99

Q. Is that the standard price for a 60-minute massage at Sixty Hotels at that time?

A. Yeah. That sounds right, yeah.

Q. Okay. And I notice here, by the way, the number below Ms. Betts's name is 1801. Was that a room at the hotel?

A. That is, yeah.

Q. Was that --

A. Or it was. That was one of the penthouses. Yeah, that was penthouse one, I believe.

Q. Okay. And have you been inside penthouse one?

A. Yes.

Q. What did it look like?

A. It was pretty big. All three penthouses kind of -- they're a blur to me now like what -- how one is different from two is different from three. But I think most of them had like a little upstairs bit, like a little duplex with a bed up there, and then down was like a big table, a little kitchen, and another bedroom at one end of the penthouse and then like a lounge area at the other end of the penthouse.

Q. Okay. And was it safe to say that the

Case 1:20-cv-04772-NRB    Document 61-2    Filed 01/12/23    Page 101 of 158

Page 100

penthouse rooms were the nicest rooms in the hotel?

    A.   Yes.  Yeah.

    Q.   Okay.  I'm going to show you another exhibit.  One second.  I believe we're on Exhibit 5.  Is that -- am I right about -- okay.

          (Exhibit 0005 was marked.)

    MR. MARIOTTI:  So I'll ask that we deem this as if it has or treat this as if it has been marked as Exhibit 5.  I'll note for the record this document has a defendant's exhibit label at the top.  But that is the only copy of the record that we've received from the defendants, and, nonetheless, I'm marking it as Exhibit 5 in this deposition.

BY MR. MARIOTTI:

    Q.   Do you recognize this document, sir?

    A.   Yeah.  That looks like a paid out receipt.  This was a generic version of the paid out receipts.  We had like -- we had ones that if it was booked by me I would print it out on one of those note cards and it would look a lot nicer.  This was -- this type of paid out receipt was available to all of those who worked in the front office.

Page 101

So, yeah, whenever we used money out of our bank, whether to pay a massage therapist or to run out and pick up some flowers that somebody else was paying for, not the hotel. So if it was being paid for by a guest or being paid for by a loved one who wanted to treat a guest, that's when we'd use a paid out. So these were the slips that we would use that would be signed by the guest.

Yeah, I can tell that this is one that was done by the front -- the front office team, not the concierge, not me the concierge, because I usually printed it out our own. It looked -- it had all the same kind of information on it, it just looked a little less formal.

And -- yeah. And it would be signed by the guest at the end of their massage. They could add on any gratuity if they wanted as well. And then the massage therapist would bring this slip back up to either myself or, if I wasn't there, to the front desk. And the manager would clock the final total, in this case 150, and then post that charge to room 1801 in this case and then give the massage therapist whatever the final total is on the paid out receipt.

A-359

Page 102

Q.    So this particular receipt, it has the date October 19, 2018, on it.  Does that indicate that that is the date that the money was paid for this particular massage?

A.    Yes.

Q.    And then it says "Margaret Betts, 1801."  Does this indicate that this was a massage that was provided to Ms. Betts who was staying in that room at that time?

A.    That does, yes.

Q.    Okay.  And then, below that, it says "60-minute spa massage, $150."  Does that indicate that $150 in cash was paid out by the hotel for Ms. Betts's massage?

A.    Correct.

Q.    And who was that cash paid to?

A.    I imagine it was paid to Yuri if Yuri did the massage.  But just looking at the last exhibit that you gave me, if I knew no better, I would have presumed that Laura was the one who came in for that massage and was paid.

Q.    And, to your knowledge, did the hotel provide any tax forms related to the cash payments made by massage therapists --

A.    I don't know.

A-360

Page 103

Q.    Okay.

A.    Yeah, I don't know.

Q.    And directing your attention to the bottom right corner, there appears to be a signature.  Would that be the signature of the guest?

A.    Yes.  That should be the signature of the guest.

Q.    Would the hotel have any other records that would reflect who this payment went to?

A.    Only what is logged in Alice and the spa paid out receipt and maybe the handover e-mail.  Yeah, I think that would be the only record, yeah.

Q.    Yeah, we mentioned -- we had discussed earlier that Ms. Bets was staying at a penthouse room.  Did the elevator from the lobby enter directly into room 1801, to the best of your --

A.    Yes.

Q.    Okay.

A.    Yeah, it did.  Yeah.

Q.    Okay.  I'm going to take this down. I'm done with this one.

Okay.  At some point did you become aware that Ms. Betts reported that she was

Page 104

sexually assaulted at Sixty LES?

A.   No.

Q.   So you are not aware of any investigation that was conducted related to Ms. Betts's assault?

A.   I was not.

Q.   Okay.  And back in October of 2018, did Sixty LES have any policies regarding guest complaints?

A.   No, nothing.  No kind of standard, you know.  Just to use our own kind of experience to, you know, handle -- handle complaints.  But there was no kind of -- like each individual complaint would be kind of judged on its own kind of to see how we would respond or compensate, you know.

Q.   Got it.  No policies regarding, for example, investigating complaints of specific types?

A.   Not that I was made aware of, no.  Maybe the managers, the front office managers, were kind of privy to that.  But, yeah, the only complaints I really got is if I sent somebody to a restaurant and they didn't like it.  Yeah.

Q.   When Ms. Betts reported this alleged assault back in October of 2018, did the hotel

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 106 of 158

Page 105

know the identity of the massage therapist who was sent to her room?

A.     When you say "the hotel," do you mean did the hotel know the identity?

Q.     Yes.

A.     Like a particular staff member or every staff member?

Q.     So, well, I just mean did any -- let me -- let me rephrase the question.

Did anyone at Sixty LES know the identity of the massage therapist who was sent to her room?

A.     I couldn't say 100 percent if whoever was working that shift and interacted with Yuri knew him.  But we have used him in the past.  So this is an absolute chance that they may have known him.  But most of the time any kind of spa interactions were done through the concierge, so. And they were always slammed with the work they had to do.  So whether they actually picked up on, you know, this massage therapist in particular as somebody they recognized, I can't really speak for them.  I'm not too sure.

Q.     Back in October of 2018, did anyone at the hotel know Yuri's last name?

Page 106

A.   That was it.  Because I didn't.  So I'm not sure how any other staff member would have known it.  I'm not sure.

Q.   And at the time back in October of 2018, were there written agreements or contracts with these individual massage therapists who the hotel used?

A.   Not that I was aware of.

Q.   Okay.  Do you know whether or not Yuri has been further identified since October of 2018?

A.   I don't know.

Q.   Okay.  Do you know after -- after Ms. Betts reported this -- this incident whether or not the hotel reviewed security camera footage?

A.   I don't know that either, no.

Q.   Do you know whether the hotel took any steps to investigate this matter?

A.   I don't.  I know that it was kind of around this time that I was told not to book any more spa treatments and to also look into transitioning to like a proper, like, company, such as Nomi.  Or Zeel I think was another one we kind of compared.  But, yeah, that was all kind of around this time, like late 2018.

Q.   You don't -- you had testified you

Page 107

don't recall any conversations with Ms. Betts.  Is that right?

A.    Yeah.  That's -- that's correct.  I did not recall any conversations with Ms. Betts.

Q.    And do you have any knowledge of any conversations that other hotel employees had with Ms. Betts?

A.    No.  I've not heard that name ever before until -- until this week, you know.

Q.    Sure.  Yeah.  Until you were preparing for this deposition?

A.    Yes.  Yes.  Exactly, yeah.

Q.    Are you aware of any law enforcement or government investigation into Ms. Betts's assault?

A.    No.

Q.    Okay.  So you've never seen or are aware of a subpoena that was sent to the hotel?

A.    No.  That was not shared with me, no.

Q.    Now, you had talked about Zeel and Nomi and so forth a moment ago.  Do you -- do you know -- were you told at the time why the hotel began a changeover of its massage services?

A.    No, I was not told why.

Q.    And you had talked about I believe it

A-365

Page 108

was Nomi was chosen by the hotel at a certain point and they started using Nomi.  Do you know whether the hotel had a written contract with Nomi?

A.   I'm not 100 percent sure.  I think I remember reaching out to Nomi to ask for their certificate of insurance.  Yeah, that does ring a bell, me asking -- or being asked, you know, to see if these companies could provide certificates of insurance.  That's something that I recall.

But, again, it was kind of not long after this that I left my job there.

Q.   Got it.  Do you know whether or not Nomi made any representations to the hotel about the specific massage therapists that they provided?

A.   Can you repeat that?  Sorry.

Q.   Sure.  Do you know whether Nomi made any representations to the hotel about the massage therapists that they provided?  In other words, let's say regarding their licensing or certifi- cations or anything else.

A.   Not specifically.  I mean I -- no, not that I -- not that I recall --

Q.   Okay.

A-366

Page 109

A.    -- yeah.

Q.    Do you know whether the hotel took any steps to vet the massage therapists at Nomi?

A.    I don't know.  I don't know.

Q.    Yeah, that's fine.

Did you ever -- did you ever book a massage at Nomi?

A.    Yeah.  I've reserved a few through Nomi for sure.

Q.    And how did that -- how was that process?

A.    Yeah.  It was -- they set us up with like a login and we had our own, like, hotel profile on there, and then you could select the date, select the time, select the type of massage, select a male or a female.  I think it might have even let you choose the person, not just male or female, I think.  It's a bit hazy.  Or it might have said "male" or "female" and then once you clicked "next" it would say like such-and-such she is available or he is available.  Yeah.  That kind of process is how I remember it.

Q.    And were you -- were you provided the last names of the massage therapists through that system?

A-367

Page 110

A.   Through Nomi?  I can't remember.  I can't remember.  Yeah, I kind of -- yeah, to me, it was just Nomi, you know.  Yeah.  It was just -- I must have read on their website that everybody they use was certified or I assumed or presumed that they did just 'cuz they looked like or seemed like a legitimate company and why wouldn't you have, like, licensed massage therapists.

So, yeah, I think when you could choose in Alice who the massage therapist was, like that last one it said Laura, I think, from my recollection, there was just one that said Nomi so that you would just choose Nomi.

And then I'm not sure if I ever did this, but you could type in that ticket any extra notes.  So if I clocked [sic] the name of who it was at Nomi I would have put, you know, Nomi selected John to come and do the massage or whatever.  But, again, I might have done that for a few of them.  I probably didn't do that for all of them.  I might have not have even done them for any of them.  But, yeah, there was a space where you could have done that, you know.

Q.   Okay.

A.   But it's not procedure.

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 112 of 158

Page 111

Q.    All right.  Anything else about the process of booking a massage or handling the massage therapists when they arrived at the hotel that changed once there was a switchover to Nomi?

A.    No.  Although, I forget how payment worked at Nomi.  Whether -- yeah, I really do forget if we still did that whole using our bank and doing the paid out slip and paying the Nomi therapist in cash or whether the hotel paid Nomi and we got like a credit when we logged in and you could see, you know, how much money you had left to assign to massages.  I can't remember the payment process when it comes to Nomi.

But when the massage therapists arrived, and it was the same deal, we would escort them down to the spa treatment room because it was likely that they had probably not been to our hotel before.  Maybe they had.  I don't know how big their team of massage therapists was.  But, yeah, I would escort them down with the key and open the door for them and let them know, you know, I was at the desk if they needed anything and -- or I'd escort them to the room if it was an in-room one, yeah.

But, yeah, I can't remember what we

A-369

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 113 of 158

Page 112

did about payment.

Q.    Okay.  Okay.  I am going to show you another exhibit.  Hold on one second.

A.    Okay.

THE VIDEOGRAPHER:  Your audio is getting a little faint again.

MR. MARIOTTI:  It is?  Okay.  I'm trying to -- trying to stay close to the micro-phone.  Thank you for making me aware of that.

All right.  Okay.  I'm going to ask that we deem this to be marked as Exhibit 6 for this deposition.

(Exhibit 0006 was marked.)

BY MR. MARIOTTI:

Q.    Do you see it in front of you, sir?

A.    I do, yes.

Q.    And do you recognize this exhibit?

A.    Not this particular one.  But I recognize the format, yeah.  And it is -- it looks like a folio, or a receipt, for somebody's stay at the hotel.

Q.    Okay.  And I'm going to look now -- well, first of all, I will note that it has the name "Ms. Margaret Betts" on the left and an address, and then on the right it says arrival

Page 113

October 19, 2018, departure October 21, 2018.  Do you see that?

A.    I see that, yes.

Q.    And the room number is 1801.  Correct?

A.    Correct.

Q.    So now I'm going to scroll down to -- it says "invoice."  Is that -- is this essentially a bill?

A.    Yes.  Mm-hmm.

Q.    So, below that, there's various lines with charges on them.  And the second line item on the first page says "paid out" and then it has a charge of $150.  What does that line mean, sir?

A.    So, yeah, now looking at this, it seems that it was the same kind of payment method we would do with our previous massage therapists who weren't with Nomi.  It looks like, yeah, it was a paid out -- oh so, sorry, because this wasn't with Nomi, was it?  No.  'Cuz this was not with Nomi.

Yeah, the paid out is the spa paid out receipt that -- that Shanel paid from her bank.  And I imagine she was the one who posted this charge to this invoice/bill/folio/receipt.

Q.    So this -- this indicates that the

Page 114

guest in this case would pay the hotel for the massage?

A.   Yes.  Yeah.  So, yeah.  That's -- that's right.

Q.   And that's typically how this was done.  Is that fair to say?

A.   Yeah.  That's fair to say.

Q.   I'm going to turn now to the second page.  And there's some entries that are dated October 25, 2018.  Do you see those?

A.   Yes, I do.  Uh-huh.

Q.   So the first entry is dated October 25, 2018.  It says:  "Paid out.  60-minute spa treatment.  Guest recovery posted to lost interface from RESV_name_ID=709596 status=checked out.  Lost interface 9500 Betts Margaret 1801." And then there's a negative $150 charge.  What does that line indicate?

A.   That indicates to me that, yeah, she was refunded on the 25th of October, 2018, the full price of the massage.  It was refunded to her Visa.

Q.   Okay.  And does this line indicate anything else about that refund other than what you've already told us?

A-372

Page 115

A.    That it says "guest recovery."  So that would appear to me that there was an issue and that's why she was refunded.  Not like she was charged twice or anything because it would have said like "duplicate," you know.  Because it says "recovery," that indicates to me that there was a complaint or a miscommunication and the guest was refunded on the 25th.

Q.    And that's what "guest recovery" means in this context?

A.    That's correct.  Yeah.

Q.    And, below that, there's a line that says "Visa refund $150."  Does that indicate essentially the same thing, that the money was put on her Visa card?

A.    Correct.  Yes.  It went back to her card then ending 6474.

Q.    And I take it you weren't involved with this refund in any way?

A.    That's correct.  I was not.

Q.    So you don't know why exactly the refund occurred.  Correct?

A.    That's correct.

Q.    You've never discussed this refund with anyone?

Page 116

A.    No.   This is the first time I've seen this refund.

Q.    Have you ever dealt with any other refunds for a massage therapy appointment?

A.    I'm trying to think if like maybe -- I'm thinking if, like, one of the massage therapists was ever, like, so late that we just said, "Hey, you may as well turn around and go home.  Don't bother coming.  We're just going to refund the guest."  That may have happened.  But never for any like -- for any negative experience from the massage itself.  I've never seen or refunded a guest that I can remember.

Q.    Okay.  I'm -- I am done with this exhibit.  I'm going to close this out.

During the time that you worked at Sixty LES, did the hotel use any outside vendors or independent contractors for other things other than massage services?

A.    We used the limousine company, Paris Limousine.  Services?  Not that I can recall.  Independent contractors?  No, not that comes to mind.

Q.    Regarding Paris, was that sort of a proper company?

Page 117

A.    Yeah.  Yes.  I think quite a few hotels in Manhattan have contracts with them, yeah.

Q.    They had a number of different employees that you interacted with?

A.    Yes.  Quite a few drivers.  I'm not sure exactly how large their fleet of cars was. But, yeah, it was a pretty big operation.

Q.    Do you know what Sixty LES's process was for choosing Paris over another company?

A.    I don't.  I don't.  I'm sorry, no.  It was already in place when I started.

Q.    Got it.

A.    Yeah.

Q.    Were they used the entire time you were there?

A.    Yes, they were.

Q.    And did Sixty --

A.    I think -- I think, yeah, I think they were, yeah.

Q.    And did Sixty LES have a written contract with Paris?

A.    Not that I saw.  I think I was told that they were contracted with them when I trained with Noah.  But it's not something I saw.

A-375

Page 118

And, yeah, there were times that we kind of wished we could use other car services because sometimes we had problems with them.  And then they were kind of expensive as well.  But, yeah, he was like, no, it's just who the hotel uses, that's who we use.  Yeah.

Q.    Okay.  How -- what sort of problems did you have with Paris?

A.    Again, traffic.  There was often some people when they got off a flight they were unable to, like, locate them at the airport.  Yeah.  Nothing too crazy or major.  Just kind of typical New York problems.  I guess, you know, traffic, yeah, and running late sometimes.

But, yeah, they were always, you know, professional.  And the cars were really -- they were kept really nicely cleaned and they always looked immaculate.

Q.    You know, we -- you had mentioned earlier that you had a concierge e-mail account that you had access to.

A.    Mm-hmm.

Q.    Who had access to that?

A.    I don't know.  I don't know.  I know whoever was working as a concierge definitely had

Page 119

access to it.  I don't know if any of my superiors did.  But, yeah, it was just pretty much myself who would, you know, keep an eye on it at the end, you know.

Q.   What -- did you have a separate e-mail account from Sixty other than the concierge account?

A.   No.  I don't think they ever gave me, like, a personal one.  Yeah, I always just used the shared one.  Even I think when I was given the manager title, the guest experience manager -- maybe then they did.  I think maybe they did give me my own e-mail then, but it was just like a carbon copy of the -- it was just like it came through to my personal e-mail but it was actually just that shared conciergeLES@SixtyHotels e-mail. But, yeah, just going by memory.

Q.   And did you use the concierge e-mail account to communicate with your co-workers other than that one e-mail that you already showed us that you would have at the end of the day?

A.   Yeah, I would, yeah.  Yeah.  That's why -- that's the e-mail I would use, yeah, to e-mail.  Not often like the agents at the front desk because I could just, you know, talk to them

A-377

Page 120

when I had a minute.  But usually the sales team because they were, like, downstairs and the GM and accounting because they were all in that space downstairs at the hotel.  So yeah.

Q.    You were up front near the front desk --

A.    Yeah.  Exactly.  Yeah.

Q.    Okay.  And you -- I know we've also seen your personal e-mail account.  Did you ever use that to communicate with co-workers when you were at Sixty?

A.    No.  No.  It was always -- I liked to kind of keep that, you know, separate from the co-workers, yeah.  Yeah.

Q.    What -- did you ever use either of the e-mail accounts to communicate with any of the massage therapists?

A.    I don't think so.  I don't think we had their e-mail addresses, no.  It was just their cell phones.  I think I reached out to maybe Nomi, the company Nomi, to their -- I think they had an e-mail account that I probably reached out to a couple of times.  But, again, I would usually just phone them.  Or if I needed to speak to one, I'd phone them.  Or I would just reserve the massage

Case 1:20-cv-04772-NRB    Document 61-2    Filed 01/12/23    Page 122 of 158

Page 121

through the website, you know.  But, yeah, I don't think we communicated with any massage therapists via e-mail.

Q.    And what about with any hotel guests, did you communicate with any of them via e-mail?

A.    Yeah.  Yeah.  All the time.  Yeah. That was usually the way to have it.  That was my preferred way rather than speaking on the phone. Even though speaking on the phone was quicker, it was always good to have something in writing, you know, sent.  But I was always back and forth with them mainly regarding like restaurants, you know, them wanting to know if I've heard back yet regarding availability and things like that.  And, you know, it was at the time when everybody has got a smart phone now and the e-mail, you now, it comes right up.  So, yeah, I would always e-mail the guests.

Q.    And did you use any other e-mail accounts as an employee of Sixty other than the two we've already discussed?

A.    No.  No.  I don't think so, no.

Q.    Other than this -- this -- the allegations made by Ms. Betts, to your knowledge has the hotel ever received complaints or been

Page 122

notified of any other incidence of sexual assault at the hotel?

A.   No, not that I'm aware of.  No.  And even if there was, I don't think it would have been shared with me.  If this one was not shared with me and it was, you know, relating to a massage which is -- like, falls under the concierge kind of umbrella and I wasn't made aware of that, then if there was anything else then I'm, you know, pretty much 100 percent sure it wouldn't have been shared with me.

Q.   Now, we've talked previously today about complaints that people would have about massage therapists being late, things like that.

A.   Mm-hmm.

Q.   Other than this -- this purported incident, has there ever been any other complaints of serious misconduct by a massage therapist that you're aware of?

A.   No.  I would have remembered that, yeah.

Q.   And any -- do you know of any other allegations made about criminal conduct at the hotel other than this -- the allegations here?

A.   Criminal conduct, no.  I'm just trying

Page 123

to think.  Like, I don't remember if the police were ever called for anything.  I mean there was some times like drugs were, you know, found in the room and drug paraphernalia in the rooms.  But, again, that's not anything that was, like, my department or, you know.

Q.   Sure.  Now, I know we talked about your current employment.  And obviously your employment at Sixty was started in 2014.  Did you work at any hotels prior to that?

A.   Yeah.  I transferred actually from another Sixty property at the time.  I don't think they -- it's in their portfolio anymore.  But at the time it was called 6 Columbus, and that was in Midtown, where I was a concierge there I think for about like 18 months.  And then -- and then, yeah, I transferred down to Sixty LES in 2014.  Yeah.

Q.   Is that in Columbus Circle?  Is that where the 6 Columbus was?

A.   Yeah. It's -- yeah.  It's right by Columbus Circle, yeah.  It's just opposite the Time Warner Center.  Yeah.

Q.   Been there.  Been there many times.

A.   Oh, yeah.  Okay.  Yeah.

Q.   So regarding that property, how was

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 125 of 158

Page 124

the management of that -- of 6 Columbus versus the -- compared to the Sixty LES property?

A.    In what ways?

Q.    Well, how was it -- how was it -- was it managed the same in terms of was it more -- let's put it this way, which one was managed more efficiently?

A.    Probably 6 Columbus just because it was -- it was smaller.  It was a bit more low key. It was just not as crazy.  It was a little bit more kind of refined, the clientele as well.

Whereas, Sixty LES, yeah, because it was just really trendy.  It was always really busy.  They had like the pool, they had the pool there, so it was always crazy in the summer.  They have like the rooftop bar there as well.  So, yeah, there were more moving parts at Sixty LES and, like, everybody seemed kind of stretched thin.

Q.    What about the management of the spa services at 6 Columbus, was there --

A.    There was no spa there, no.  No spa. But they -- we did -- I think they did -- we did in-room massages there.  Yeah, there would have been.  But it was not something that was requested

Page 125

often there.

Q.   And was -- were there, like, cards that were put in the room regarding in-room massage, you know, the way that there were in Sixty LES?

A.   I don't remember.  Yeah, I don't recall.

Q.   Okay.

A.   Yeah.

Q.   All right.  Let's see here.  And do you know for the -- for the massages, in-room massages, at 60 Columbus --

A.   6 Columbus.

Q.   Six.  Excuse me.  Were those using outside vendors?

A.   Yeah.  Yeah.  They were outside vendors.

Q.   And do you know anything about those?  Do you remember anything about the outside vendors?

A.   I'm trying to recall who they were, and I don't really remember.  I mean I was there a year and a half, but it seems like it had flown by.  And we didn't do it that often.  So I'm just trying to think who it might have been.  It might

Page 126

have been Laura.

Q.    Hmm.

A.    But, yeah, I can't -- I can't remember.  Yeah, I can't put a name or a face even really 'cuz it kind of happened so rarely there.

Q.    Have you worked at any other hotel that has provided in-room massage?

A.    Before that, before 6 Columbus, I worked -- my first hotel job was The Nolitan in Nolita.  And it's going back -- and I can't -- I don't think they offered massage.  I can't remember.  And I was not concierge there either, so I probably wouldn't have paid attention anyway.  Yeah.

Q.    All right.  I am going to -- I think I may be done with my questions.  I'm going to just take a quick break and check my notes, and then I'll come back.  Hopefully I won't have any more.  But, if I do, I'll -- it will be --

A.    Okay.

Q.    -- it will be very few.

A.    Okay.  I'll be here.  All right.

THE VIDEOGRAPHER:  Going off the record.  The time is 2:13 p.m.

/ / /

A-384

Page 127

(A break was taken from 2:13 p.m. until 2:16 p.m.)

THE VIDEOGRAPHER:  Going back on the record.  The time is 2:16 p.m.

BY MR. MARIOTTI:

Q.    Mr. Edwards, I have no further questions for you.

A.    Okay.  Thanks.

MR. SOBEL:  And I have no questions either.  So thank you very much.

THE WITNESS:  Okay.  Thank you as well.

MR. SOBEL:  Thank you for your time. All right.

THE WITNESS:  Okay.

MR. SOBEL:  We'll follow up -- there will be some things to follow up with.  We really do appreciate your time today.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Going off the record.  The time is 2:17 p.m.

(The following further discussion was held off the video record:)

THE COURT REPORTER:  Renato, do you

Case 1:20-cv-04772-NRB   Document 61-2   Filed 01/12/23   Page 129 of 158

Page 128

want this one typed up?

MR. MARIOTTI:  Yeah.  I will want electronic version.  But I don't need the video yet.

MR. SOBEL:  Same.  Same on both.

(The deposition was concluded at 2:18 p.m.)

--oo0oo--

A-386

Page 129

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, DEBRA L. KLESZYK, a Certified Shorthand Reporter of the State of Illinois, CSR License 084-002981, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes, to the best of my ability, a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me remotely via videoconference at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I

Page 130

interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Elk Grove Village, Illinois, this 13th day of February, 2021.

DEBRA L. KLESZYK
Certified Shorthand Reporter
License No. 084-002981

A-388

**[& - add]**                                                                 Page 1

### &

**&**  1:19 14:21

### 0

**0001**  3:10 25:16
**0002**  3:11 64:12
**0003**  3:13 88:7
**0004**  3:14 91:17
**0005**  3:16 100:7
**0006**  3:17 112:13
**04772**  1:5 4:6
**084-002981**  129:7
  130:9

### 1

**1**  13:13 25:15
**10**  21:14
**100**  2:11 3:16 7:2
  37:25 38:3 62:24
  75:2 85:16 97:14
  105:13 108:5
  122:10
**10:29**  5:3
**10:50**  1:16 4:3
**112**  3:17
**11743**  2:11
**11:46**  44:8,10
**1200**  26:19,23 27:4
**12:04**  44:10,12
**13**  5:23
**13th**  130:4
**15**  5:13
**150**  98:23 101:22
  102:12,13 113:13
  114:17 115:13
**18**  123:16
**1801**  99:5 101:23
  102:7 103:18
  113:4 114:16
**1875**  130:8
**19**  102:2 113:1

**193**  1:19
**1984**  26:9
**1:00**  77:5
**1:07**  87:18,20
**1:16**  87:20,22
**1:20**  1:5 4:6

### 2

**2**  64:10
**20**  9:13
**2014**  16:2,3 22:14
  30:24 90:6 123:9
  123:17
**2016**  92:22
**2017**  92:22
**2018**  20:18,21,22
  23:25 24:2 44:23
  44:24 47:12 61:10
  73:25 102:2 104:7
  104:25 105:24
  106:5,10,24 113:1
  113:1 114:10,13
  114:20
**2019**  16:5 20:17,19
  47:12 90:6
**2021**  1:16 4:2
  130:5
**21**  113:1
**24**  51:14
**25**  3:10 114:10,13
**25th**  114:20 115:8
**2:13**  126:24 127:2
**2:16**  127:2,4
**2:17**  127:21
**2:18**  128:7

### 3

**3**  1:16 4:2 88:6
**30**  79:24
**312**  2:5
**32**  22:12

**33**  22:12
**346-7500**  2:5
**36**  10:9
**37th**  2:4

### 4

**4**  91:16
**46123**  13:3
**464**  2:11
**4:00**  73:9 74:16
  79:23 80:13,19

### 5

**5**  19:9,9,12 100:6
  100:10,15
**5'10**  60:15,18
**5'11**  60:18
**5'8**  60:15
**5'9**  60:15
**549-4677**  2:12
**55**  2:4
**5:00**  26:1

### 6

**6**  112:11 123:14,19
  124:1,8,21 125:13
  126:8
**60**  50:19 89:11,15
  99:2 102:12
  114:13 125:12
**60603**  2:5
**631**  2:12
**64**  3:11
**6474**  115:17
**66,000**  22:8
**6:30**  21:14 74:7

### 7

**7**  3:5
**709596**  114:15

### 8

**8276**  13:2
**88**  3:13
**8:00**  90:11

### 9

**90**  50:20 55:19,19
  86:23 89:15
**91**  3:14
**9500**  114:16
**9:29**  5:2

### a

**a.m.**  1:16 4:3 5:2,3
  44:8,10 90:11
**ability**  10:6 129:16
**able**  7:25 10:14
  38:3 49:13,18
  91:21
**absolute**  105:16
**absolutely**  8:7
  50:16 82:5 95:13
**access**  49:18 69:2
  69:7 118:21,23
  119:1
**accident**  76:9
**accidentally**  17:14
  77:7
**accommodate**
  6:11
**account**  26:5,7
  118:20 119:6,7,19
  120:9,22
**accounting**  57:7
  120:3
**accounts**  120:16
  121:20
**accurate**  129:16
**action**  130:2
**actual**  27:6
**add**  33:14 101:18

A-389

**[added - back]**                                                      Page 2

**added** 57:1 93:7
**address** 13:1,2,12 50:18 112:25
**addresses** 120:19
**administered** 3:22
**advance** 27:13 29:7 43:15 83:4 90:11
**advertise** 34:14
**advertisement** 34:20
**advertising** 34:15
**affect** 10:11
**aforesaid** 129:9,18
**afternoon** 25:24
**afterward** 81:21
**age** 50:9
**agent** 97:6
**agents** 20:9 43:22 49:1 55:4 82:23 97:24 119:24
**ago** 44:14 107:21
**agreements** 106:5
**ahead** 22:1 53:14
**airport** 118:11
**airports** 66:21 86:8
**alex** 89:9,11 90:1
**alice** 70:8 71:10,13 79:7,13,17 92:12 92:15 93:14 95:7 103:11 110:10
**allegations** 121:24 122:23,24
**alleged** 58:13 104:24
**allow** 28:20 53:12
**alternative** 94:24
**ambiguous** 97:5
**amenities** 17:8,20 18:23 78:9 79:25

**amenity** 80:4,5,11 84:21 86:14,16
**amount** 57:2
**angelina** 1:19
**annoyances** 62:7
**answer** 8:19 21:18 21:22 28:9,21 35:2,3,3,7 38:23 52:17,18 53:5,12 53:15
**answered** 12:10
**answering** 21:5
**answers** 8:2,5 10:14
**anybody** 12:9 18:8 71:18
**anymore** 123:13
**anyway** 126:13
**apart** 65:3
**apologies** 6:12
**apologize** 7:6 15:11 25:9 83:2 96:15
**apology** 86:14,16
**appear** 90:21 95:14 115:2
**appeared** 1:18 2:7 2:13,20 49:4
**appears** 25:18 34:3 103:4
**appointment** 29:6 81:11 92:25 93:5 94:2 116:4
**appreciate** 11:20 127:18
**appreciated** 61:18
**appreciation** 63:17
**appropriate** 35:1
**approximately** 25:25 35:25 36:1

36:17 60:12
**april** 16:2,3
**area** 27:5 32:1,4 57:23 58:2 99:24
**aris** 37:3
**arrange** 16:24 17:2 18:23 75:14 84:21
**arranged** 43:14 79:23
**arrival** 17:9 78:9 112:25
**arrivals** 15:21 18:1
**arrived** 86:12 87:6 111:3,15
**arriving** 17:7 31:18
**aside** 42:10,10
**asked** 19:23 20:3 39:4 44:20,24 45:3 47:10 49:25 50:14 74:24 79:3 108:8
**asking** 7:9,11,19 21:23 50:20,24,25 51:2 52:12 68:22 68:22,23 77:4 80:13 108:8
**aspects** 33:1
**assault** 58:14 104:5,25 107:15 122:1
**assaulted** 104:1
**assign** 19:3 111:12
**assistant** 98:9
**assists** 68:9
**assumed** 48:23 110:5
**attach** 43:12 49:14 66:15

**attached** 42:24 43:13 88:17
**attachment** 49:16 49:17
**attention** 103:3 126:13
**attorney** 4:9 129:23,24
**attorneys** 4:8
**audio** 25:1 52:19 112:5
**august** 15:11,12
**authorization** 15:16
**automatically** 95:15
**availability** 51:10 121:14
**available** 26:20 29:13 31:7 37:6 46:17 51:11,13 90:10 96:8 100:24 109:21,21
**avenue** 2:11
**average** 19:15
**avon** 1:20 9:14 13:3 14:22
**aware** 103:25 104:3,19 106:8 107:13,18 112:9 122:3,8,19

**b**

**b** 7:17 26:8 67:14
**back** 22:14 23:24 29:9 30:23 32:2 44:11 50:18 51:7 51:12 52:23,25 53:9 60:6 76:10 77:4 82:19 87:21 101:20 104:7,25 105:24 106:4

**[back - certain]**                                                    Page 3

115:16 121:11,13
126:10,18 127:3
**background** 48:3
  79:11
**bad** 40:5 63:5
**bags** 84:10,10
**bald** 60:5,6
**bank** 56:23,23
  57:2 97:24 98:4
  101:2 111:7
  113:23
**banks** 57:5,8
**bar** 33:25 34:3,6,7
  35:18 37:1 41:8
  70:20 124:16
**based** 5:15
**basically** 82:22
**bcc'ing** 65:13
**becoming** 18:13
**bed** 99:21
**bedroom** 99:22
**began** 107:23
**beginning** 16:5
**behalf** 1:12 2:7,13
  4:11,14,14
**believe** 12:13
  13:22 16:2 20:18
  43:24 47:8 99:11
  100:5 107:25
**bell** 108:8
**bellmen** 56:3
**ben** 1:11 3:3 4:7
  4:19 7:17 53:14
  73:22 82:19
**beneath** 26:18
**best** 5:15 6:7,15
  21:19 41:10
  103:18 129:15
**bets** 103:16
**better** 25:5 91:22
  92:1,2 102:19

**betts** 1:3 4:3 58:11
  58:11,14,17 98:6
  102:6,8 103:25
  104:24 106:13
  107:1,4,7 112:24
  114:16 121:24
**betts's** 93:18 99:5
  102:14 104:4
  107:14
**big** 69:24 99:16,22
  111:19 117:8
**bigger** 46:19
**bill** 3:17 55:6 98:5
  98:6 113:8,24
**birthday** 78:20
**bit** 16:12 20:4
  23:24 24:9 25:5
  26:12,13 34:15
  49:12 60:8 67:5
  91:21 97:4 99:20
  109:18 124:9,10
**black** 69:25
**blame** 97:5
**blank** 62:24 96:20
  96:25 97:4
**blizzard** 6:6
**blue** 70:20
**blur** 99:17
**book** 49:25 50:14
  53:20 75:9 106:19
  109:6
**booked** 48:24
  50:13 54:22 73:14
  73:15,17 75:1,1,6
  77:6 84:24 93:8
  93:10,10 100:21
**booking** 67:7,7
  75:18 85:1 111:2
**bother** 116:9
**bottom** 68:7 73:21
  82:18 90:9 103:4

**bought** 89:13
**bound** 72:1
**box** 69:25 78:8
  79:4
**boyfriend** 80:9
**brain** 63:1
**brains** 60:2
**break** 8:15,20 44:2
  44:9,15 70:21
  87:13,19 126:17
  127:1
**breakfast** 15:18
**breaks** 8:17
**bring** 32:2 56:12
  101:19
**buff** 61:1
**build** 60:22
**bumped** 19:14
**bus** 67:6
**businesses** 78:17
**busy** 68:19 124:14

**c**

**c** 2:1 12:20 13:10
  33:6
**calendar** 51:14
  72:9,10 73:1,6
  80:19 86:10
**call** 30:25 31:5,6,7
  31:8,9 32:8,8 37:5
  37:8 42:7 46:18
  50:18 51:7,12
  57:16 71:22 72:14
  75:18,22,23 77:21
  81:21 82:7 94:22
  96:9
**called** 4:20 9:14
  12:9,14 13:21,23
  15:23 28:12 31:5
  32:23 34:8 37:2,3
  37:7 47:21 55:9
  75:10 77:4,7

80:12 95:16 123:2
  123:14
**calling** 50:17
  75:19 78:19
**calls** 28:19
**camera** 32:4
  106:14
**campbell** 2:4 4:11
**cancellation** 51:15
**candles** 79:25
  80:16
**car** 15:2 62:11
  66:20 67:7 70:13
  86:4,6 118:2
**carbon** 119:14
**card** 89:18,22
  115:15,17
**cards** 15:16
  100:22 125:2
**care** 17:6,11
**cars** 117:7 118:16
**case** 1:13 4:3,5
  29:3,19 54:3
  64:24 90:1 101:22
  101:23 114:1
**cash** 55:14 57:3,12
  97:23 102:13,16
  102:23 111:9
**cations** 108:22
**cc'd** 82:22
**cc'ing** 65:12
**celebrities** 18:11
  18:14 23:7
**celebrity** 84:20
**cell** 120:20
**center** 94:4 123:22
**central** 5:2
**certain** 6:3 37:25
  48:12 72:4 75:13
  86:23 108:1

[certainly - contact]                                                          Page 4

certainly  6:20
certifi  108:21
certificate  3:13
  88:3 89:13 108:7
  129:1
certificates  108:9
certifications
  14:16
certified  1:13
  110:5 129:3,5
  130:9
certify  129:7
challenge  25:10
champagne  78:24
chance  105:16
change  20:5,6 22:1
  22:21,25 47:2
  77:24
changed  111:4
changeover
  107:23
charge  55:5,9,13
  67:11,24 89:24
  98:5 101:23
  113:13,24 114:17
charged  56:21
  89:6 115:4
charges  113:11
check  15:16,17
  51:10 54:9 55:3
  69:17 82:8 126:17
checked  28:25
  32:3 69:7 114:15
checking  15:15
  79:5
checks  48:3
chic  23:4
chicago  2:5
chocolate  78:24
chocolates  78:16

choose  46:15,16
  95:16,18 109:17
  110:10,13
choosing  117:10
chosen  108:1
circle  123:18,21
city  9:12 41:4
  69:12
civil  1:18
clarification  71:1
clarity  98:7
clean  83:21 84:2
cleaned  118:17
clear  17:18 32:11
  67:22 75:4,17
clicked  96:23
  109:20
client  5:17
clientele  124:11
clients  6:14 18:24
  35:21
clock  101:22
clocked  110:16
close  14:22 112:8
  116:15
closed  9:8 69:17
  69:21
closer  25:2 50:7
closet  56:9
coburn  2:3 4:11
collagen  33:25
  34:3,6,7 35:18
  37:1 41:8
coloration  71:6
columbus  123:14
  123:18,19,21
  124:1,8,21 125:12
  125:13 126:8
come  17:2 29:24
  53:23 56:24 57:23
  76:19,22 78:5

  80:25 85:6 110:18
  126:18
comes  111:13
  116:22 121:17
coming  62:23
  64:23 72:20 78:23
  93:11 116:9
commencement
  129:8
commencing  1:16
comments  82:11
  98:16
communicate  7:23
  10:1 71:12,20
  119:19 120:10,16
  121:5
communicated
  72:5 121:2
communicating
  15:20
companies  44:25
  108:9
company  34:7,8
  34:12 35:13,16,16
  37:18,21 46:12
  75:20 86:5 96:18
  106:21 110:7
  116:20,25 117:10
  120:21
compared  35:9
  106:23 124:2
compensate
  104:15
complaint  104:13
  115:7
complaints  31:17
  62:1,5 64:4 81:6
  104:9,12,17,22
  121:25 122:13,17
complete  10:14
  13:18

compliments
  89:10
computer  25:2
  49:19,21 65:18
computers  66:2
concern  5:23
concerning  129:11
concerns  31:17
concierge  3:11
  16:21,21 17:5,17
  19:10,10,24 20:6
  20:10,12,13 21:8
  22:10,18 27:14
  32:2 33:10 43:18
  43:20,21 61:12,16
  61:19,21 65:14
  66:24 69:2,3,7
  72:9,12,18 73:11
  73:21,24 77:3
  97:25 101:12,12
  105:18 118:20,25
  119:6,18 122:8
  123:15 126:12
conciergeles
  119:16
concierges  19:19
  19:21 22:15
concluded  128:6
conclusion  28:19
conduct  122:23,25
conducted  104:4
conference  3:24
confirm  51:7
confirmation
  51:16
congratulations
  13:14
conjunction  84:12
constitutes  129:15
contact  75:11

**[contacted - different]**                                                    Page 5

**contacted** 12:6,7
**contain** 94:1
**context** 38:5 43:8
  86:3 94:11 115:10
**contexts** 78:3
**continued** 22:25
**continuous** 68:9
**contract** 108:3
  117:22
**contracted** 86:5
  117:24
**contractor** 51:21
**contractors** 28:5
  116:18,22
**contracts** 18:21
  106:5 117:2
**conversation**
  11:10 12:23 42:11
**conversational**
  62:16
**conversations**
  11:6 51:18 107:1
  107:4,6
**cool** 23:19
**cooler** 32:17
**copied** 68:12
  77:15,23
**copy** 100:12
  119:14
**corner** 103:4
**corporate** 18:9
**correct** 25:21
  27:11,12 29:14
  32:14 41:20 59:2
  63:9,11,12 66:10
  73:24 75:20,21
  81:22,23 82:12,13
  88:11 89:25 93:22
  93:23 94:3 102:15
  107:3 113:4,5
  115:11,16,20,22

  115:23
**correctly** 74:20
**counsel** 5:9,10,12
  12:24 42:11 71:1
  129:23,25
**couple** 38:10
  53:18 93:12
  120:23
**couples** 24:8
**coupon** 3:13 88:4
  88:25 89:4
**course** 8:21 9:21
**court** 1:1 7:21 8:1
  13:5 127:25
**courtesy** 82:6
**covered** 25:9
**crazy** 68:19 84:14
  118:12 124:10,15
**create** 30:11
**created** 32:20,22
  90:19 93:1
**credit** 15:16
  111:10
**crew** 50:11
**criminal** 122:23
  122:25
**csobel** 2:12
**csr** 129:6
**cup** 32:16 57:25
**current** 13:1,2
  123:8
**currently** 10:10
  11:16 14:18
**cursor** 83:11
**curtis** 2:10 4:13
  11:1 35:1
**customized** 29:11
  30:11
**cut** 60:6
**cuz** 35:20 40:17
  46:22 62:12 86:18

  96:2 97:23 110:6
  113:19 126:5
**cv** 1:5 4:6

**d**

**d** 3:1 7:18,18 26:9
  26:9 47:22
**daily** 90:10
**dark** 70:20 79:10
  79:11
**date** 69:19,20 73:5
  102:2,3 109:15
**dated** 114:9,12
**day** 17:7 19:3 21:8
  31:25 46:16 51:3
  51:4 64:22,25
  65:1,3,25 67:2,9
  68:20 73:3,3,5,14
  73:15 74:10 76:8
  85:3,12 92:18,18
  93:9 119:21 130:4
**day's** 15:21
**days** 20:12 93:12
**deal** 111:15
**dealing** 40:22
**dealt** 116:3
**debate** 53:8
**debbie** 52:23
**debra** 1:13 129:5
  130:8
**decided** 9:6 16:11
**deciding** 45:19
**decision** 45:23
**deem** 25:15 64:9
  88:6 100:9 112:11
**deemed** 91:16
**deep** 24:5 30:12
**defendant's**
  100:11
**defendants** 1:8
  2:14 4:14 5:25
  6:14 100:14

**defense** 5:10,11
**definitely** 62:5
  118:25
**demoted** 16:8 19:5
**demotion** 16:15,16
**department** 18:20
  84:16 123:6
**departments**
  18:22
**departure** 113:1
**deponent** 2:8
**deposed** 10:16
**deposition** 1:11
  5:1,5,18 8:13,22
  9:19 10:1,21 11:3
  11:23 12:5,24
  100:15 107:11
  112:12 128:6
  129:12,18,19
**derived** 6:13
**describe** 23:2 24:1
  59:21
**described** 26:25
**describing** 41:2
**description** 3:9
**desk** 12:11 19:24
  20:10,12,24 32:2
  43:19,20,20,21,22
  48:25 55:4,25
  61:13,17 65:15
  82:23 97:6,24
  101:21 111:22
  119:25 120:6
**determined** 18:4
**diana** 34:9 36:25
  37:2 41:18
**difference** 46:1,6
  59:10 72:10
**different** 14:25
  15:2 18:6 35:24
  36:7 83:23 99:18

**[different - example]**                                   Page 6

99:19 117:4
**directing** 103:3
**direction** 129:15
**directly** 24:17 75:6,16,19 103:18 130:1
**dirty** 84:2
**disclose** 28:4
**disclosure** 28:15
**discussed** 63:14 88:20 92:13 103:15 115:24 121:21
**discussion** 42:1 86:11 127:23
**district** 1:1,1
**document** 5:7 24:20 25:18,20 26:3 27:24 31:3 42:13,16 43:7 64:15 85:25 88:9 93:1,3 94:5 100:11,17
**documentation** 93:4
**documents** 5:3,6 5:14,15,19,20 6:3 9:22 11:22 47:2 48:12,14 66:12 88:19 89:1
**doing** 7:10 11:20 65:16 68:20 74:4 111:8
**door** 111:21
**dot** 26:8
**doubtful** 61:19
**downstairs** 120:2 120:4
**dozen** 61:25
**drink** 58:2 86:21

**drive** 13:3,10 14:23
**drivers** 117:6
**drop** 80:4,6,7 95:9 95:12 96:23
**dropping** 86:8
**drove** 62:11
**drug** 123:4
**drugs** 123:3
**due** 86:13 87:2
**duly** 4:18,21 129:10
**duplex** 99:21
**duplicate** 115:5
**duties** 20:10
**duty** 61:21 64:20 64:20

**e**

**e** 2:1,1 3:1,12 6:3 7:17,18 11:13 21:5 26:5,8,9 33:5 34:9 40:1,10 42:24,24 43:4,7,8 43:12 47:18,22 49:3,13,14,19,22 50:18 51:16 59:13 64:19 66:6,8,11,12 66:16,16,18,22 68:3,12,16,22 69:3 69:5,8 73:7,8 77:2 80:13 82:10,15 88:20 89:19 93:9 93:18 94:1 103:13 118:20 119:5,13 119:15,16,18,20 119:23,24 120:9 120:16,19,22 121:3,5,16,17,19
**earlier** 22:13 23:6 23:22 27:1,9 48:11 59:4,20

63:6 81:20 86:25 92:13 93:17 103:16 118:20
**early** 21:9 47:12 74:12
**easier** 26:13
**east** 1:6 2:4 4:4 15:23
**eastern** 1:17 5:3
**edlira** 47:22,22
**education** 13:16
**edwards** 1:11 3:3 4:7,15,19 6:2,9,10 7:6,17 21:15 25:19 35:6 44:15 127:6
**effect** 82:17
**efficient** 7:12
**efficiently** 124:7
**efforts** 39:8
**either** 16:9 24:5 40:5 62:2 63:21 76:15 97:12 101:20 106:15 120:15 126:12 127:10
**electronic** 128:3
**elevator** 30:4 53:19,23 55:23 56:1 103:17
**elk** 130:4
**employ** 24:17
**employed** 14:18 28:16 36:8
**employee** 19:8 56:1 121:20 129:22,24
**employees** 52:7 53:4 107:6 117:5
**employment** 123:8 123:9

**encourage** 68:8
**ended** 45:18
**enforcement** 107:13
**england** 13:17
**enhance** 68:9
**enter** 103:17
**enters** 9:18
**entire** 27:23 117:15
**entitled** 1:13 67:13
**entries** 114:9
**entry** 95:5 114:12
**escort** 55:23 111:15,20,23
**especially** 9:7 61:12
**essentially** 113:7 115:14
**estimate** 27:2
**european** 60:9 96:4
**evened** 57:5
**events** 16:24
**everybody** 19:11 20:2 58:6 68:13 95:16 110:4 121:15 124:18
**exactly** 22:19,20 33:12 34:21 36:18 38:11 42:16,22 59:17 66:4 85:17 91:3 92:14 107:12 115:21 117:7 120:7
**examination** 3:4 7:4 129:9
**examined** 4:21
**example** 66:17 67:9 68:7 79:3 85:18 93:12

**[example - further]**                                                    Page 7

104:17
**exchange** 81:1
**excluding** 42:1
**exclusively** 26:20
**excuse** 5:11
125:14
**exhibit** 3:9,10,11
3:13,14,16,17
25:15,16 64:8,10
64:12 77:1 83:7
87:12 88:1,2,6,7
91:11,16,17 92:5,8
98:21 100:5,6,7,10
100:11,15 102:19
112:3,11,13,17
116:15
**exhibits** 3:8
**existing** 73:18
**expensive** 118:4
**experience** 16:17
16:19 17:19 18:3
20:7,22 22:5,7
57:17 104:11
116:11 119:11
**experiences** 40:22
**explain** 52:2 54:1
56:17
**explained** 10:23
**extent** 5:16 23:25
**extra** 110:15
**eye** 119:3

**f**

**f** 67:14
**face** 40:4 68:20,20
82:4 126:4
**faces** 40:6 63:5
**facial** 43:10
**facials** 24:7 33:24
35:9 42:15 70:15
**faint** 52:20 112:6

**fair** 14:11,11 28:3
28:6 58:24 114:6
114:7
**fairly** 72:3 87:3
96:4
**falls** 122:7
**familiar** 41:21
58:10 64:14 92:4
92:8,11
**family** 9:6 17:21
18:10
**fashion** 84:11,12
84:18
**february** 1:16 4:2
16:6 130:5
**federal** 1:17
**fedex** 76:15
**feedback** 68:8
**feel** 6:8,9
**feet** 26:23 27:4
**female** 51:1,2
85:13 94:9,12
95:4 96:11,13,24
109:16,18,19
**females** 63:20
**file** 80:4,6,7
**filed** 80:10
**filled** 56:16
**filling** 97:6
**final** 57:2 101:22
101:24
**find** 62:13 65:22
67:20 92:1
**finding** 49:9
**fine** 11:8,19 14:8
34:23,24 109:5
**finish** 21:16 35:6
**finished** 31:25
56:24 80:25
**first** 4:21 10:8
15:25 26:8 29:9

29:10 30:23 31:5
31:7,9 32:8 33:20
35:25 37:4 41:1
42:4 53:23 65:3
94:22 112:23
113:12 114:12
116:1 126:9
**fisher** 2:19
**five** 18:16 36:2,19
83:7
**fleet** 117:7
**flexibility** 51:5
**flight** 118:10
**floor** 2:4 83:25
**flowers** 78:22
101:3
**flown** 125:23
**folio** 112:20
113:24
**follow** 6:19 127:16
127:17
**following** 52:24
80:14 127:22
**follows** 4:22
**foot** 26:19
**footage** 106:14
**foregoing** 129:12
**forget** 19:1,7
111:5,7
**forgetting** 65:5
**forgot** 32:1 65:4,4
77:23 94:24
**forgotten** 41:6
**form** 28:8 38:21
52:11 57:12 58:5
59:6 80:4,5 82:10
82:10
**formal** 101:15
**format** 112:19
**formatted** 42:23
42:23 43:6 59:7

**formatting** 59:9
70:21
**forms** 80:11
102:23
**forth** 23:7 42:15
53:9 107:21
121:11
**forward** 7:10
45:24
**forwarded** 28:2
**forwarding** 65:20
**found** 6:1 16:13
20:19 29:3 40:16
49:11 88:16,18
123:3
**four** 36:2
**free** 34:15,16
**freelance** 35:13
90:12,16,23 91:5
**frequent** 87:1,3
**fresh** 83:17
**friend** 76:18 79:24
**friendly** 61:3,5,7
64:1
**front** 12:11 19:24
20:9 43:20,22
47:23 48:25 55:4
55:25 56:22 61:13
61:17 82:23 97:5
97:24 100:24
101:11,11,21
104:20 112:15
119:24 120:5,5
**full** 7:16 114:21
**fully** 29:1
**fun** 23:5
**funny** 78:1,4
**furloughed** 9:4
**further** 5:18 27:22
91:8,23 106:10
127:6,22

A-395

**[future - herbal]**                                                                 Page 8

**future**  72:18 73:5 73:16

**g**

**garment**  84:10
**gation**  104:4
**gender**  96:20 97:9 97:12,13,15
**general**  12:12,12 45:16 47:19 67:13 94:20
**generally**  24:1
**generic**  82:14 100:19
**gentleman**  32:23
**getting**  50:10 112:6
**gift**  3:13 88:3 89:21
**gifted**  89:22
**girl**  79:23
**girlfriend**  80:14
**give**  6:5 8:2,5 10:6 10:14 24:21 53:9 54:19 63:18 64:8 75:10 94:16 101:24 119:12
**given**  119:10 129:17
**giving**  8:17
**gm**  48:1 120:2
**gmail**  26:4,5,7 40:16 48:18 65:13 65:21,25 88:14
**gmail.com.**  26:10
**go**  8:20 14:7 15:18 22:1,17 24:19 30:6 31:11 44:5 53:14 54:25 73:6 74:13,14 76:24 116:8

**going**  4:2,24 5:14 5:17 6:20 7:10,11 7:19 11:6 14:9 20:5 24:19,21 26:11 29:9 42:4 44:1,7,11 45:24 52:17 53:7,8 55:22,24 56:4 64:7 74:13 76:19 76:24 79:2 87:12 87:17,21,25 91:10 91:15 98:20 100:4 103:22 112:2,10 112:22 113:6 114:8 116:9,15 119:17 126:10,15 126:16,23 127:3 127:20
**good**  4:1 9:10,10 57:18 67:9 92:3 93:16 121:10
**gosh**  47:21 61:11
**government** 107:14
**grab**  15:17 43:22
**gratuity**  57:1 101:18
**great**  13:14 85:7
**groups**  18:21,24 84:16,17
**grove**  130:4
**guess**  19:15,15 23:5 30:9 31:24 32:3 34:13,22 35:13 38:7 62:11 73:17 77:13 82:21 118:13
**guest**  15:9,14 16:17,19 17:16 18:3 20:7,22 22:5 22:6 43:23 50:17

51:12 55:5 56:19 57:1 58:10 66:25 67:18 73:8 74:16 77:4,6 79:22 80:8 80:19 81:21 84:24 85:1 86:13 89:14 89:18,19,22 98:17 101:5,7,9,17 103:6 103:8 104:8 114:1 114:14 115:1,7,9 116:10,13 119:11
**guest's**  55:11,11 55:17
**guests**  6:5 26:21 29:15 30:17 51:19 52:5 53:1 57:16 57:16 67:2 69:20 71:2 75:12 76:6 82:11 85:20 89:2 95:22 121:4,18
**guy**  60:9
**guys**  31:8
**gym**  27:6 61:1

**h**

**h**  2:4 13:10 33:6
**hair**  60:5
**half**  125:23
**halfway**  43:19 65:11 92:21
**hampton**  1:19 14:21 15:6
**hand**  7:24 43:22 55:20 73:2 130:4
**handed**  12:7
**handing**  54:15 69:3
**handle**  18:25 56:3 78:25 82:20 94:18 104:12,12
**handled**  76:5

**handling**  22:23 111:2
**handover**  40:1 48:16,18 64:19 66:23 70:8 73:7 77:2,3 79:7 93:7 103:12
**handovers**  3:11 65:20
**hang**  82:24
**happen**  6:1 78:2 87:11
**happened**  19:13 20:16,19 29:21 32:18 76:8 77:9 77:13,18,25 85:17 90:3,4 116:10 126:5
**happens**  40:18
**happy**  30:6 56:20
**hard**  79:7
**hazy**  18:10 109:18
**hcampbell**  2:6
**head**  7:24 12:14 33:9 46:5 86:19
**heading**  31:5 81:25
**heads**  93:10
**hear**  62:1 64:4
**heard**  41:24 42:4,5 107:8 121:13
**hearing**  50:4
**height**  60:12
**held**  127:23
**helicopter**  67:5,6
**hello**  58:19
**help**  8:1 63:22
**helpful**  71:8
**helping**  79:19
**herbal**  57:21

Case 1:20-cv-04772-NRB     Document 61-2     Filed 01/12/23     Page 140 of 158

**[hereto - interrupt]**                                      Page 9

| | | | |
|---|---|---|---|
| **hereto**  129:25 | 49:18 50:22,23 | **identified**  106:10 | **indirectly**  130:1 |
| **hereunto**  130:3 | 54:8,13 55:6 57:1 | **identity**  54:14 | **individual**  56:23 |
| **hey**  78:20 82:2 | 58:10,17 61:10 | 105:1,4,11 | 73:21 98:1 104:13 |
| 85:7 116:8 | 66:24 67:13,13,18 | **illinois**  1:15 2:5 | 106:6 |
| **hi**  82:1 | 69:20 75:8 76:17 | 129:6 130:4 | **individuals**  39:9 |
| **high**  17:22 59:15 | 78:14 82:13 83:23 | **imagine**  19:6 | **influencers**  23:7 |
| 59:17 | 86:5 89:13,20 | 36:14 44:23 47:17 | **influences**  18:12 |
| **higher**  19:14 | 99:6 100:2 101:4 | 80:7 84:16 102:17 | 18:13 |
| **highest**  13:15 | 102:13,22 103:9 | 113:23 | **information**  42:19 |
| 22:11 | 104:25 105:3,4,25 | **immaculate** | 51:16 54:5 67:16 |
| **highly**  5:4 | 106:7,14,16 107:6 | 118:18 | 67:23 68:22 69:20 |
| **hindsight**  14:10 | 107:18,22 108:1,3 | **immediately**  52:4 | 75:11 77:17,21 |
| **history**  48:23 | 108:14,19 109:2 | **impression**  52:6 | 101:14 |
| **hmm**  8:21 20:24 | 109:13 111:3,9,18 | 53:2 | **inn**  1:19 14:21 |
| 30:16 37:14 39:23 | 112:21 114:1 | **inbox**  68:17 | 15:6 |
| 47:17 59:8 60:1 | 116:17 118:5 | **incidence**  122:1 | **inquire**  30:14 |
| 62:21 66:10 70:17 | 120:4 121:4,25 | **incident**  32:9,10 | **inquiring**  43:23 |
| 72:7 80:3 90:14 | 122:2,24 126:6,9 | 33:21 37:2 106:13 | **inquiry**  49:13 |
| 113:9 118:22 | **hotel's**  77:13 | 122:17 | **inside**  99:12 |
| 122:15 126:2 | **hotels**  1:6 4:4 12:4 | **incidents**  46:4 | **instagram**  18:12 |
| **hold**  24:23 76:13 | 28:17 36:13 38:19 | 48:22 | **instances**  49:3 |
| 76:16,21 112:3 | 41:11,12 91:6 | **include**  66:11,21 | **instruct**  35:2 |
| **holly**  2:4 4:11 | 99:2 117:2 123:10 | 68:3 | **instructing**  52:17 |
| **home**  21:4,5 25:11 | **hour**  19:9,12 | **included**  16:22 | **insurance**  108:7 |
| 49:12,19 66:16,22 | 22:10,12 51:14 | 27:5 66:8 | 108:10 |
| 116:9 | **hourly**  19:11,11 | **including**  66:6 | **interacted**  105:14 |
| **honest**  39:25 | **hours**  90:10 | **incoming**  17:12 | 117:5 |
| **honeymoon**  78:23 | **house**  54:12 56:22 | 70:19 76:6 | **interaction**  85:3 |
| **hood**  69:15 | **housekeeping** | **independent**  28:5 | 85:10 |
| **hop**  67:6,6 | 15:20 | 116:18,22 | **interactions**  85:4 |
| **hopefully**  126:18 | **hr**  12:14 | **index**  3:8 | 105:18 |
| **hot**  23:4 | **huh**  58:23 65:8 | **indiana**  1:20 9:2,9 | **interested**  66:19 |
| **hotel**  1:7 3:17 4:5 | 74:1 76:2 114:11 | 9:11 13:3 | 130:1 |
| 6:5 12:7 15:22 | **hunched**  60:8,16 | **indianapolis**  9:14 | **interesting**  14:5 |
| 16:25 17:21 18:4 | **huntington**  2:11 | **indicate**  93:25 | 24:15 67:20 |
| 18:9 23:3,8 24:16 | **husband**  78:23 | 96:21 97:9,11,11 | **interface**  114:15 |
| 26:20 28:13 33:2 | **i** | 98:17 102:2,7,12 | 114:16 |
| 33:8,11 34:12 | | 114:18,23 115:13 | **internal**  67:15 |
| 35:15 36:12,13 | **idea**  39:11 57:18 | **indicates**  75:5 | **interrupt**  21:16 |
| 38:13,17 40:13 | 61:11 | 113:25 114:19 | 35:2 |
| 41:17 44:17 47:1 | **ideally**  97:1 | 115:6 | |

**[interrupted - l]**                                          Page 10

**interrupted** 11:19 22:1
**inventory** 75:25
**investi** 104:3
**investigate** 106:17
**investigating** 104:17
**investigation** 107:14
**invoice** 113:7,24
**involved** 83:12 115:18
**ipod** 31:22 32:14 37:3
**issue** 31:20 87:1 115:2
**item** 29:10 113:11
**items** 17:13 78:15

**j**

**jacket** 76:18
**jam** 59:13
**january** 16:6
**job** 15:8 16:13,14 22:23 92:1 108:12 126:9
**jobs** 83:14
**john** 110:18
**judged** 104:14
**june** 13:13

**k**

**k** 12:20 13:10 47:23,23
**keep** 26:2 51:23 57:4 72:21 119:3 120:13
**kept** 118:17
**key** 54:10,15 88:15 111:20 124:9

**keys** 55:21 81:1
**kids** 17:24
**kind** 9:4 10:22 16:5,9 17:4,19 18:13,21,24 19:2 19:18,24 20:14,15 22:24,25 23:11,13 23:14 24:5,6 29:4 31:20,22 32:25 34:10,13 36:11 38:12 40:18 43:19 44:25 51:23,23,25 52:2 53:22 56:3 57:9 60:4,6,7,7,8 60:9,16 61:19,20 62:4,7 63:2,4,23 65:11,15,23 66:5 66:21 69:1,5,18,18 69:20 70:20,22 77:14,14 78:17 79:10 81:4 82:14 82:15,23,24 90:18 96:8,9 99:17 101:14 104:10,11 104:13,14,14,21 105:17 106:18,23 106:23 108:11 109:21 110:2 113:15 118:2,4,12 120:13 122:8 124:11,18 126:5
**kinds** 17:25
**kitchen** 99:22
**kleszyk** 1:13 129:5 130:8
**knew** 19:17 23:1 36:12 41:9 46:13 54:16,22 55:15 62:17 67:23 77:5 81:23 82:3 102:19 105:15

**know** 6:11,12,12 6:20 7:20 8:9,13 8:16 9:6,19 11:1 11:16 12:8,17 15:19 16:9 17:23 18:4,17 19:4,23 21:5,12 23:12,15 23:17 25:4 26:24 27:24 28:7 29:7 30:3,9 31:11 32:20,22 33:3 34:8,16,19,21 35:12,14,15,20,20 36:12,15 37:18,20 37:23,25 38:1 39:3,7,7,12,13,15 39:15,17,24 40:1 40:24 41:3,12,14 41:14,15 42:12,18 43:14 45:2,12,18 45:21,23 46:11,18 48:11,19 50:3,9 51:9,25 53:11 54:1,17,19,20,25 55:3,8,14,18 56:3 56:20,21 57:11,14 58:1,3,3,4,6,13,19 59:4 60:6,9,18,24 60:25 61:6,7,8,9 61:13 62:8,14,23 62:24 63:2,3,7,10 63:13,25 64:24,24 65:23,24,24 67:9 67:16,17,20,21 68:3,4,14,23 69:5 69:9,16,16,21 70:22 71:18,19 72:15,18,21,21,23 73:16,18 74:24 75:12 76:8,20 77:15,24 78:18,20

78:22,25 79:13,15 80:22 81:2,13 82:2,6,21,24 83:6 83:7,24,25 84:4,17 84:22 85:14 86:20 86:22 87:7 89:20 90:25 91:4 93:11 93:13 94:13 95:14 95:15,19,20,24 96:10 98:6 102:25 103:2 104:11,12 104:15 105:1,4,10 105:21,25 106:9 106:11,12,15,16 106:18 107:9,22 108:2,8,13,18 109:2,4,4 110:3,17 110:23 111:11,18 111:21,22 115:5 115:21 117:9 118:13,16,19,24 118:24,24 119:1,3 119:4,25 120:8,13 121:1,11,12,13,15 122:6,10,22 123:3 123:6,7 125:4,11 125:18
**knowing** 36:15
**knowledge** 41:10 48:5,6,9,10 58:16 58:25 59:3,10 82:9 102:22 107:5 121:24
**known** 23:17 62:4 105:17 106:3
**knows** 50:9
**kuka** 47:22

**l**

**l** 1:13 12:20 33:5 47:22 129:5 130:8

A-398

[label - low]                                                                    Page 11

**label**  100:12
**lady**  34:8 37:7
   41:7 47:21
**language**  90:15,21
**large**  24:12 29:18
   29:23 50:23 117:7
**larger**  35:16
**laswick**  12:20
**late**  5:20 20:21
   21:11,13 31:15,18
   38:18 39:17 40:17
   44:23 47:12 62:8
   62:12 74:12 81:17
   86:12 87:2,6
   106:24 116:7
   118:14 122:14
**laura**  36:25 37:12
   37:13 51:9 54:19
   94:8,11,15,17,22
   94:22 95:9,10,15
   95:17,21 102:20
   110:11 126:1
**law**  107:13
**lawsuit**  10:18
**lawyers**  7:7
**layout**  92:7
**learning**  14:23
**leave**  16:4,7 33:11
   76:8,17 96:25
   97:4
**leaving**  32:6
**led**  23:12
**leeds**  13:21,24
**left**  17:13 26:14
   31:25 32:17 33:13
   38:12 47:6 66:5
   68:17 73:2 76:22
   83:24 94:4 98:23
   108:12 111:11
   112:24

**legal**  28:19
**legally**  8:5
**legitimate**  110:7
**lemaich**  32:24,24
   90:20,20
**les**  3:10 12:4 16:1
   16:4,7 23:3,10,23
   24:2,16 26:15,18
   26:19,22 27:2,11
   38:8 61:4,4 63:11
   64:2 65:12 67:3
   77:17,20 84:11
   90:5 92:17 95:22
   104:1,8 105:10
   116:17 117:21
   123:17 124:2,12
   124:17 125:5
**level**  13:15
**liberal**  8:16
**license**  96:1,2
   129:6 130:9
**licensed**  37:23
   39:4,19 110:8
**licenses**  14:15 38:1
   38:6,9,17 39:16
   44:20 45:3,6,14,14
   47:14
**licensing**  108:21
**life**  63:1
**lights**  84:3
**liked**  37:16 40:13
   83:18 120:12
**lima**  33:5
**limited**  24:4
**limousine**  86:4
   116:20,21
**line**  48:17 70:21
   74:16 94:6 95:4
   96:20 113:11,13
   114:18,23 115:12

**linens**  83:25 84:2,3
**lines**  78:2 113:10
**list**  31:3,6,10 32:8
   32:8 33:14,17,20
   33:20 35:25 36:6
   36:17,21 37:5,8
   39:1,9,11,18 42:18
   45:7,12 67:1
   78:15 84:20
**listed**  27:21 29:10
   66:25 74:19
**listen**  21:19 52:10
**lists**  32:21 44:16
**literally**  5:1
**little**  16:12 17:24
   18:10,23 20:4
   23:24 25:1,2,5
   26:12,12 29:5
   32:9 34:15 42:19
   57:24 60:8,14,16
   67:5 78:15 79:7
   81:24 91:21 92:1
   96:22 97:4 99:20
   99:20,22 101:15
   112:6 124:10
**live**  14:22
**lived**  13:11
**lives**  62:17
**living**  9:2
**llc**  1:6,6,7 2:10 4:4
   4:5,5
**llp**  2:3
**lobby**  26:18 56:4
   82:1 103:17
**local**  78:17,18
**locate**  118:11
**log**  61:15 70:13,13
   70:14
**logged**  61:20
   93:14,16 94:21
   103:11 111:10

**logging**  61:14
**login**  46:15 109:13
**logo**  34:3
**long**  13:11 15:5
   87:15 96:4 108:11
**longer**  9:7
**look**  44:24 45:13
   56:25 60:3 62:20
   92:8 99:15 100:22
   106:20 112:22
**looked**  11:12
   19:16 28:1 49:17
   59:22 60:8,24
   63:4 74:22 77:12
   77:19,20 81:24
   84:4 94:14 101:14
   101:15 110:6
   118:18
**looking**  27:1 42:14
   43:1 50:19 66:23
   74:25 83:6 86:1
   102:18 113:14
**looks**  34:2 43:3
   67:6 68:11 69:24
   70:7 78:11 79:18
   92:11,14 93:15
   100:18 112:19
   113:17
**lost**  114:14,16
**lot**  23:14 60:7
   61:20 62:22 65:25
   68:20 76:10 84:15
   84:15 100:22
**lots**  85:3
**lounge**  99:23
**love**  89:9
**loved**  101:6
**lovely**  57:24
**low**  25:1 84:4
   124:9

**[lower - members]**                                                    Page 12

**lower**  1:6 4:4 15:23 16:9,10,10 16:12 84:9 98:23

**m**

**m**  33:5
**macaroons**  78:16
**maggie**  58:11
**mail**  6:3 26:5 42:24 43:4,7,12 49:3,13,14,19 50:18 51:16 59:13 66:6,8,11,16,18,22 68:3,12 69:3,8 73:7,8 77:2 82:10 89:19 93:18 94:1 103:13 118:20 119:5,13,15,16,18 119:20,23,24 120:9,16,19,22 121:3,5,16,17,19
**mailed**  43:8 47:18 80:13 93:9
**mails**  3:12 11:13 21:5 40:1,10 42:24 49:22 64:19 66:12,16 68:16,22 69:5 82:15 88:20
**major**  14:5 118:12
**majority**  17:10
**making**  15:18 20:4 22:6,10 68:2,14 112:9
**male**  37:3 40:3 51:2 59:24 60:4 61:23 63:21 85:12 95:5 96:11,12,24 109:16,17,19
**males**  36:5 63:19
**managed**  124:5,6
**management**  17:5 124:1,20

**manager**  1:7 4:5 12:12,12 16:17,19 17:17,19 18:3 20:7,22 22:6,7 45:17 47:19,24 98:10 101:21 119:11,11
**managers**  20:5 47:19,20 48:25 64:20,21 82:21,22 98:1,8 104:20,20
**manhattan**  86:7 117:2
**margaret**  1:3 4:3 58:11 102:6 112:24 114:16
**margaret's**  98:5
**margins**  43:5
**maria**  32:6,11 33:21 37:2 41:5 41:13,17
**mariotti**  2:3 3:5 4:10,10,23 5:11 6:16,22,25 7:5 11:1,4 12:21 14:14 21:20 22:3 24:25 25:3,7,13,17 28:14 29:8 34:25 35:5 39:6 42:9 44:1,5,13 50:6,10 50:12 52:13,16,21 53:7,13 54:6 64:13 70:5,9 71:4 71:7,9 87:23,24 88:5,8 91:18 100:8,16 112:7,14 127:5 128:2
**marked**  3:9 25:15 25:16 64:10,12 88:6,7 91:16,17 100:7,10 112:11

112:13
**marking**  100:14
**massage**  17:1,3 24:8 27:8 29:2,10 29:12 30:13,18,24 31:1,4,14,18,22,23 31:24,25 32:5,11 33:23 34:20 35:11 35:16,23 37:24 38:9,17 40:4,12,13 40:19 41:2,3,12,19 43:10 44:16,25 45:3,7,14 46:8,20 47:11,15 48:4,8,24 49:25 50:13,14,20 50:25 51:3 52:3 53:20,25 54:3,7,8 54:14,18,20,24 55:1,6,7,19,19,21 56:5,11,12,24 57:3 57:11,16,23 58:25 59:21,24 61:23 62:15 63:17 71:12 72:3,20 73:9 74:16,18 75:11,13 75:18 77:5,8 79:23 80:1,14,17 80:19,23,24 81:7 81:11,12,22 82:2 82:12 83:17,18,20 83:20,23 84:3,6 85:1,7,21 86:11 89:11,15,24 90:12 90:16 91:5 92:24 93:5 94:8,12,14,15 94:16,18 95:2,4,5 95:20 97:22 98:2 98:3,16 99:2 101:2,17,19,24 102:4,7,12,14,18 102:21,24 105:1

105:11,21 106:6 107:23 108:15,19 109:3,7,15,24 110:8,10,18 111:2 111:3,14,19 113:16 114:2,21 116:4,6,12,19 120:17,25 121:2 122:7,14,18 125:4 126:7,11
**massages**  24:5,7 29:15 30:2 35:10 35:11 36:7,9 40:17 42:15 43:11 46:14 56:6 61:9 63:11 70:14 111:12 124:24 125:11,12
**masseuse**  60:4
**masseuses**  87:1
**matter**  106:17
**matters**  129:11
**mean**  21:15 27:3 27:18 30:4 31:13 61:5 67:14 68:18 69:12 73:6 74:3 81:6 86:3 94:12 96:6 97:20 105:3 105:8 108:23 113:13 123:2 125:22
**meaning**  74:10
**means**  74:4 97:21 115:9
**medications**  10:11
**meeting**  11:18
**member**  105:6,7 106:2
**members**  61:3 64:1

A-400

**[memorable - nomi]**                                                                         Page 13

**memorable** 23:13

**memory** 10:11 18:10 36:1 119:17

**mentioned** 22:13 23:6,22 37:2 39:21 42:5 44:19 56:15 59:5 60:21 62:19 63:6 71:10 103:15 118:19

**mentioning** 25:4

**ments** 68:10

**menu** 3:10 25:19 26:15,17 27:19,22 28:3,23 42:17 43:13 47:2 49:11 49:14,15 54:4 59:5,6 66:17 78:14 88:16,24 89:3 90:22,24 95:9

**menus** 49:6,9 59:11 90:19

**method** 113:15

**metropolitan** 13:21,24

**miami** 77:7

**micro** 112:8

**microphone** 50:7

**mid** 21:13 74:2,4

**middle** 6:6 35:3 74:12 83:12

**midtown** 123:15

**mike** 25:8

**mind** 40:6 72:22 78:5 85:12 116:23

**mine** 65:10,14 67:9

**minute** 4:25 5:1 50:19,20 55:19,19 89:11,15 99:2 102:12 114:13

120:1

**minutes** 5:13 9:13 44:6 63:19 65:19

**miscommunicati...** 115:7

**misconduct** 122:18

**missed** 9:5 68:4

**mistake** 77:8

**mixture** 30:12

**mm** 8:21 20:24 30:16 37:14 39:23 59:8 60:1 62:21 66:10 72:7 80:3 90:14 113:9 118:22 122:15

**modalities** 30:15

**moment** 14:24 24:23 44:14 66:3 107:21

**money** 19:6 57:7 97:23 101:1 102:3 111:11 115:14

**monroe** 2:4

**months** 123:16

**morning** 4:1 21:10 21:13

**mother** 33:6

**motions** 7:24

**mouse** 94:5

**move** 33:19 74:15 75:25

**moved** 13:13 19:19,21 20:20 32:7

**moving** 124:17

**muscular** 60:21,24

**music** 14:4 31:22

**musicians** 23:14

**n**

**n** 2:1 3:1 7:17 26:8

**name** 4:8 7:16 12:17,20 13:8 26:8,9 32:6,24 33:4 34:9 37:4 40:24 41:1,3,6,7,8 41:8,12,17,24 42:5 42:12 47:23 48:21 49:2,4 50:17 54:19 55:11,17 63:7 70:15 74:21 74:22 80:7,8 82:4 89:14 93:19 95:4 95:8,10,24 96:4,15 98:11 99:5 105:25 107:8 110:16 112:24 114:15 126:4

**named** 41:22 58:11 62:19 95:21

**names** 6:5 33:14 33:16 36:6,16,21 36:24 37:10 39:21 40:6 41:9 71:2 109:24

**natasha** 37:7

**nature** 7:25

**nautilus** 77:7,17 77:22

**near** 120:5

**nearby** 69:14

**nearest** 53:22

**neath** 73:16

**necessarily** 52:1 60:23 67:17

**neck** 63:18

**need** 6:9 8:15 10:4 10:24 11:17 52:13 65:22 66:15,22 79:12,15 91:23

128:3

**needed** 6:4 65:24 111:22 120:24

**negative** 114:17 116:11

**neighbor** 69:14

**neighborhood** 16:23 69:11 78:17 78:18

**networking** 16:22

**never** 39:4 41:16 41:24 49:21 65:4 68:25 75:10 97:7 107:17 115:24 116:11,12

**new** 1:1 2:11,11 9:3,7 36:13 40:20 69:13 118:13

**newer** 23:14

**nice** 57:24 84:5

**nicely** 118:17

**nicer** 100:22

**nicest** 100:1

**nick** 45:17 47:25 48:1

**night** 5:8,24 6:2 21:11

**noah** 32:24,25 90:20 117:25

**noah's** 33:3

**nodding** 7:24

**nolita** 126:10

**nolitan** 126:9

**nomi** 45:1,11,19 45:22,24 46:2,4,7 46:11 47:1,3,7 51:10 96:10,11,12 96:18 106:22 107:21 108:1,2,4,6 108:14,18 109:3,7 109:9 110:1,3,12

Veritext Legal Solutions

**[nomi - paid]**                                                                              Page 14

110:13,17,17
111:4,6,8,9,13
113:17,19,20
120:20,21
**noon** 77:4
**nope** 88:22
**notable** 23:9,11
**note** 4:24 28:20
52:8,11 69:8 77:2
89:18 100:10,22
112:23
**noted** 40:21 97:13
**notes** 17:8 48:21
73:21,22 82:19
110:16 126:17
**notice** 33:23 46:1
73:8 90:9,12
96:19 99:4
**notified** 122:1
**nrb** 1:5 4:6
**number** 4:6 12:13
50:18 55:11,18
71:17,19 75:23
77:21,22,24 96:9
99:5 113:4 117:4
**numbers** 19:16

**o**

**o** 34:9
**o'clock** 21:14
**oasis** 26:19
**oath** 3:22
**object** 6:21 28:8
**objection** 28:18,20
38:21 52:10,11,14
52:14 53:10
**objections** 3:21,23
**obligated** 8:5
**obtain** 45:3,6,14
89:23
**obviously** 50:16
73:13 95:2 123:8

**occasion** 30:17
77:10,12 85:18
**occasionally** 23:8
30:20
**occasions** 53:18
55:12 72:2,4
83:22
**occurred** 115:22
**occurring** 90:7
**october** 15:7 20:21
23:25 24:2 61:10
102:2 104:7,25
105:24 106:4,10
113:1,1 114:10,13
114:20
**offer** 89:10
**offered** 16:8 24:2
78:12 126:11
**office** 47:23 98:9
100:25 101:11
104:20
**officially** 16:17
**oh** 9:2 21:3 23:20
25:3 35:8 44:4
49:7 61:11 69:13
70:7 76:18 85:15
96:14 113:18
123:24
**okay** 5:22 7:14
9:15 10:6,7,23
11:8,14 12:3
21:21,24 22:2,21
23:2,22 24:22
25:7,12,25 26:2,11
26:13 28:10 33:13
34:23 36:20 42:13
43:6 44:1,14
49:24 52:15,21
53:13 54:7,24
57:15 58:8 64:7
64:11 68:5 70:5

71:4,24 73:20
75:24 76:24 78:7
80:18 81:3,14,16
82:3,9 83:5,10
84:7,23 85:24
86:2 87:5,14,16
88:1,23 89:8 90:5
91:8,8,12,20,25
92:3,4,7,16 93:25
94:4 95:7 97:16
98:13 99:4,12,25
100:4,6 102:11
103:1,20,22,24
104:7 106:9,12
107:17 108:25
110:24 112:2,2,4,7
112:10,22 114:23
116:14 118:7
120:8 123:24
125:8 126:20,22
127:8,11,15,19
**old** 10:8 11:12
45:12 84:2
**once** 25:10 40:17
46:2 56:23 62:12
92:18 109:19
111:4
**ones** 11:24 46:22
48:15 59:13 96:1
100:20
**oo0oo** 128:8
**open** 111:21
**opened** 69:14
**opens** 72:15
**operation** 35:19
46:19,24 117:8
**operations** 23:23
23:24
**opposed** 45:19
74:10

**opposite** 123:21
**order** 29:5
**ordinary** 47:11,13
**originally** 90:19
**outcome** 130:1
**outgoing** 70:19
76:7,10,13,14,14
76:16,21
**outlook** 65:16,17
66:1
**outright** 39:4
**outs** 55:10
**outside** 10:2 17:1
48:7 52:3 54:3
62:18 69:12
116:17 125:15,16
125:19
**overseeing** 15:17
**oversight** 94:20
**owner** 18:9
**owner's** 18:10

**p**

**p** 2:1,1 80:4,6,7,10
**p.m.** 26:1 44:10,12
73:9 74:16 77:5
79:23 80:13,19
87:18,20,20,22
90:11 126:24
127:2,2,4,21 128:7
**packages** 17:12
70:19,19 75:25
76:6
**page** 3:4 28:10,11
29:9 64:22 76:25
77:1,17,20 83:7
86:1 89:9 113:12
114:9
**pages** 5:23
**paid** 3:16 19:10
55:9,10,17,20 57:8
57:12,25 89:5

[paid - prenatal]                                                            Page 15

92:25 93:3 98:3 100:18,19,23 101:5,6,7,25 102:3 102:13,16,17,21 103:12 111:8,9 113:12,18,21,21 113:22 114:13 126:13

**pall** 89:9,11 90:1

**pandemic** 9:4

**paper** 59:18

**paragraph** 78:7

**paraphernalia** 123:4

**parentheses** 29:12 94:8

**paris** 85:25 86:4 116:20,24 117:10 117:22 118:8

**parking** 62:13 86:13 87:2

**part** 17:19 27:24 31:9 73:6

**participating** 9:1

**particular** 43:7 48:24 50:24 51:3 64:1 85:1,17 92:24 93:5 94:14 102:1,4 105:6,21 112:18

**particularly** 45:22

**parties** 3:21 129:23,25

**parts** 17:15 77:16 124:17

**party** 44:24 51:21 75:7

**passing** 58:18

**pasted** 68:12 77:16,23

**pay** 9:6 16:9,11,12 55:14 57:2 90:1 98:2 101:2 114:1

**paying** 17:22 80:8 101:4 111:8

**payment** 15:17 56:16,17 57:10,13 81:1,1,2 97:23 103:10 111:5,13 112:1 113:15

**payments** 102:23

**pending** 8:19 79:16

**penthouse** 29:23 30:8 99:10,13,23 99:24 100:1 103:16

**penthouses** 30:1,5 99:10,17

**people** 12:15 15:15 17:13 19:23 23:9,11 24:8 28:24 29:22,25 30:5,7 31:6,9,14 33:19 34:11 36:8 36:16 38:2 39:18 66:19 68:21,22 69:16 76:8 78:19 84:15 118:10 122:13

**percent** 7:2 37:25 38:3 62:24 75:2 85:16 86:23 97:14 105:13 108:5 122:10

**perform** 49:8 54:23 65:17

**performed** 48:3

**perks** 23:20

**permanently** 56:8

**person** 19:21 21:10 22:22 32:23 40:5,6 50:11,17 69:3 75:19 80:8 80:12 89:13 90:18 95:8 96:9 97:21 109:17

**person's** 80:9

**personal** 6:3 10:4 11:12 26:4,7 49:19 65:13 66:6 66:8,11 119:9,15 120:9 129:14

**personally** 71:25 82:17

**petals** 79:25 80:16

**pevzner** 2:10 4:14

**phone** 12:10,13 49:20,23 71:17,19 71:19,22 72:6 77:24 85:5,6 112:9 120:24,25 121:8,9,16

**phones** 120:20

**pick** 20:10 54:10 71:22 76:19 86:19 101:3

**picked** 32:15 66:20 84:11 105:20

**picking** 86:7

**pickup** 76:13,16 76:21

**picture** 59:23

**pile** 80:6 83:24

**place** 117:12 129:21

**placed** 78:8

**plaintiff** 1:4,12 2:8 4:12 5:4

**plaintiff's** 5:7,8 48:20

**plant** 23:12

**plates** 61:17

**platform** 10:2 71:10

**please** 7:15 8:2,9 8:16 9:19 11:18 22:1 30:14

**point** 8:8,15 20:23 33:13,14 40:19 44:20 48:2 66:7 103:24 108:2

**police** 123:1

**policies** 104:8,16

**polite** 37:15

**politeness** 82:6

**pool** 124:14,14

**portfolio** 123:13

**position** 6:17 16:10 17:6 33:7

**possession** 6:14 40:2

**post** 101:23

**posted** 97:17 98:5 113:23 114:14

**pot** 57:25

**practice** 81:10,21 82:7

**practices** 22:22

**prefer** 34:22 97:3

**preference** 96:20 96:24 97:2,3,10,12 97:13,15

**preferred** 30:8 31:3 32:21 33:20 51:2 121:8

**pregnant** 51:1

**prejudice** 5:16

**prenatal** 24:6 30:15,18,21

A-403

**[preparation - reason]**                                                            Page 16

**preparation**  11:23
**prepare**  10:20
  11:15 55:10
**preparing**  107:10
**present**  2:18
**presumed**  29:1
  38:24 39:5 102:20
  110:5
**pretty**  23:19 37:5
  37:6,9 42:22
  65:18 67:1 69:9
  74:5 99:16 117:8
  119:2 122:10
**previous**  32:3
  113:16 129:8
**previously**  46:20
  46:23 90:22
  122:12
**price**  55:6 98:23
  99:1 114:21
**prices**  42:18
**pricing**  30:14
**print**  42:23 43:2,4
  59:7,12 89:17
  100:21
**printed**  43:17
  101:13
**printer**  59:14
**printers**  59:16
**prior**  17:9 45:19
  46:8 58:12,15
  61:10 74:25 77:10
  78:9 123:10
**private**  27:7 54:11
  94:1
**privy**  104:21
**probably**  14:9
  23:13 36:14 47:17
  58:19 61:22 64:23
  68:12 78:4 79:15
  85:9,14 86:17,22

86:23 87:6 89:12
  91:1 92:21,23
  94:25 110:20
  111:17 120:22
  124:8 126:13
**problem**  7:3,3,14
  50:6 85:11 87:16
  98:13
**problems**  118:3,7
  118:13
**procedure**  1:18
  110:25
**proceeding**  3:23
**proceedings**
  129:17
**process**  50:1,2
  56:17 109:11,22
  111:2,13 117:9
**produced**  5:4 49:5
**product**  51:25
**professional**  35:4
  118:16
**profile**  86:21
  109:14
**program**  70:12,16
  70:23 72:3 92:10
  95:16
**promise**  87:13
**pronounced**  32:25
**proper**  106:21
  116:25
**properly**  97:6,7
**property**  123:12
  123:25 124:2
**prosecco**  78:8 79:3
**provide**  21:20
  25:22 47:16 63:11
  68:8 89:18 91:14
  102:23 108:9
**provided**  24:20
  25:20 28:5 36:9

39:1 41:16 46:2,7
  48:13 49:3 51:20
  52:6 53:3 56:5
  61:10 88:10 89:2
  95:21 96:2 97:22
  102:8 108:16,20
  109:23 126:7
**provider**  36:7
**providers**  34:20
  35:24 36:11
**providing**  47:3
**purchased**  78:8
**purported**  122:16
**purposes**  13:5
**pursuant**  1:17
**push**  77:4
**put**  7:1 17:23
  28:23,24 29:4
  32:16 35:14 39:2
  51:13 55:8 69:15
  73:15,18 77:17
  79:4 82:4 88:15
  94:5 97:2,3
  110:17 115:14
  124:6 125:3 126:4
**putting**  42:10,10

**q**

**quality**  46:7 59:15
  59:17 68:9
**question**  8:9,18,19
  21:19,23 38:22
  52:11,18,23,24
  53:6,15 75:24
  105:9
**questions**  4:24
  5:15,18 7:9,12,20
  8:2,6 10:5 83:4
  126:16 127:7,9
**quick**  65:22
  126:17

**quicker**  65:25
  121:9
**quickly**  65:23
**quite**  24:9 26:25
  31:8,15 35:8,10
  49:12 60:7 76:10
  117:1,6
**quoted**  98:23

**r**

**r**  2:1 7:18 26:9
  37:4 47:22
**rack**  60:2
**raise**  19:9,12,13
  20:2,3
**range**  21:1
**rappers**  23:15
**rare**  35:9
**rarely**  37:5 90:3
  126:5
**rates**  84:17
**reach**  51:8 71:18
  75:15
**reached**  75:9
  120:20,22
**reaching**  108:6
**read**  42:19 52:22
  52:22,25 70:11
  79:8,10 91:22
  110:4
**ready**  15:21
**really**  22:24 23:15
  37:17 46:3,23
  53:17 58:21 63:4
  65:21 67:5 81:18
  97:5 104:22
  105:22 111:6
  118:16,17 124:13
  124:13 125:22
  126:5 127:17
**reason**  10:13
  73:12

Veritext Legal Solutions

Case 1:20-cv-04772-NRB    Document 61-2    Filed 01/12/23    Page 148 of 158

**[rebook - requested]**                                            Page 17

**rebook**  85:8
**rebooked**  74:23
**rebranded**  77:15
**recall**  23:9 32:10
  33:15,17,18 35:24
  36:17 37:10 44:21
  47:4,4 58:21,23
  60:13 61:4 62:3
  62:22 74:17 79:13
  84:25 86:15 89:3
  90:6,22 95:19
  96:3 107:1,4
  108:10,24 116:21
  125:7,21
**receipt**  3:16
  100:19,23 101:25
  102:1 103:12
  112:20 113:22,24
**receipts**  100:20
**receive**  5:20 47:14
  57:16 71:17 93:21
**received**  4:25 5:8
  5:24 11:13 12:6
  43:12 62:4 68:14
  83:3 100:13
  121:25
**recognize**  88:1
  100:17 112:17,19
**recognized**  85:4
  105:22
**recollection**  31:19
  32:19 110:12
**recollections**
  37:12
**recommend**  69:15
  69:22
**record**  3:14 4:2,25
  7:1,16 44:8,12
  87:18,22 100:11
  100:13 103:14
  126:24 127:4,21

127:24 129:16
**recorded**  7:25
**records**  94:1 103:9
**recovery**  114:14
  115:1,6,9
**red**  86:17,23
**redacted**  6:4 70:1
  74:21 75:3
**redaction**  70:4
**redactions**  71:1,3
**reduced**  129:14
**redundancy**  16:11
**reference**  83:8
**references**  85:25
**referred**  18:20
**referring**  94:6
**refined**  124:11
**reflect**  47:2 103:10
**reflexology**  24:6
**refund**  114:24
  115:13,19,22,24
  116:2,10
**refunded**  114:20
  114:21 115:3,8
  116:13
**refunds**  116:4
**regard**  28:15
**regarded**  18:19
**regarding**  12:23
  35:23 42:15 56:16
  82:11 84:24 104:8
  104:16 108:21
  116:24 121:12,14
  123:25 125:3
**regards**  51:5
**regular**  24:5 30:24
**regularly**  81:10
**relate**  72:22
**related**  10:5 47:11
  68:2 72:13 92:12
  94:1 102:23 104:4

**relates**  70:23
  76:11
**relating**  5:21
  65:23 67:17 89:2
  122:6
**relative**  129:22,24
**relax**  58:2
**relaxation**  26:20
**relaying**  67:24
**relevant**  5:5 69:1
**reliable**  31:9,12
  37:16 96:7
**relocated**  9:3
**relying**  81:4
**remade**  80:21
**remake**  83:21
**remaking**  83:8,13
**remember**  8:11,12
  12:18 13:22 22:19
  22:20 23:25 30:20
  30:22 31:21 32:6
  33:12 36:18,20,22
  36:22,24 38:2,7,11
  38:13 40:3 59:25
  60:10 61:22 62:10
  64:5 66:4 75:22
  77:25 90:17 95:11
  95:11 98:12 108:6
  109:22 110:1,2
  111:12,25 116:13
  123:1 125:6,19,22
  126:4,12
**remembered**  40:2
  122:20
**remembering**
  74:20,21
**reminder**  68:15
**reminders**  67:19
**remotely**  1:15
  3:22 129:20

**remove**  33:16
**renamed**  13:22
**renato**  2:3 4:10
  5:22 6:20 50:5
  52:12 127:25
**renewal**  26:19
**rent**  9:7 17:22
**repeat**  108:17
**repeats**  18:16
**rephrase**  105:9
**replace**  84:2
**replaced**  19:20,22
**replenish**  57:7
**reply**  49:14 93:21
**report**  62:6 93:7
**reported**  58:14,22
  103:25 104:24
  106:13 129:13
**reportedly**  5:8
**reporter**  1:14 7:21
  8:1 127:25 129:3
  129:6 130:9
**reporter's**  13:5
**reports**  40:10,22
  64:19 66:6,9
**represent**  4:9
**representations**
  108:14,19
**representative**
  15:9,14
**representing**  11:2
  12:9
**reprimanded**  65:5
**request**  5:7 8:17
  17:2 24:9 25:14
  28:13 29:15 30:3
  38:17 40:11 43:9
  43:10,10 51:6
  54:2 85:21
**requested**  5:6 30:2
  40:14 84:24

Case 1:20-cv-04772-NRB    Document 61-2    Filed 01/12/23    Page 149 of 158

**[requested - second]**                                    Page 18

124:25
**requests** 35:9
  42:25 86:6
**require** 90:11
**required** 27:14
**researching** 18:1
**reservations** 27:14
  28:12 70:14
**reserve** 5:17,21
  16:23 46:13 53:24
  72:16 120:25
**reserved** 73:4
  109:8
**reserving** 30:21,22
**respond** 49:22
  104:15
**responses** 7:22
**responsibilities**
  15:13 16:18,22
  17:11,16 21:2
**rest** 23:17 39:18
**restaurant** 67:7
  69:14 70:13 72:15
  72:24 104:23
**restaurants** 16:23
  68:23 121:12
**restocked** 80:20
**restocking** 83:8,12
**resulted** 49:9
**results** 48:19
  93:22,24
**resv** 114:15
**retrieve** 76:23
**return** 80:25
**reverse** 28:11
**review** 11:22
**reviewed** 27:23
  106:14
**reviewing** 5:14
  40:9

**richard** 2:19
**right** 5:17 16:16
  22:16 27:25 29:2
  34:1,2 44:18
  59:17 63:8 64:8
  72:8 74:13 81:23
  82:21 83:1 84:10
  87:10,25 93:20
  94:7 95:3 96:14
  96:19 97:17 98:20
  99:3 100:6 103:4
  107:2 111:1
  112:10,25 114:4
  121:17 123:20
  125:10 126:15,22
  127:14
**riley** 45:17 48:1
**ring** 108:7
**rmariotti** 2:6
**road** 14:25
**robert** 23:12
**role** 18:3 33:7
**rooftop** 124:16
**room** 3:15 9:15,18
  11:18 17:23 18:23
  24:4,11,12,14 27:7
  27:7,16,18,20
  29:13,16,18,20,23
  29:24 30:3,7
  31:24 34:11 43:25
  50:21,22,23 53:20
  54:11,25 55:1,2,9
  55:11,13,16,18,19
  55:24 56:6,9,21
  57:15 58:25 78:9
  79:4 80:1,16,21
  82:7 83:9,13,15,23
  89:6 98:5,6,16,19
  98:19 99:6 101:23
  102:9 103:17,18
  105:2,12 111:16

111:23,24 113:4
  123:4 124:24
  125:3,3,11 126:7
**rooms** 15:21 17:8
  56:11 100:1,1
  123:4
**rose** 80:15
**roses** 79:25 80:15
**rubs** 63:19
**rules** 1:18 53:11
**run** 34:8 44:2
  101:3
**running** 62:8
  118:14
**runs** 41:7
**rush** 83:22
**ruthann** 12:13,14
**ruthann's** 12:13
  12:17

                s

**s** 2:1 7:18 12:20
  13:9 26:9 34:9
  37:4
**sad** 29:4
**safe** 99:25
**salaried** 22:5
**salary** 20:6
**sales** 18:20,22
  84:16,19 120:1
**sam** 13:9
**sat** 53:19
**saturday** 73:9
  74:17 79:24 80:14
**sauna** 27:5
**saved** 6:2
**saw** 28:25 32:4
  39:17 49:16 81:24
  82:3 90:22 117:23
  117:25
**saying** 55:8 56:20
  78:20 86:21

**says** 26:14,17
  27:13 29:10,11,12
  30:10,13 33:24
  56:20 66:24 68:8
  68:16 69:11 70:8
  72:9,9 73:1,8,16
  73:21,22 74:2,15
  76:21 77:1,3,3
  78:8 79:6,12,14,22
  80:18 82:18,18,19
  84:9 86:12 89:8,9
  89:11 90:9 94:7,7
  94:8 95:3 96:19
  97:16,17 98:15,16
  98:23 102:6,11
  112:25 113:7,12
  114:13 115:1,5,13
**scanned** 47:18
**scene** 56:4
**scheduled** 5:2 77:8
  94:18
**screen** 24:21 39:8
**screened** 39:3,14
**screens** 92:17
**screenshot** 3:14
  92:14
**scroll** 113:6
**search** 48:14,22
  65:17,19,21 88:12
  93:22,23
**searched** 40:16
  48:15,18,20 49:2
  49:15 93:18
**searches** 49:8
**searching** 65:25
  66:1 88:14
**second** 32:8 33:20
  36:17 37:8 64:8
  85:21 100:5 112:3
  113:11 114:8

Case 1:20-cv-04772-NRB    Document 61-2    Filed 01/12/23    Page 150 of 158

**[seconds - slip]**

Page 19

seconds  72:11
section  31:7 33:24
  33:24 67:12,13,23
  68:18 69:1,11
  72:12,22 73:11,11
  76:1,3,10,12,20,25
  79:6 86:10
sections  72:11
secure  27:15 94:23
security  106:14
see  18:1 26:12,12
  26:15,16 29:13
  34:4,14 36:14
  38:5 43:13 48:19
  48:21 51:24 56:25
  63:2,2 70:6 73:21
  79:6 83:1 90:13
  91:21,25 92:16
  94:6,9 97:18
  98:24 104:14
  108:9 111:11
  112:15 113:2,3
  114:10 125:10
seeing  38:13 61:23
seen  38:1 54:4
  92:10 95:25
  107:17 116:1,12
  120:9
select  95:10
  109:14,15,15,16
selected  110:18
send  40:10 51:15
  64:19 66:22 71:15
  78:21
sending  66:16
  68:13 69:19
sends  82:14
sense  58:8
sent  5:24 6:3 42:24
  66:9,12 72:2
  82:10,17 86:14,15

104:22 105:2,11
  107:18 121:11
seo  34:9 41:8,18
separate  119:5
  120:13
september  79:24
serious  62:5
  122:18
servers  5:25
service  3:15 15:9
  37:19 38:25 46:2
  46:7 47:3 51:20
  54:22 57:15 65:18
  66:20 67:8 86:4,6
  96:15
services  15:14
  17:17 24:1 27:15
  27:21 28:5 52:6
  53:3 70:13 73:4
  73:10,17 75:5
  95:21 107:23
  116:19,21 118:2
  124:21
session  30:11
set  27:21 39:1
  49:21 56:8 57:24
  80:1,13,16 84:3,17
  109:12 130:3
seven  86:1
sexual  58:14 122:1
sexually  104:1
shanel  97:18,21
  98:3,7,8 113:22
shape  60:25,25
  61:1
share  24:21
shared  69:2
  107:19 119:10,16
  122:5,5,11
shattuck  13:2,10

shaved  60:6
sheet  31:3
sheets  83:17,21
shiatsu  30:15,19
  30:22
shift  21:13 40:9,11
  40:21 62:6 64:18
  64:19,25 65:10
  66:6,9 73:4 74:5
  93:7 105:14
shifts  65:3
ship  76:9
shipments  17:12
  70:18 76:7,11,14
  76:14
shipping  17:12
short  44:2 60:5
  87:13
shorter  60:14,20
shorthand  1:14
  129:3,5 130:9
shortish  60:7
show  16:24 64:7
  87:25 91:10 100:4
  112:2
showed  119:20
showing  25:14
  54:21 64:9
sic  5:4,9 60:3
  110:16
side  1:6 4:4 14:25
  15:2,23 24:10,10
  24:14,14 28:11
  29:20,20 51:24
  56:11,11 60:20
  73:2 79:1 82:16
sign  54:9 55:8
  56:19 58:1 89:6
signature  103:5,5
  103:7 130:8

signed  80:2,11
  101:9,17
signing  58:5
similar  34:19 63:4
single  27:15,18
sir  11:11 13:12
  14:20 15:8 36:24
  64:15 91:23 92:5
  100:17 112:15
  113:13
sit  7:7 58:1
site  86:18
six  125:14
sixty  1:6,6,7 3:10
  4:4,4,5 12:4,4
  15:23 16:1,4,7
  23:2,9,23 24:2,16
  26:14,18,19,22
  27:2,10,11 28:16
  38:8,18 39:17
  40:24 41:4,11,12
  41:16 45:8 46:20
  47:6 48:3,8 52:7
  53:4 61:4 63:11
  64:2 65:12 66:13
  67:3 77:13,16,20
  77:24 78:3 84:11
  90:5 91:6 92:17
  95:22 99:2 104:1
  104:8 105:10
  116:17 117:9,18
  117:21 119:6
  120:11 121:20
  123:9,12,17 124:2
  124:12,17 125:5
sixtyhotels  119:16
size  27:2
slammed  105:19
slightly  43:4
slip  55:7,17,20
  56:15,25 57:5,25

**[slip - stuff]**                                                                    Page 20

81:1,2 101:20 111:8
**slips** 57:8 101:8
**small** 26:25 27:8
**smaller** 124:9
**smart** 121:16
**smile** 82:1
**sms** 71:15
**sobel** 2:10,10 4:13 4:13,13 5:10,22 6:18,24 7:2 10:22 11:3,9 12:19 14:12 21:15,18,22 21:25 25:20 28:2 28:8,18 34:22 38:21 42:1,6 50:3 50:8 52:8,10,15,22 53:5,11,14 70:3,25 71:5 88:10 127:9 127:13,16 128:5
**sobelpevzner.com** 2:12
**somebody** 12:11 17:3,21 21:8 32:5 37:1 40:11 53:18 55:23,25 67:24 68:1 72:20 74:23 76:17,22 78:13,14 79:3 101:4 104:22 105:22
**somebody's** 112:20
**soon** 9:19 72:15
**sorry** 13:19 36:3 47:5 50:5 69:4 78:6 81:18 98:14 108:17 113:18 117:11
**sort** 37:18 116:24 118:7

**sorts** 89:22
**sounds** 14:5 21:1 99:3
**source** 17:23
**southern** 1:1
**spa** 3:10,13,15 16:25 17:3 23:22 23:24 24:1,4,11,17 25:19 26:15,18,22 27:2,3,10,15,15,18 27:20,21 28:25 30:4,6,6 32:1,4 34:10 42:17,18,20 43:23 47:2 49:6,9 49:10,13,14,15,17 50:21 52:2,6 53:3 53:19 54:4,20 55:9,16,20,21,22 56:8 57:8,19,23 58:2 59:5,6 66:17 68:23 72:9,20,23 72:25 73:1,2,4,9 73:10,16 74:16 75:5 77:20 79:23 80:13,18,20,21,25 83:8,13 86:10,12 88:3,15,16,19 89:2 89:13 94:2 98:16 98:18 102:12 103:12 105:17 106:20 111:16 113:21 114:14 124:20,22,22
**space** 24:10 110:22 120:3
**spare** 56:7,9,14
**sparkling** 86:24
**speak** 58:16 105:22 120:24
**speaking** 52:14 121:8,9

**special** 84:12
**specialty** 30:14,18
**specific** 17:16 37:12 104:17 108:15
**specifically** 10:5 108:23
**specified** 129:21
**speeches** 53:9
**spell** 7:15 13:4,7 33:3
**spelled** 34:9 47:22
**spent** 5:13
**spoke** 10:22 12:9 12:15 48:11 81:7
**spoken** 12:3,16
**sports** 30:12
**spot** 23:4
**spread** 61:13
**square** 26:19,23 27:4
**staff** 23:17 57:17 61:3 63:16,18,23 64:1 67:16,20,25 68:2 105:6,7 106:2
**staffed** 29:1
**standard** 1:17 99:1 104:10
**start** 15:25 92:20 95:18
**started** 7:11 9:4 15:7,10 19:19 22:14 30:23 45:11 57:20 65:12,14,16 65:20 66:4,5 80:10 92:19 95:14 96:10 108:2 117:12 123:9
**starting** 4:9 82:23

**state** 1:14 4:8 7:15 28:4 129:6
**statement** 7:3
**states** 1:1
**status** 114:15
**stay** 16:10,12 23:5 59:1 69:19 112:8 112:20
**stayed** 18:16,17 23:8 58:17 62:6
**staying** 23:9,15 24:12 29:23 30:1 30:5 34:11 50:23 67:17 76:17 78:14 84:15 102:8 103:16
**steal** 32:12
**stenographically** 129:13
**steps** 48:7,13 50:15 54:13 106:17 109:3
**stipulated** 3:21
**stipulation** 3:20
**stocked** 15:19 83:15
**stocky** 60:24
**stood** 60:17
**story** 20:16
**straight** 60:17 78:5 85:6
**strawberries** 78:24
**street** 2:4 13:7
**stretched** 21:2 124:18
**strong** 60:9,22
**stuck** 40:18
**study** 14:3
**stuff** 19:16 61:14 61:20 70:22 76:9

A-408

**[stuff - things]** Page 21

78:16
**subject** 48:17 77:3
**submit** 57:6,6
**submitted** 11:25
**subpoena** 107:18
**substantial** 35:19
**subway** 62:12 87:4
   87:7
**suggest** 94:17
**suite** 2:11
**suites** 1:19 14:22
**summer** 124:15
**super** 11:16 60:19
**superiors** 119:1
**supervisor** 32:3
**support** 78:18
**supposed** 7:8,8
**sure** 9:21 10:23
   11:21 13:6 15:18
   15:20 17:7 21:17
   23:21 35:22 37:5
   37:6,9,22 40:7
   42:6 44:4 68:2,14
   75:2 78:4 79:20
   81:14 82:13,15
   83:15,16 84:23
   85:16 87:8 91:3,7
   91:7 97:14 105:23
   106:2,3 107:10
   108:5,18 109:9
   110:14 117:7
   122:10 123:7
**survey** 82:14
**swedish** 30:12
**sweet** 37:17
**sweets** 78:9 79:4
**switch** 21:10
**switchover** 111:4
**sworn** 4:17,18,21
   7:11 129:10

**system** 6:1 92:13
   109:25

**t**

**t** 13:10,10
**tab** 71:15
**table** 27:8 54:18
   56:5 72:16 83:17
   83:21 84:3 99:22
**tables** 24:13
**take** 16:10,11,12
   17:6 27:21 29:5
   30:4 31:23 44:2
   48:13 54:13 56:1
   57:8 83:5 84:1
   87:13 103:22
   115:18 126:17
**taken** 1:12,15 39:8
   44:9 53:18 87:19
   127:1 129:19
**talk** 7:7 23:23 59:4
   62:15 119:25
**talked** 59:20 62:9
   78:13 92:25
   107:20,25 122:12
   123:7
**talking** 42:14
   44:15 59:5
**talks** 86:11
**tall** 60:19
**task** 73:18
**tasks** 19:24 20:8
   33:1 72:13,18,23
   73:11 79:16,16
**tax** 102:23
**tea** 57:21,25 58:2
   58:5,7
**team** 19:18 27:14
   84:19 101:12
   111:19 120:1
**technically** 16:8
   18:2 20:3 33:9

**techniques** 30:13
**technology** 14:4
**tell** 12:19 36:23
   46:17 51:19 76:3
   94:15 101:10
**template** 66:19
   89:16
**ten** 18:17 63:19
   65:19
**tenure** 38:18
   39:17
**term** 85:25
**terms** 124:5
**testified** 4:22
   10:18 27:9 81:20
   86:25 106:25
**testify** 93:17
   129:10
**testimony** 10:6
   129:17
**text** 70:7 71:15
   72:2 79:10
**thai** 30:15,19,21
**thank** 4:23 7:13
   21:23 25:3,4,8
   71:8 79:18 87:23
   112:9 127:10,11
   127:13
**thanks** 50:8 127:8
**theater** 16:24
   72:24
**therapist** 29:24
   30:11 31:1 32:5
   32:12 37:24 41:19
   49:25 50:13,14
   51:3 55:7,21 57:3
   59:24 61:23 62:16
   72:3 75:11,13
   80:24 81:8,11
   85:21 94:7,16,24
   97:22 98:2,4

101:3,19,24 105:1
   105:11,21 110:10
   111:9 122:18
**therapist's** 40:4
**therapists** 17:1
   28:12,16 31:4,15
   31:18,23 32:21
   35:12,23 38:9,18
   40:19 41:2,4,13
   44:16 45:3,7,15,20
   46:8,20 47:12,15
   48:4,8 52:3 54:3,7
   54:8,14,24 56:12
   57:11 59:21 63:17
   71:13 83:18,20
   90:13,16 91:5
   95:21 102:24
   106:6 108:15,20
   109:3,24 110:8
   111:3,14,19
   113:16 116:7
   120:17 121:2
   122:14
**therapy** 116:4
**thin** 21:2 124:19
**thing** 18:13 34:10
   40:15,21 42:4
   63:24 69:5 84:23
   86:19 115:14
**things** 7:25 17:23
   17:24,25 18:22
   24:6 25:10 51:23
   51:24 66:15,25
   67:1,10 69:18
   70:15,23 72:16
   76:22 78:5 79:1
   82:16,25 87:2
   90:19 116:18
   121:14 122:14
   127:17

**[think - turn]**                                            Page 22

**think**  6:23 7:20 12:10 14:17 15:10 15:11 16:3 18:7,8 18:11,14,15,19 19:8 22:8,11 24:20 25:8 28:10 28:19,23 30:22 32:7,16,18,18,24 33:9,15 35:21 36:1,4,11 37:4,7 38:10 40:4 41:5,6 43:4 44:22,25 45:16,17 46:3,5,10 46:15,22,24 47:8 47:21,23,25 48:15 48:16 49:10,15 51:22 52:12 53:17 57:6 60:3,16 61:18,22 63:3,20 65:11 66:14,18 70:2,19 71:16 72:1 73:25 74:6 74:23 75:1 77:11 77:12,15,18,25 81:20 86:5,25 88:14,22 95:17,25 96:1,4 97:24,25,25 98:9 99:19 103:13 106:22 108:5 109:16,18 110:9 110:11 116:5 117:1,19,19,19,23 119:8,10,12 120:18,18,20,21 121:2,22 122:4 123:1,12,15 124:23 125:25 126:11,15

**thinking**  40:7,7 61:6 116:6

**third**  44:24 51:21 75:6,19 76:12 85:22

**thompson**  2:3 4:11

**thompsoncobur...**  2:6,6

**three**  19:18 22:14 36:4 63:20 77:1 90:8 99:16,19

**ticket**  110:15

**tickets**  16:24 72:24

**tiers**  18:7

**time**  1:17 4:3 7:13 11:17 13:23 16:6 19:7 22:24 24:16 24:18 25:25 29:5 38:8,14 40:23 41:11 44:8,12 45:4 46:16 47:20 47:24 48:1,2,8 49:20 51:3,4,13 54:21 63:17 65:12 69:7,9 73:23 74:10 75:1 77:10 77:11 81:7 83:5 83:19 84:14 85:8 85:12,22 87:9,18 87:22 90:5 92:22 93:14 98:9 99:2 102:9 105:17 106:4,19,24 107:22 109:15 116:1,16 117:15 121:6,15 123:12 123:14,22 126:24 127:4,13,18,21 129:20

**times**  18:16,18 30:2 52:1 61:25 90:8 118:1 120:23

123:3,23

**tip**  62:25 63:1 65:15

**tissue**  24:5 30:12

**title**  15:8 16:14 20:6 119:11

**today**  5:24 7:20 8:23 9:16,23 10:5 10:14,21 11:17 73:17 78:9 88:21 122:12 127:18

**told**  11:16 19:4 20:1 31:11 38:8 45:13 81:4,9 106:19 107:22,24 114:25 117:23

**tomorrow**  72:13 72:14 74:2

**tongue**  62:25

**top**  32:17 46:5 66:24 72:12 89:9 100:12

**topic**  12:22

**total**  101:22,25

**tote**  84:10

**tour**  67:6

**tours**  67:7

**towels**  83:16

**town**  9:14

**toys**  17:24

**traffic**  40:18,20 86:13 87:2 118:9 118:13

**train**  19:23

**trained**  23:1 31:2 31:11 32:23,25 38:25 39:10 51:23 90:18 97:7 117:24

**training**  20:9,14 54:17

**transcript**  129:12

**transferred**  12:11 123:11,17

**transitioned**  17:5

**transitioning**  106:21

**traveling**  17:21

**tray**  57:24

**treat**  78:13 100:9 101:6

**treatment**  24:3,11 27:7,7,15,18 30:7 31:24 34:11 50:21 54:11 56:8 57:20 57:22 80:21 83:9 83:13 98:18 111:16 114:14

**treatments**  17:3 42:18 68:23 73:3 90:10 106:20

**trendy**  124:13

**tried**  59:12 65:17 65:19 78:17 94:22 94:23

**trouble**  50:4,4

**true**  129:16

**truth**  129:10

**truthful**  8:5 10:14

**try**  5:14 6:11,18 17:22 50:6 52:21 53:24 72:15

**trying**  25:9 45:11 46:3 60:2 63:3 66:14 69:21 79:9 91:25 112:8,8 116:5 122:25 125:21,25

**tucked**  26:18

**tuesday**  82:19

**turn**  36:8 54:17 98:20 114:8 116:8

A-410

**[turns - way]**                                                    Page 23

| | | | |
|---|---|---|---|
| **turns** 77:6 | **understood** 11:14 | **v4** 18:19 | **view** 30:9 |
| **twice** 115:4 | 12:1 71:7 | **v4s** 18:24 | **views** 81:22 |
| **two** 19:20 20:12 | **undertook** 50:15 | **v5** 18:7 19:1 | **village** 130:4 |
| 22:23 24:10,13 | **united** 1:1 | **valeriya** 41:22 | **vip** 17:20 18:2,5,5 |
| 28:11 36:5 37:10 | **university** 13:17 | **validity** 3:22 | 18:19 20:8 78:10 |
| 38:13 41:9 42:21 | 13:21,24 | **variety** 66:25 | 84:20,20 |
| 59:11,19 60:3 | **unstaffed** 16:25 | **various** 41:2 44:16 | **vips** 17:6,20 18:25 |
| 72:11,11 90:8 | 52:2 | 113:10 | 19:3 |
| 99:18 121:21 | **upcoming** 18:1 | **vasilets** 41:22 | **visa** 114:22 115:13 |
| **type** 50:24 95:8,13 | 79:16 | **vendors** 69:12 | 115:15 |
| 95:18 100:23 | **update** 89:14,15 | 116:17 125:15,17 | **visors** 11:17 |
| 109:15 110:15 | 89:17 94:25 | 125:20 | |
| **typed** 49:10,15 | **updated** 77:14 | **verbal** 7:22 8:2 | **w** |
| 128:1 | **upper** 26:14 | **verbiage** 91:2,5 | **w** 7:18 12:20 26:9 |
| **typeface** 92:8 | **ups** 76:15 | **verify** 54:14 | **waiting** 27:5 32:1 |
| **types** 104:18 | **upstairs** 99:20 | **version** 43:16,17 | 53:20,20,24 |
| **typewriting** | **use** 7:12 11:17 | 100:19 128:3 | **waive** 3:21 |
| 129:14 | 30:6 35:16 39:10 | **versions** 42:22 | **waived** 3:23 |
| **typical** 67:1 | 45:19,24 54:2 | **versus** 4:4 17:17 | **walk** 29:2 50:1 |
| 118:12 | 56:10,13,14 85:15 | 22:23 46:8 50:11 | 84:5 |
| **typically** 86:15 | 89:17,23 101:7,8 | 57:12 67:24 75:6 | **walked** 60:17 |
| 114:5 | 104:11 110:5 | 124:1 | **walking** 81:25 |
| **typing** 92:7 95:15 | 116:17 118:2,6 | **vet** 48:7 109:3 | **wall** 19:17 |
| | 119:18,23 120:10 | **victor** 37:9 40:5,7 | **want** 11:5 24:19 |
| **u** | 120:15 121:19 | 59:25 60:11 61:6 | 55:13 83:2 84:5 |
| **u** 13:10 47:23 | **user** 95:8 | 61:24 62:2,20 | 128:1,2 |
| **uh** 58:23 65:8 74:1 | **uses** 118:6 | 63:10,13,22,25 | **wanted** 17:3 24:8 |
| 76:2 114:11 | **usps** 76:15 | 64:5 | 30:24 50:21,22,25 |
| **umbrella** 122:8 | **usual** 20:8 67:9 | **victor's** 63:7 | 51:4 52:4 58:7 |
| **unable** 118:10 | **usually** 17:13 | **video** 3:23 127:24 | 75:13,14 78:13 |
| **uncommon** 85:20 | 18:22 21:7 53:23 | 128:3 | 101:6,18 |
| 85:23 | 55:5 56:2 71:21 | **videoconference** | **wanting** 121:13 |
| **underneath** 70:22 | 72:5 74:6 76:11 | 1:15 2:7,13,20 | **warner** 123:22 |
| 72:25 | 101:13 120:1,23 | 129:20 | **washcloths** 83:16 |
| **understand** 5:23 | 121:7 | **videographer** 2:19 | **washroom** 44:3 |
| 6:8,16,22,23,25 | | 4:1,16 24:25 25:6 | **water** 32:17 |
| 8:4,8 9:25 10:3 | **v** | 44:7,11 52:19 | **way** 1:19 7:8,23 |
| 22:4 27:17 52:14 | **v** 1:5 | 87:17,21 112:5 | 52:20 54:9 70:1 |
| 79:21 92:11 | **v1** 18:7,8 | 126:23 127:3,20 | 71:20 77:19 83:18 |
| **understanding** | **v2** 18:11,14 | **videotaped** 1:11 | 84:9 89:23 98:15 |
| 25:19 38:16 86:14 | **v3** 18:15 | | 99:4 115:19 121:7 |
| | | | 121:8 124:6 125:4 |

[ways - york]                                                                Page 24

| | | | |
|---|---|---|---|
| **ways**  124:3 | 130:3 | 11:3,5,15,25 13:9 | 89:16,25,25 90:2,5 |
| **we've**  41:1 42:14 | **women**  36:4 | 13:20,23 14:2,4,13 | 90:8,14,20,23,24 |
| 62:9 72:14 78:12 | **word**  48:16,16,18 | 14:24,25 15:3 | 91:2,24,24 92:3,10 |
| 100:13 120:8 | 81:4 88:15 90:23 | 18:6 19:3 20:13 | 92:10,19,20 93:2 |
| 121:21 122:12 | **words**  68:10 | 20:15,25 21:3,3,4 | 93:15,17 94:10,25 |
| **website**  46:14 | 108:20 | 21:6,14 22:19 | 94:25 95:1,6,17,23 |
| 77:14 110:4 121:1 | **work**  6:10 7:8 | 23:4,5,12,18,18,20 | 96:3,17,17,17,17 |
| **week**  20:13 63:17 | 11:16 13:7 14:20 | 26:8 29:20,21 | 96:18,22 97:1,19 |
| 84:11,13,18 85:8 | 20:7,8 21:4 49:11 | 30:8,20 33:5,22 | 98:25 99:3,3,7,10 |
| 107:9 | 49:22 51:6 52:1 | 34:17,18 37:16 | 100:3,18 101:1,10 |
| **weekend**  72:21 | 61:12,18 90:12 | 39:15 40:20 41:5 | 101:16 103:2,13 |
| **weekends**  35:10 | 105:19 123:10 | 41:14,18 42:3,10 | 103:14,15,21,21 |
| **welcome**  17:8 | **worked**  15:5,22 | 43:11,11 44:23 | 104:21,23 106:23 |
| **went**  13:17,18,25 | 17:1 19:11 24:16 | 46:22 47:8,9 48:1 | 107:3,10,12 108:7 |
| 19:20 22:11 36:12 | 27:10 37:19,20,21 | 49:7,10,21 50:16 | 109:1,5,8,12,21 |
| 74:15 80:20,23 | 40:23 41:4 46:24 | 52:4,4 53:11,16 | 110:2,2,3,9,22 |
| 81:5,8,12,16 | 56:18 57:10 75:21 | 54:5 55:2 56:2,4 | 111:6,20,24,25 |
| 103:10 115:16 | 82:16 92:17 | 56:19 57:9 58:9 | 112:19 113:14,17 |
| **west**  9:13 | 100:24 111:6 | 58:12,22,24 59:2 | 113:21 114:3,3,7 |
| **whereof**  130:3 | 116:16 126:6,9 | 59:14,14,19 60:10 | 114:19 115:11 |
| **wide**  21:1 | **worker**  65:14 | 60:11,19,25 61:1,2 | 117:1,3,8,14,19,20 |
| **wider**  43:5 | **workers**  54:12 | 61:25 62:13,13 | 118:1,5,6,11,14,15 |
| **wife**  9:5 | 119:19 120:10,14 | 63:22,23 65:7,9,9 | 119:2,9,17,22,22 |
| **wife's**  78:20 | **working**  14:21 | 66:10 67:4,4,8,8 | 119:22,23 120:4,7 |
| **window**  51:15 | 15:25 41:11 56:22 | 67:21 68:6,19 | 120:7,14,14 121:1 |
| **wine**  78:15 79:25 | 67:3,10 105:14 | 69:13,17,22,23 | 121:6,6,6,17 |
| 80:15 84:22 86:17 | 118:25 | 70:7,10,18 71:11 | 122:21 123:11,16 |
| 86:17,23,24 | **workstation**  53:22 | 71:14,14,20,21,22 | 123:17,20,20,21 |
| **wise**  29:6 | **write**  7:22 | 72:1,3,12,19 73:19 | 123:22,24,24 |
| **wish**  63:2 | **writing**  19:17 91:6 | 73:25,25,25 74:4,6 | 124:12,17,24 |
| **wished**  118:2 | 121:10 | 74:9,12,12 75:1,14 | 125:6,9,16,16 |
| **withdraw**  38:15 | **written**  62:6 83:4 | 75:15,21,22 76:5 | 126:3,4,14 128:2 |
| **witness**  1:18 3:3 | 106:5 108:3 | 77:12 78:1,1,6 | **year**  13:20 14:1 |
| 4:6,16,18,20 5:5 | 117:21 | 79:5,9,10,20 80:12 | 19:8 22:8 125:23 |
| 5:20,21 14:13 | **wrote**  90:15 | 80:17 81:3,13,14 | **yep**  7:17 11:19 |
| 21:17,21,24 22:2 | | 81:16,18 82:5,16 | 51:12 |
| 25:12 28:10,22 | **x** | 82:25 83:14 84:1 | **yesterday**  25:23 |
| 34:23 38:24 42:3 | **x**  3:1 | 84:8,18,21,22 85:9 | 28:1 42:7 88:10 |
| 42:7 44:4 52:9,17 | **y** | 85:11,23,23 86:18 | 91:14 |
| 53:16 70:6 127:11 | **yeah**  6:18,22,24 | 86:19,22 87:3,4,9 | **york**  1:1 2:11,11 |
| 127:15,19 129:9,9 | 8:21 9:8,9 10:25 | 88:17,24 89:5,6,14 | 9:3,7 36:13 40:20 |

Veritext Legal Solutions

**[york - zoomed]**                                                                    Page 25

118:13
**young**  50:11
**yuri**  37:9 39:22,24
  40:5,8,11,16,22,24
  59:20,25 60:11
  61:9,24 62:2,10,22
  63:21 73:10 74:17
  74:18,24 75:6,9,10
  75:15,16,18,18
  80:20 84:24 85:15
  86:12,12 95:1,10
  102:17,17 105:14
  106:9
**yuri's**  49:2 95:4
  105:25

**z**

**zeel**  44:25 106:22
  107:20
**zeppelin**  23:12
**zero**  93:23
**zip**  13:3
**zoom**  26:11 91:19
  91:22,23
**zoomed**  27:24

A-413

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                    VERITEXT LEGAL SOLUTIONS
          COMPANY CERTIFICATE AND DISCLOSURE STATEMENT


  Veritext Legal Solutions represents that the
  foregoing transcript is a true, correct and complete
  transcript of the colloquies, questions and answers
  as submitted by the court reporter. Veritext Legal
  Solutions further represents that the attached
  exhibits, if any, are true, correct and complete
  documents as submitted by the court reporter and/or
  attorneys in relation to this deposition and that
  the documents were processed in accordance with
  our litigation support and production standards.

  Veritext Legal Solutions is committed to maintaining
  the confidentiality of client and witness information,
  in accordance with the regulations promulgated under
  the Health Insurance Portability and Accountability
  Act (HIPAA), as amended with respect to protected
  health information and the Gramm-Leach-Bliley Act, as
  amended, with respect to Personally Identifiable
  Information (PII). Physical transcripts and exhibits
  are managed under strict facility and personnel access
  controls. Electronic files of documents are stored
  in encrypted form and are transmitted in an encrypted
  fashion to authenticated parties who are permitted to
  access the material. Our data is hosted in a Tier 4
  SSAE 16 certified facility.

  Veritext Legal Solutions complies with all federal and
  State regulations with respect to the provision of
  court reporting services, and maintains its neutrality
  and independence regardless of relationship or the
  financial outcome of any litigation. Veritext requires
  adherence to the foregoing professional and ethical
  standards from all of its subcontractors in their
  independent contractor agreements.

  Inquiries about Veritext Legal Solutions'
  confidentiality and security policies and practices
  should be directed to Veritext's Client Services
  Associates indicated on the cover of this document or
  at www.veritext.com.
```

A-415

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARGARET BETTS, | ) ) ) | **Civil Action No.:**<br>**1:20-cv-04772 (NRB)** |
| Plaintiff, | ) ) | |
| - against – | ) ) ) | **DEFENDANTS'**<br>**RESPONSE TO PLAINTIFF'S**<br>**STATEMENT OF MATERIAL** |
| SIXTY LOWER EAST SIDE, LLC,<br>SIXTY HOTELS, LLC and<br>SIXTY HOTEL MANAGER, LLC, | ) ) ) ) | **FACTS PURSUANT TO**<br>**LOCAL CIVIL RULE 56.1** |
| Defendants. | ) ) ) ) | Assigned Justice:<br>Hon. Naomi Reice Buchwald, U.S.D.J. |

Defendants, **SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC and SIXTY HOTEL MANAGER, LLC**, by their attorneys SOBEL PEVZNER, LLC, respectfully submit this Response to Plaintiff's Statement of Material Facts pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, in support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment on Liability.

1.      Defendants own and manage Sixty LES, a luxury boutique hotel on the Lower East Side of Manhattan with approximately One hundred and forty (140) rooms and more than one hundred employees. (William Grotheer Depo. [Napoli Dec., Ex. 9] at 12; Villanueva Depo. [Napoli Dec., Ex. 14] at 11-12; Riley Depo. [Napoli Dec., Ex. 12] at 9-10; Stuart-Husain Depo. [Napoli Dec., Ex. 13] at 11, 48; Fares Depo. [Napoli Dec., Ex. 8] at 10-11.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "1" as not supported by deposition testimony or admissible evidence to the extent that they differ from the following statement: Defendant, Sixty Lower East Side, LLC, owned the hotel and**

**Defendant and Sixty Hotels, LLC, managed the hotel during the time frame relevant to this lawsuit.**

4.     Sixty LES organizational structure or hierarchy as it pertains to the facts of this case was as follows: Under Mr. Horn was Jennifer Villanueva, the area general manager for New York City. (Villanueva Depo. [Napoli Dec., Ex. 14] at 11).

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "4" as not correctly identifying a "hierarchy." Notwithstanding, the Defendants clarify paragraph "4" by stating that Jennifer Villanueva testified that she was an area general manager overseeing the Lower East Side Property and Soho Property.**

6.     Under Mr. Riley was the concierge, Ben Edwards. (Edwards Depo. [Napoli Dec., Ex. 7] at 16.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "6" as not supported by deposition testimony or admissible evidence. The Defendants clarify paragraph "6" by stating that Ben Edwards testified that he was the guest experience manager or concierge but did not specifically state a time frame for each position or that he was "under Chris Riley."**

7.     One feature of the hotel that was promoted to guests via a Spa Menu placed in all the rooms was the hotel spa (Defendants' Response to Plaintiff's Request for Admission, ¶ 52 & Exhibit A [Napoli Dec., Ex. 5]). The Spa Menu read in relevant part:

> Tucked beneath the lobby of SIXTY LES, The SPA at SIXTY LES is a 1,200 square foot oasis of renewal and relaxation available exclusively to hotel guests.

2

A-417

Our spa and fitness areas combine aspects of privacy and modern luxury. Complimentary fitness and sauna facilities are available 24 hours a day, seven days a week. Advance reservations, via our concierge team, are required to secure spa services in our single spa treatment room.

MASSAGE                                               60    MINUTES    90
                                                     $150                $225

*CUSTOMIZED MASSAGE* (Also available in your room)
        Your therapist will create a customized session using a mixture of
        Swedish, Deep Tissue, Sports, and other massage techniques.

### Response:

The Defendants object and dispute the materials facts contained in paragraph "7" as not supported by deposition testimony or admissible evidence. The Defendants object to Plaintiff's characterization as to what portion of the Spa Menu is relevant. Specifically, the Defendants deem all portions relevant, specifically including the following:

**"SPA SERVICES AVAILABLE IN YOUR ROOM"**
        **"We consult with independent professionals who specialize in mobile spa treatments. Please allow at least 24 hours advance notice for any appointment inquiries."**

**"FACIALS BY THE COLLAGEN BAR"**
        **"Advance reservations, via our concierge team, are required to secure spa services in our single spa treatment room."**

**"RESERVATIONS"**
        **"Scheduling spa appointments at least one hour prior to your arrival is recommended to avoid disappointment. Therapists are called to the hotel upon your request."**

**"DUETS AND COUPLES"**
        **"Our Spa is designed as an individual retreat. For duet or side-by-side services, we can extend the use of a hotel suite, if available."**

8.    Hotel management did not consider the spa to be an "actual service" or operation of the hotel, in part because "we really didn't have the space" to provide more than a single massage. (Villanueva Depo. [Napoli Dec., Ex. 14] at 19-20, 47; Riley Depo. [Napoli Dec., Ex. 12] at 16-17; Edwards Depo. [Napoli Dec., Ex. 7] at 24, 27; Stuart-Husain Depo.

3

A-418

[Napoli Dec., Ex. 13] at 15; Fares Depo. [Napoli Dec., Ex. 8] at 24.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "8" as not supported by deposition testimony or admissible evidence. The Defendants object to the Plaintiff's characterization of testimony to wit: "Hotel management did not consider the spa to be an actual service." The testimony cited by the Plaintiff does not so state and moreover confirms this is not an undisputed material fact.**

9.    Of the more than 100 employees of the hotel, none were assigned to the spa, not even part time — the spa was left unstaffed, with all services being provided by independent contractors. (Riley Depo. [Napoli Dec., Ex. 12] at 18-19; Edwards Depo. [Napoli Dec., Ex. 7] at 16-17, 24, 27.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "9" as not supported by deposition testimony or admissible evidence. The Defendants object to the Plaintiff's characterizations contained in this paragraph. Specifically, Riley testified that the Hotel did not have full time or part time employees in the spa; Edwards testified that the spa was unstaffed, but that it was as a result of the fact that the hotel worked with outside massage therapists, all of which fell under his responsibility to arrange. The testimony is not cited accurately and therefore the paragraph does not contain an admitted material fact.**

10.    In the hotel industry, ownership and operators are jointly responsible to exercise reasonable care in establishing operating procedures to protect guests, employees, and physical

4

assets. (Lloyd Williams Report [Napoli Dec., Ex. 2] at 2); Lloyd Williams Dec. [Napoli Dec., Ex. 3] ¶ 9 ).

**RESPONSE TO ITEMS 10-14 ARE CONSOLIDATED AND SET FORTH FOLLOWING PARAGRAPH 14.**

11.     This responsibility includes the responsibility of hotel management to implement, in advance, as unalterable foundations of the hiring process, background checks for personnel providing services at a hotel. (Lloyd Williams Report [Napoli Dec., Ex. 2] at 4; Lloyd Williams Dec. [Napoli Dec., Ex. 3] ¶ 12).

**RESPONSE TO ITEMS 10-14 ARE CONSOLIDATED AND SET FORTH FOLLOWING PARAGRAPH 14.**

12.     This responsibility applies particularly to the provision of personal services to hotel guests, in which the service provider will have direct contact with the guest. As a typical matter of course, in the hotel industry, providers of a wide range of services – for example, aesthetician, esthetician, swimming instructor, golf instructor, in-house room service server, and massage therapist – are vetted prior to being retained to extend a service offering to a guest, and are tested, often with "practical" or "performance" examinations, against an established set of standards. (Lloyd Williams Report [Napoli Dec., Ex. 2] at 4; Lloyd Williams Dec. [Napoli Dec., Ex. 3] ¶ 10).

**RESPONSE TO ITEMS 10-14 ARE CONSOLIDATED AND SET FORTH FOLLOWING PARAGRAPH 14.**

13.     With regard to the provision of massage therapists for in-room massages, industry standards preclude the offering of such services to guests absent a complete criminal background

5

**A-420**

check and verification of adherence to local licensing requirements. (Lloyd Williams Report [Napoli Dec., Ex. 2] at 4; Lloyd Williams Dec. [Napoli Dec., Ex. 3] ¶ 10).

**RESPONSE TO ITEMS 10-14 ARE CONSOLIDATED AND SET FORTH FOLLOWING PARAGRAPH 14.**

14.    Traditional and widely accepted hotel industry operating standards and practices is to have the hotel general manager is responsible for the day-to-day oversight of any in-room spa services offered at the hotel. (Lloyd Williams Report [Napoli Dec., Ex. 2] at 5; Lloyd Williams Dec. [Napoli Dec., Ex. 3] ¶ 16ins).

**Response (10-14):**

**The Defendants object and dispute the materials facts contained in paragraphs "10" through "14", all inclusive, as not supported by deposition testimony or admissible evidence. The Defendants object to the inclusion of the opinions of Plaintiff's purported expert, Lloyd Williams, in the Statement of Material Facts.  Mr. Williams opinions are not material facts, nor are they uncontroverted evidence as Plaintiff characterizes them in the Memorandum of Law.  Mr. Williams has prepared an affidavit in support of the Plaintiff's Motion for Partial Summary Judgment, he has neither been qualified as an expert in any relevant field by this Court, nor have his qualifications and methodologies used in reaching his conclusions and opinions been subjected to deposition by the Defendant, nor the Court's evaluation under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).  Moreover, his opinions are objected to as vague and conclusory and unsupported by the facts of this action.  Finally, Mr. Williams was disclosed during a time frame where the parties stipulated to staying all expert witness exchanges and this constitutes the only reason he has not been subjected to a**

6

deposition to the present time.  For these reasons, his opinions should never be included in a "Statement of Materials Facts and are not proper nor in compliance with Local Rule 56.1. A more detailed objection to this expert is set forth in the Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment.

15.   The president of Defendant Sixty Hotels, LLC, is not involved in the process of selecting contractors to provide services at Sixty LES. (Maynard Depo. [Napoli Dec., Ex. 11] at 13.)

**Response:**

The Defendants object and dispute the materials facts contained in paragraph "15" as not supported by deposition testimony or admissible evidence. The Defendant objects to the scope of Plaintiff's statement but admits that Mr. Maynard was not involved in the selection of on-property contractors.

16.   Rather, with one exception, the general manager is responsible for vetting and ultimately hiring independent contractors. (Grotheer Depo. [Napoli Dec., Ex. 9] at 28-29, 58; Riley Depo. [Napoli Dec., Ex. 12] at 12-17.)

**Response:**

The Defendants object and dispute the materials facts contained in paragraph "16" as not supported by deposition testimony or admissible evidence.  The testimony of the Witnesses does not support the content of this paragraph as agreed upon material fact.  Mr. Grotheer testified that he..." did not know" if the general manager was involved and Mr. Riley did not testify in conformance with Plaintiff's statement.  Finally, neither addressed "responsibility" or duty, nor in conformance with the Plaintiff's use of the term, "Vetting"

7

or to what extent, "vetting" was performed.

17.    The exception is that the general manager has no responsibilities related to the spa or spa services and has no involvement in selecting the persons performing in-room massage services. (Riley Depo. [Napoli Dec., Ex. 12] at 13:18- 20, 17:10-12, 20:3-7.).

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "17" as not supported by deposition testimony or admissible evidence.  Mr Riley did not testify in conformance with the Plaintiff's characterization of his testimony. Specifically, he testified that he was not involved with "the massage vendor" and that is the full extent of relevant testimony.**

18.    On October 19, 2018, the employee at Sixty LES responsible for scheduling in room massages was the hotel's concierge, Ben Edwards. (Riley Depo. [Napoli Dec., Ex. 12] at 20.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "18" as not supported by deposition testimony or admissible evidence.  The Defendants object to this paragraph to the extent that it differs from Mr. Riley's actual testimony to wit: … "Ben, who was the concierge, would reach out to schedule massages."**

20.    Although the list was not produced in discovery, Mr. Edwards recalls that the first section of the list, with the most reliable providers, contained "like three women and maybe two males." (Edwards Depo. [Napoli Dec., Ex. 7] at 31, 36.).

**Response:**

8

**The Defendants object and dispute the materials facts contained in paragraph "20" as not supported by deposition testimony or admissible evidence. The Defendants object to the inclusion of Plaintiff's statement regarding discovery as a material fact. The balance of this paragraph is admitted as to Mr. Edward's testimony.**

21.    The second part of the list contained about five other names. (Edwards Depo. [Napoli Dec., Ex. 7] at 36.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "21" as not supported by deposition testimony or admissible evidence. Mr Edwards testified that he did not remember exactly the number of names on the second list… "Maybe around five again" is the full extent of the relevant testimony.**

22.    Mr. Edwards remembered some of their names -- Laura, Diana, Maria, Aria, Natasha, Yuri, and Victor. (Edwards Depo. [Napoli Dec., Ex. 7] at 36-37.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "22" as not supported by deposition testimony or admissible evidence. The Defendants object to the Plaintiff's characterization linking the names Mr. Edwards recalled to the "second list." His testimony does not support this assertion as an agreed upon material fact. Rather he testified about names in relation to both lists.**

23.    Mr. Edwards stated that although it seemed the people on the list "all kind of knew each other," they were not part of a company – "they all just worked for themselves." (Edwards

9

Depo. [Napoli Dec., Ex. 7] at 36, 46.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "23" as not supported by deposition testimony or admissible evidence. The Defendants object to this paragraph as an agreed upon material fact. At the time of his testimony, Mr. Edwards testimony was not linked to any specific time frame and represented his recollection at the time of the deposition.**

24.    Mr. Edwards further testified that near the end of his time working at Sixty LES (after the incident that led to this lawsuit occurred), when he was told to get the license information for the massage therapists, he only obtained licenses of "one or two" of the roughly ten (10) people on the list. (Edwards Depo. [Napoli Dec., Ex. 7] at 38.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "24" as not supported by deposition testimony or admissible evidence. The Defendants object to the Plaintiff's characterization of Mr. Edwards testimony as material fact. Specifically, he testified that he was "told to get licenses from the massage therapists that we used often. And I think we got a couple of them." Mr. Edwards testimony is not accurately set forth and therefore this paragraph does not contain undisputed material facts as required by   Rule 56.1.**

26.    Defendants possess "no documents relating to any defendant's inquiries into the background, criminal history, hiring, or retention of personnel from third- parties or agencies utilized by any defendant to provide any in-room services to defendants' guests." (Defendants'

10

Response to Plaintiff's First Request for Production of Documents [Napoli Dec., Ex. 4], ¶ 16.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "26" as not supported by deposition testimony or admissible evidence. The Defendants' prior response to discovery is accurately recited; however, the inclusion of a discovery response in a statement of material facts is not proper under Rule 56.1.**

27.   Defendants never did any background check on any of the massage therapists that were sent to guests' rooms at Sixty LES. (Defendants' Response to Plaintiff's Requests for Admission [Napoli Dec., Ex. 5], ¶¶ 45, 49; Grotheer Depo. [Napoli Dec., Ex. 9] at 34, 36-37.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "27" as not supported by deposition testimony or admissible evidence. The Defendants' Response to Plaintiff's Request for Admission does not contain the admission or facts as set forth in this paragraph by the Plaintiff. Defendants' Response to Plaintiff's Request for Admissions specifically denies such requested admission. (*See,* Exhibit "D" to Sobel Dec in Support of Motion for Summary Judgment [Defendants' Response to Plaintiff's Request for Admissions]) William Grotheer also did not testify in any manner consistent with the Plaintiff's references to page 34, 36-37. The witness was testifying in response to questions posed as to one Defendant, namely, "Sixty LES" and therefore the characterization that the questions went beyond that one Defendant is incorrect and not a material fact. Specifically, he testified from his knowledge on behalf of Sixty LES and specifically testified that ... "I am not aware of who's vetted them. That would be something the hotel itself would do..."**

11

29.    Defendants' corporate representative conceded in the Rule 30(b)(6) deposition that Sixty LES does not "know anything about the specific massage therapists that were sent to Sixty LES," and does not even "know the name of the massage therapists who had provided services to Ms. Betts and other hotel guests in 2018." (Grotheer Depo. [Napoli Dec., Ex. 9] at 34:8-15; see also id. at 21, 25-26, 34.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "29" as not supported by deposition testimony or admissible evidence.  The Defendants object to this statement as a material fact, as the witness stated specifically, that his testimony was limited to what "…I am aware of." Additionally, the testimony of multiple other witnesses confirmed that the name and identity of the therapist was known to them.  (*See,* Exhibit "L" to Sobel Dec in Support of Motion for Summary Judgment [Fares Deposition] Pages 31-33); (*See,* Exhibit "J" to Sobel Dec in Support of Motion for Summary Judgment [Edwards deposition] Page 73, Line 8; Page 74, Lines 20-24; Page 75, Lines 4-23; Page 84, Line 23; Page 85, Line 19; Page 105, Lines 10-17.)**

30.    One reason Sixty LES does not even know the name of the massage therapists (other than the first names on a list which apparently no longer exists) is that all massage therapists were paid by the hotel in cash, with no tax reporting. (Villanueva Depo. [Napoli Dec., Ex. 14] at 33.)

**Response:**

**The Defendants object and dispute the material facts contained in paragraph "30" as not supported by deposition testimony or admissible evidence.  This is an allegation, a**

12

conclusion the plaintiff reaches based upon limited testimony of one of ten witnesses who have deposed during discovery. The testimony of Jennifer Villanueva is completely misquoted. To the extent that Ms. Villanueva testified that, "…They typically were paid in cash. That's really almost any hotel that I've worked at for massage therapists they pay them out in cash…" In regard to tax forms, she stated, "I don't know" and not as characterized by Plaintiff.

31.    Plaintiff Margaret Betts, a Chicago resident, checked into the hotel on October 19, 2018, having booked a two-night stay, at a base rate of $1,500 a night. (Betts Depo. [Napoli Dec., Ex. 6] at 24, 29, ; Sixty LES Invoice Ex. 16).

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "31" as not supported by deposition testimony or admissible evidence. The Defendants object to the extent that the Plaintiff characterizes the entry on an invoice, "Package" as a "base rate."**

32.    Plaintiff Margaret Betts booked Room 1801, known as the Orchard Suite, which was the best room in the hotel and one of the most expensive. (Stuart-Husain Depo. [Napoli Dec., Ex. 13] at 49; Fares Depo. [Napoli Dec., Ex. 8] at 40; Villanueva Depo. [Napoli Dec., Ex. 14] at 34).

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "32" as not supported by deposition testimony or admissible evidence. The Defendants object as not being an accurate statement of fact. The Plaintiff did not book the Penthouse suite she ultimately stayed in. The Plaintiff was given an upgrade to the Penthouse Suite by Samantha**

13

Fares upon the request of the Plaintiff. (Fares Depo. at Pages 25-26.)  The Plaintiff booked a lower grade of room than she was upgraded to by Ms. Fare.

33.      After checking in, Plaintiff called the hotel to schedule a massage and spoke with front desk agent Samara Farris, indicating a preference for a female massage therapist, a preference which was duly noted in hotel documents, with Laura being scheduled to do the massage. (Fares Depo. [Napoli Dec., Ex. 8] at 29, 36-37; Edwards Depo. [Napoli Dec., Ex. 7] at 97; Betts Depo. [Napoli Dec., Ex. 6] at 72-73.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "33" as not supported by deposition testimony or admissible evidence.  The Defendants object to this statement as it inaccurately quotes testimony of Ms. Fares in support of the purported facts as well as the conclusion reached by Plaintiff's counsel.  Neither the testimony nor document indicate a "preference for a female massage therapist."  Specifically, Ms. Fares testified that she did not recall whether the plaintiff expressed a preference for a male or female therapist. Additionally, when shown the document referred to in this paragraph by the Plaintiff and asked about the inclusion of the word "female", she testified that the word female "Maybe the preference. I don't know. Or that Laura is a female?"**

35.      There were no "materials from the hotel or on the hotel website that informed guests that spa services were performed by a third party," according to the general manager of Sixty LES. (Riley Depo. [Napoli Dec., Ex. 12] at 19-20.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "35"**

14

as not supported by deposition testimony or admissible evidence. The Defendants object to the Plaintiff's characterization of Mr. Riley's testimony. Specifically, he responded to a question as to whether or not he was "aware" of any materials and any material fact is limited to his awareness.

36. Plaintiff therefore believed that she had ordered an in-room massage to be performed by a hotel employee staffing the "Spa at Sixty." (Betts Depo. [Napoli Dec., Ex. 6] at 79-81.)

**Response:**

The Defendants object and dispute the materials facts contained in paragraph "36" as not supported by deposition testimony or admissible evidence. The Defendants object to the Plaintiff's linking her "belief" as described in paragraph 36 to an unidentified basis for such belief. Moreover, it is an inaccurate recitation of the Plaintiff's testimony. Specifically, she testified in response to a question as to whether she assumed he was coming from the spa, she responded, "...That he was employed by them...but that was never a topic of conversation..."

37. Plaintiff would have never ordered an in-room massage if she had "been advised . . . that there were no massage therapists available from the spa, that – that the hotel would need to go outside the hotel to get somebody" to do the massage. (Betts. Depo. [Napoli Dec., Ex. 6] at 83-84.)

**Response:**

The Defendants object and dispute the materials facts contained in paragraph "37" as not supported by deposition testimony or admissible evidence. The Defendants object to

15

Plaintiff's characterization of her testimony.  She simply testified that had she been advised that the hotel would need to go outside for a therapist, "…I would have said no."

39.     "Yuri" never disclosed in any way that he was from an outside agency.  (Betts Depo. [Napoli Dec., Ex. 6] at 88.)

**Response:**

The Defendants object and dispute the materials facts contained in paragraph "39" as not supported by deposition testimony or admissible evidence.  The Defendants object to Plaintiff's characterization of her testimony.  The Plaintiff's testimony actually states that the therapist and she never discussed who he worked for and whether he was from an outside agency.

40.     Plaintiff consented to massage services being performed by "Yuri" on the belief that he was an employee of the Sixty LES luxury boutique hotel who had been appropriately vetted, consistent with normal standards for luxury hotels, as legally authorized to perform massage therapy in the State of New York. (Betts. Depo. [Napoli Dec., Ex. 6] at 83-84.)

**Response:**

The Defendants object and dispute the materials facts contained in paragraph "40" as not supported by deposition testimony or admissible evidence.  The Defendants object to this paragraph as it is a conclusion or argument the Plaintiff intends to make, not a statement of material fact.  Nowhere in the Plaintiff's testimony is "consent" even mentioned, nor that she would have withheld such consent based upon the arguments advanced in this paragraph.

41.     Following her stay at the Sixty LES hotel, Plaintiff reported to management at Sixty

16

LES that she had been sexually assaulted by "Yuri" during the massage. (Betts Depo. [Napoli Dec., Ex. 6] at 22; Riley Depo. [Napoli Dec., Ex. 12] at 21-22.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "41" as not supported by deposition testimony or admissible evidence. The Defendants object to this statement as a material fact as it is misleading by its omission of the time of such complaint. The Plaintiff testified to reporting it first to the police and then to the hotel but could not recall if it, "…was within a week." Additionally, the specific content of the report was not testified to by the Plaintiff as represented in this paragraph.**

43.    However, Sixty LES never reported the complaint to law enforcement authorities, and did not conduct an investigation, because Yuri was not an employee. (Riley Depo. [Napoli Dec., Ex. 12] at 24, 40.)

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "43" as not supported by deposition testimony or admissible evidence. The Defendants object to Plaintiff's characterization set forth in this statement of material facts. The testimony of Mr. Riley clearly sets forth the extent of the actions taken by the hotel following receipt of the Plaintiff's call.**

45.    When law enforcement authorities contacted Sixty LES, in response to the complaint made by Plaintiff, Sixty LES was unable to identify the man who had allegedly sexually assaulted Ms. Betts, because the hotel only knew that he went by the name "Yuri." (Riley Depo. [Napoli Dec., Ex. 12] at 41, 48.)

17

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "45" as not supported by deposition testimony or admissible evidence.  The Defendants object to Plaintiff's characterization of her testimony and objects to Plaintiff's request that the conclusions contained in this paragraph be considered statements of material fact.  Support of this paragraph does not exist anywhere in Mr. Riley's testimony.**

46.     In correspondence with counsel for Plaintiff, counsel for Sixty LES concealed the fact that, even two years after the incident in question, Sixty LES still did not know the real identity of "Yuri," by giving counsel for Ms. Betts the false impression that it had notified law enforcement authorities of the identity of "Yuri." [See Riley Depo [Napoli Dec., Ex. 12] at 49-, and 2-page letter to Riley from Plaintiff's counsel Renato Mariotti which was Exh 4 to Riley Deposition]

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "46" as not supported by deposition testimony or admissible evidence.  The Defendants object to Plaintiff's request that the entire content of this paragraph be considered a material fact.  The allegations and conclusions reached by the Plaintiff in this paragraph are nothing more than argument for summation and not evidence.**

47.     Subsequently, through the investigation by Plaintiff's counsel, Plaintiff learned the real identity of "Yuri." His full name is Iouri Astakhov.

**Response:**

**The Defendants object and dispute the materials facts contained in paragraph "47" as not supported by deposition testimony or admissible evidence.  The Defendants object to**

18

**A-433**

Plaintiff's assertion contained in this paragraph.  The name of the therapist was provided by Valeria Vasilets in her deposition testimony. (Vasilets Deposition at page 22.)  The spelling by the stenographer was phonetic.  Another spelling of the therapist's name was actually provided by Curtis Sobel during a conference with the Court, a fact which is not proper for a statement of material fact but is being brought to the Court's attention.

48.    The Court can take judicial notice of the New York licensing records which show that Iouri Astakhov was not authorized to perform massage services in the State of New York at the time of the incident. [See Office of Admissions Verification Search [Napoli Dec., Ex. 15].

**Response:**

The Defendants object and dispute the materials facts contained in paragraph "48" as not supported by deposition testimony or admissible evidence.  The Defendants object to the inclusion of a request for judicial notice as set forth in this paragraph.  More importantly, the document provided by the Plaintiff as Exhibit 15 actually confirms the fact that the therapist involved was licensed by the State of New York in 2008.  The Court should take judicial notice of the fact that the therapist's license as with all massage therapist licenses are issued for life unless revoked, annulled or suspended. Registration with the Department of Education has no effect on the fact that Iuori Astakhov was a licensed massage therapist in the State of New York on October 19, 2018.

Dated: Huntington, New York
      January 12, 2023

                        Respectfully submitted,

                        SOBEL PEVZNER, LLC

By:    *Curtis Sobel*

                        CURTIS SOBEL, ESQ.
                        *Attorneys for Defendants*

19

A-434

464 New York Avenue, Suite 100
Huntington, NY 11743
Tel: 631-549-4677
CSobel@sobelpevzner.com
File No.: H-14394

TO:   NAPOLI SHKOLNIK, PLLC
      Joseph Napoli, Esq.
      *Attorneys for Plaintiff*
      400 Broadhollow Road
      Melville, NY
      Tel: 212-397-1000
      JNapoli@NapoliLaw.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| MARGARET BETTS, | ) ) ) | **Civil Action No.:** **1:20-cv-04772 (NRB)** |
| Plaintiff, | ) ) |  |
| - against – | ) ) ) | **NOTICE OF MOTION** **FOR SUMMARY** **JUDGMENT** |
| SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC and SIXTY HOTEL MANAGER, LLC, | ) ) ) ) ) ) | Assigned Justice: Hon. Naomi Reice Buchwald, U.S.D.J. |
| Defendants. | ) ) |  |

TO:    NAPOLI SHKOLNIK, PLLC
Joseph Napoli, Esq.
*Attorneys for Plaintiff*
400 Broadhollow Road
Melville, NY
Tel: 212-397-1000
JNapoli@NapoliLaw.com

**PLEASE TAKE NOTICE** that upon the accompanying Local Rule 56.1 Statement of

Material Facts, the accompanying Declaration of Curtis Sobel with supporting exhibits attached

thereto, and the accompanying Memorandum of Law, as well as all pleadings and proceedings

hereto, the undersigned will move this Court before the Honorable Naomi Reice Buchwald,

U.S.D.J., at the United States Courthouse, for the Southern District of New York, 500 Pearl Street,

New York, New York 10007, for an Order, pursuant to Fed. R. Civ. P. 56, granting defendants,

SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC and SIXTY HOTEL MANAGER,

LLC, summary judgment dismissing all claims against them, and for such other and further relief

which to this Court deems just and proper.

A-436

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Order of this Court, opposition papers, if any are to be filed on or before January 26, 2023, and reply papers, if any, shall be filed on or before February 9, 2023.

A Rule 56.1 Statement pursuant to F.R.C.P. § 56 and Rule 56.1(a)of the Civil Rules of this District, as to which defendants contend that there can be no genuine issues of fact to be tried, is attached hereto.

Dated: Huntington, New York
January 12, 2023

Respectfully submitted,

SOBEL PEVZNER, LLC

By:    *Curtis Sobel*
CURTIS SOBEL, ESQ. (CS 0964)
***Attorneys for Defendants***
464 New York Avenue, Suite 100
Huntington, NY 11743
Tel: 631-549-4677
CSobel@sobelpevzner.com
File No.: H-14394

TO:    NAPOLI SHKOLNIK, PLLC
Joseph Napoli, Esq.
***Attorneys for Plaintiff***
400 Broadhollow Road
Melville, NY
Tel: 212-397-1000
JNapoli@NapoliLaw.com

2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARGARET BETTS, | Civil Action No.:<br>**1:20-cv-04772 (NRB)** |
| Plaintiff, | |
| - against – | **DEFENDANTS'**<br>**STATEMENT OF MATERIAL**<br>**FACTS PURSUANT TO**<br>**LOCAL CIVIL RULE 56.1** |
| SIXTY LOWER EAST SIDE, LLC,<br>SIXTY HOTELS, LLC and<br>SIXTY HOTEL MANAGER, LLC, | |
| | Assigned Justice:<br>Hon. Naomi Reice Buchwald, U.S.D.J. |
| Defendants. | |

Defendants, **SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC and SIXTY HOTEL MANAGER, LLC**, by their attorneys, SOBEL PEVZNER, LLC, respectfully submit the following Statement of Material Facts pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, in support of Defendants' Motion for Summary Judgment.

1.    On October 19, 2018, The Defendant, Sixty Lower Easts Side, LLC ("LES"), owned a hotel located at 190 Allen Street, New York , N.Y.

2.    On October 19, 2018, the hotel owned by LES was managed by the Defendant, Sixty Hotels, LLC.

3.    On October 19, 2018, the Defendant, Sixty Hotel Manager, LLC, did not own, operate, control, manage or have any other involvement in the hotel located at 190 Allen Street, New York, New York.

4.    On October 19, 2018, Edward Maynard was the President of Sixty Hotels LLC. (*See,* **Exhibit "E" to Sobel Dec** [Maynard Deposition] Page 9, Lines 18-20.)

5.      On the date of his deposition, March 1, 2021, Edward Maynard was no longer the President of Sixty Hotels, LLC.  (*See,* **Exhibit "E" to Sobel Dec** [Maynard Deposition] Page 9, Lines 5-9.)

6.      On October 19, 2018, the following individuals were employed by Sixty Hotels, LLC, in the following capacities: Christopher Horn, VP of Operations; Nicholas Riley, Hotel Manager; Jennifer Villanueva, Area General Manager, Felicia Stuart-Husain, Assistant Front Office Manager; Samantha Fares, Front Desk Agent; Ben Edwards, Guest Experience Manager.

7.      On October 19, 2018, William Grotheer was not employed by Sixty Hotels, LLC, having started employment in October of 2019.

8.      On October 19, 2018, Brenton Krumpfes was in a relationship with the Plaintiff, Margaret Betts, that he described as being a "close friend of the opposite sex." (*See,* **Exhibit "F" to Sobel Dec** [Krumpfes Deposition] Page 12, Line 23 to Page 13, Line 1.)

9.      On October 19, 2018, Hephzibah Strmic-Pawl and the Plaintiff, Margaret Betts were in a good friendship.  (*See,* **Exhibit "G" to Sobel Dec** [Strmic-Pawl Deposition] Page 10, Lines 10-14.)

10.      On October 19, 2018, the Plaintiff was a registered guest in the hotel owned by the Defendant, Sixty Lower East Side, LLC.  At various times on October 19, 2018, Brenton Krumpfes and Hephzibah Strmic-Pawl were guests of the Plaintiff and present in Suite 1801.  The Plaintiff was upgraded to the Penthouse Suite 1801 upon her request.

11.      Brenton Krumpfes was present in Suite 1801 at the time of a sexual assault was allegedly perpetrated upon the Plaintiff.

2

12.    At approximately 7:00 p.m. on October 19, 2018, the Plaintiff requested an in-room massage via a telephone call to the front desk of the Defendant's Hotel.

13.    At the time of the Plaintiff's request for an in-room massage, there was present in Suite 1801, a document entitled, "Sixty LES Spa Menu."  (*See,* **Exhibit "H" to Sobel Dec**) In relevant part, The Spa Menu contained the following information:

**"SPA SERVICES AVAILABLE IN YOUR ROOM"**
"We consult with independent professionals who specialize in mobile spa treatments. Please allow at least 24 hours advance notice for any appointment inquiries."

**"FACIALS BY THE COLLAGEN BAR"**
"Advance reservations, via our concierge team, are required to secure spa services in our single spa treatment room."

**"RESERVATIONS"**
"Scheduling spa appointments at least one hour prior to your arrival is recommended to avoid disappointment. Therapists are called to the hotel upon your request."

**"DUETS AND COUPLES"**
"Our Spa is designed as an individual retreat. For duet or side-by-side services, we can extend the use of a hotel suite, if available."

14.    In response to the request for an in-room massage made by the Plaintiff, hotel staff contacted Valeria Vasilets, who at that time was an independent contractor.  In addition to LES, Valeria Vasilets provided massage services as an independent contractor to a few hotels including Sixty Soho and Soho Grand. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 14, Lines 16-24 and Page 19, Lines 2-12.)

15.    The request from the Plaintiff was for an immediate massage appointment.  The concierge had a practice of advising guests who wanted an immediate appointment, that the Spa was unstaffed and that the hotel used outside massage therapists. (*See,* **Exhibit "J" to Sobel Dec** [Edwards Deposition] Page 52, Lines 1-4.)

3

16.     Prior to October 19, 2018, Valeria Vasilets met Iuori Astakhov, another independent massage therapist with whom she performed couples massages. She described his work as good and very successful, without incident. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 23, Lines 8-13.)

17.     Ms. Vasilets was unable to fulfill the Plaintiff's request for an in-room massage and so she called Iouri Astakhov who agreed to provide the massage. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 24, Lines 3-14.)

18.     Valeria Vasilets advised LES that she was going to be calling Iouri to handle the massage. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 39, Lines 12-20.)

19.     The LES employee who called Valeria Vasilets knew Iouri from prior work at the hotel. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 39, Lines 17-20.)

20.     When Valeria Vasilets started working with LES, the hotel requested information and documentation from her including a copy of her massage therapy license, photo identification, driver's license and insurance. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 25, Line 20 to Page 26, Line 1.)

21.     On October 19, 2018, Valeria Vasilets knew that Iouri Astakhov was a licensed massage therapist in New York State. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 28, Lines 5-10.)

22.     Iouri Astakhov had a license in Massage Therapy from the State of New York with the date of licensure of October 1, 2008.

23.     Once issued, a license to perform Massage Therapy in New York State is issued for life barring revocation, annulment or suspension. (*See,* **Exhibit "K" of Sobel Dec** [Printout of a

4

portion of the New York State Department of Education Government Website. Pg. 3, Question and Answer 19]). Defendant will request the Court to take Judicial Notice of this Statement of Material Fact.

24.    Iouri Astakhov's license in Massage Therapy from the State of New York has never been revoked, annulled or suspended and was in effect on October 19, 2018 when he provided massage therapy services to the Plaintiff.

25.    Iouri Astakhov continued registration with the Department of Education through November of 2013; however, registration is not the equivalent of licensure and Astakhov was licensed by the State of New York to provide Massage Therapy on October 19, 2018.

26.    Prior to October 19, 2018, Iouri Astakhov provided Massage Therapy to guests of LES without complaint.

27.    Prior to October 19, 2018, no Defendant ever received complaints about Iouri Astakhov.

28.    On October 19, 2018,  Iouri Astakhov was known to employees of LES as a massage therapist. *See,* **Exhibit "H"** (Fares Deposition pgs 31-33).  The hotel utilized his services for prior guests, had the phone number of the massage therapist and would contact him directly when a guest requested him as the therapist. (*See,* **Exhibit "J" to Sobel Dec** [Edwards Deposition] Page 73, Line 8; Page 74, Lines 20-24; Page 75, Lines 4-23; Page 84, Line 23; Page 85, Line 19; Page 105, Lines 10-17.)

29.    At no time prior to October 19, 2018, was Iouri Astakhov accused of any criminal conduct.

30.    Prior to October 19, 2018, Iouri Astakhov had no criminal record.

5

31. The Plaintiff alleges that on October 19, 2018, during an in-room massage provided by Iouri Astakhov, she alleges to have been subjected to improper touching and sexual assault.

32. There is no evidence that Iouri Astakhov ever committed any criminal act including the criminal act of sexual assault prior to time of the massage on October 19, 2018.

33. At no time prior to October 19, 2018 was Iouri Astakhov convicted of any criminal act including sexual assault.

34. There is no evidence that LES and its employees knew or should have known that Iouri Astakhov had the propensity to commit any crime including the criminal act of sexual assault during the massage provided to the Plaintiff.

35. Other than the report made by the Plaintiff, the hotel never received any complaints nor has Defendant been notified of any incidence of sexual assault. (*See,* **Exhibit "J" to Sobel Dec** [Edwards Deposition] Page 121, Line 23 to Page 122, Line 3.)

36. At the time of the massage, Iouri Astakhov was an independent contractor, not employed by LES.

37. The Plaintiff remained as a guest in LES through Sunday, October 21, 2018.

38. After returning to Chicago, the Plaintiff called LES and spoke to Felecia Stuart at which time she reported the alleged incident involving the massage therapist.

39. After receiving the report from the Plaintiff, LES received a subpoena from the District Attorney's Office of New York County. LES fully complied with the subpoena.

40. At no time to date have any criminal charges been brought or referred against the massage therapist.

6

41.    At no time to date have any criminal charges been brought or referred against any defendant, or any of the defendants' employees.

42.    After the Plaintiff reported the incident to LES, Valeria Vasilets was contacted by the Hotel Manager and was interviewed during the following week. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 41, Lines 15 to Page 42, Line 20.)

43.    Even though her full name is Valeria, she was often referred to as "Laura" because Lara is the short form of Valeria. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 51, Line 14 to Page 52, Line 7.)

44.    At no time prior to learning of the allegation made by the Plaintiff did Valeria Vasilets ever receive a complaint with respect to massages at Sixty Hotels. (*See,* **Exhibit "I" to Sobel Dec** [Vasilets Deposition] Page 58, Line 23 to Page 59, Line 2.)

45.    At some point late in the year of 2018, the Manager Nicholas Riley requested Ben Edwards to obtain licenses for all the massage therapists on the LES list. However, he stopped before completing this task as the hotel decided to use a massage service known as "Nomi." (*See,* **Exhibit "J" to Sobel Dec** [Edwards Deposition] Page 45, Lines 6-12.)

46.    There was a standard procedure when a massage therapist arrived at the hotel for the purpose of providing a massage to a hotel guest. All therapists were known to the Concierge, Ben Edwards, so a showing of identification was not required. (*See,* **Exhibit "J" to Sobel Dec** [Edwards Deposition] Page 54, Lines 13-23.)

47.    There was a standard procedure for payment to be made to the massage therapist by the front-end hotel personnel. The therapist would sign a slip confirming that the massage was finished, and if they added a gratuity. The front-end employee would then pay the therapist from

7

their "bank." (*See,* **Exhibit "J" to Sobel Dec** [Edwards Deposition] Page 56, Line 15 to Page 57, Line 10.)

48.     On or about October 19, 2018, the defendant hotel had policies in place to address guest complaints. (*See,* **Exhibit "M" of Sobel Dec** [Stuart-Husain Deposition] Page 32, Lines 18-25.)

49.     There were no complaints relating to massages including but not limited to crimes including sexual assault other than the complaint by the plaintiff. (*See,* **Exhibit "M" of Sobel Dec** [Stuart-Husain Deposition] Page 36, Line 13 to Page 37, Line 8); (*See,* **Exhibit "L" to Sobel Dec** [Fares Deposition] Page 48, Lines 8-19); (*See,* **Exhibit "N" to Sobel Dec** [Villanueva Deposition] Page 44, Line 15 to Page 45, Line 5); (*See,* **Exhibit "O" to Sobel Dec** [Riley Deposition] Page 58, Lines 2-25); (*See,* **Exhibit "P" to Sobel Dec** [Horn Deposition] Page 32, Line 3 to Page 33, Line 3.)

50.     There is no evidence that Iouri Astakhov had a propensity for criminal conduct prior to October 19, 2018.

51.     There is no evidence that Iouri Astakhov had committed any criminal act prior to October 19, 2018.

52.     There is no evidence that the Defendant knew or should have known of Iouri Astakhov's alleged2 propensity to commit the act of which he was accused by the Plaintiff.

53.     On and prior to October 19, 2018, there existed no common law duty for the Defndant to conduct a background check of any independent contractor.

54.     There is no evidence as to what if any information would have been discovered by

8

a background check of Iouri Astakhov.


Dated:  Huntington, New York
        January 12, 2023


                        Respectfully submitted,


                        *Curtis Sobel*
                        CURTIS SOBEL (CS 0964)

9

A-446

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| MARGARET BETTS, | ) | **Civil Action No.:** |
|  | ) | **1:20-cv-04772 (NRB)** |
| Plaintiff, | ) |  |
|  | ) |  |
| - against – | ) | **DECLARATION OF** |
|  | ) | **CURTIS SOBEL, ESQ.** |
| SIXTY LOWER EAST SIDE, LLC, | ) |  |
| SIXTY HOTELS, LLC and | ) |  |
| SIXTY HOTEL MANAGER, LLC, | ) | Assigned Justice: |
|  | ) | Hon. Naomi Reice Buchwald, U.S.D.J. |
| Defendants. | ) |  |
|  | ) |  |

I, CURTIS SOBEL, ESQ, an attorney duly admitted to practice law before the United States District Court for the Southern District of New York, hereby declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1.      I am a founding member of SOBEL PEVZNER, LLC, attorneys for defendants, **SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC and SIXTY HOTEL MANAGER, LLC**, in the above-captioned matter and as such, I am fully familiar with the facts and circumstances of this action.

2.      I submit this Declaration in support of Defendants' motion for summary judgment dismissing all claims against them, and for such other and further relief which to this Court deems just and proper.

3.      Annexed hereto as **Exhibit "A"** is a copy of Plaintiff's Summons and Complaint.

4.      Annexed hereto as **Exhibit "B"** is a copy of Defendants' Verified Answer.

5.      Annexed hereto as **Exhibit "C"** is a copy of Plaintiff's Request for Admissions.

6.    Annexed hereto as **Exhibit "D"** is a copy of Defendants' Response to Plaintiff's Request for Admissions.

7.    Annexed hereto as **Exhibit "E"** is a copy of the deposition transcript of Edward Maynard held on March 1, 2021.

8.    Annexed hereto as **Exhibit "F"** is a copy of the deposition transcript of Brenton Krumpfes held on January 19, 2021.

9.    Annexed hereto as **Exhibit "G"** is a copy of the deposition transcript of Hephzibah Strmic-Pawl held on February 4, 2021.

10.    Annexed hereto as **Exhibit "H"** is a copy of the "Sixty LES Spa Menu."

11.    Annexed hereto as **Exhibit "I"** is a copy of the deposition transcript of Valeryia Vasilets held on February 8, 2021.

12.    Annexed hereto as **Exhibit "J"** is a copy of the deposition transcript of Ben Edwards held on February 3, 2021.

13.    Annexed hereto as **Exhibit "K"** is a printout of a portion of the New York State Department of Education Government Website. Pg. 3, Question and Answer 19.

14.    Annexed hereto as **Exhibit "L"** is a copy of the deposition transcript of Samara Fares held on January 20, 2021.

15.    Annexed hereto as **Exhibit "M"** is a copy of the deposition transcript of Felicia Stuart-Husain held on January 11, 2021.

16.    Annexed hereto as **Exhibit "N"** is a copy of the deposition transcript of Jennifer Villanueva held on January 13, 2021.

2

A-448

17.    Annexed hereto as **Exhibit "O"** is a copy of the deposition transcript of Nicholas Riley held on January 13, 2021.

18.    Annexed hereto as **Exhibit "P"** is a copy of the deposition transcript of Christopher Horn held on February 3, 2021.

Dated: Huntington, New York
        January 12, 2023

Respectfully submitted,

SOBEL PEVZNER, LLC

By:    *Curtis Sobel*

CURTIS SOBEL, ESQ. (CS 0964)
**Attorneys for Defendants**
464 New York Avenue, Suite 100
Huntington, NY 11743
Tel: 631-549-4677
CSobel@sobelpevzner.com
File No.: H-14394

TO:    NAPOLI SHKOLNIK, PLLC
        Joseph Napoli, Esq.
        **Attorneys for Plaintiff**
        400 Broadhollow Road
        Melville, NY
        Tel: 212-397-1000
        JNapoli@NapoliLaw.com

3

A-449

# EXHIBIT – B

A-450

Case 1:20-cv-04772-NRB Document 63-4 Filed 08/21/23 Page 2 of 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x
MARGARET BETTS,

                      Plaintiff,

    - against -

SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC
and SIXTY HOTEL MANAGER, LLC,

                      Defendants.
--------------------------------------------------------------------------x

**Civil Action No.:**
**1:20-cv-04772 (NRB)**

**VERIFIED ANSWER**
**WITH JURY DEMAND**

        The defendants, **SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS LLC and SIXTY HOTEL MANAGER, LLC,** by their attorneys, SOBEL PEVZNER, LLC, answering the Complaint of the plaintiff, allege upon information and belief:

## ANSWERING NATURE OF THE CASE

    **1.**    Defendants deny, upon information and belief, each and every allegation contained in paragraphs "1" through "6", all inclusive, of the Complaint.

    **2.**    Defendants deny, upon information and belief, each and every allegation contained in paragraphs "7" and "8" of the Complaint, and respectfully refer all questions of law to this Honorable Court.

## ANSWERING PARTIES AND JURISDICTION

    **3.**    Defendants deny having knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "9" of the Complaint.

    **4.**    Defendants deny having knowledge or information sufficient to form a belief as to each and every allegation contained in paragraphs "13" and "14" of the Complaint, and respectfully refer all questions of law to this Honorable Court.

**ANSWERING BACKGROUND FACTS**
**THE RELATIONSHIP BETWEEN THE DEFENDANTS**

5. Defendants deny, upon information and belief, each and every allegation contained in paragraphs "15", "16", "17" and "19" through "23", all inclusive, of the Complaint.

6. Defendants deny having knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "18" of the Complaint.

**ANSWERING THE SEXUAL ASSAULT**

7. Defendants deny having knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "24" of the Complaint, except admit on October 19, 2018, Ms. Betts arrived at Sixty LES.

8. Defendants deny, upon information and belief, each and every allegation contained in paragraphs "25", "27", "29", "30" and "32" through "35", all inclusive, of the Complaint.

9. Defendants deny having knowledge or information sufficient to form a belief as to each and every allegation contained in paragraphs "26" and "31" of the Complaint.

10. Defendants deny, upon information and belief, each and every allegation contained in paragraph "28" of the Complaint, and respectfully refer all questions of law to this Honorable Court.

**ANSWERING POLICE INVESTIGATION**

11. Defendants deny having knowledge or information sufficient to form a belief as to each and every allegation contained in paragraphs "36", "37" and "38" of the Complaint.

**ANSWERING SIXTY LES's "INVESTIGATION"**

12. Defendants deny, upon information and belief, each and every allegation contained in paragraphs "39" through "42", all inclusive, of the Complaint.

13. Defendants deny, upon information and belief, each and every allegation contained

in paragraph "43" of the Complaint, and respectfully refer all questions of law to this Honorable Court.

## ANSWERING IMPACT OF THE
## ASSAULT ON MS. BETTS' HEALTH AND WELLBEING

14. Defendants deny, upon information and belief, each and every allegation contained in paragraphs "44" through "48", all inclusive, of the Complaint.

## ANSWERING COUNT 1
### (Negligence)
## ANSWERING DEFENDANTS SET FORTH AND ALLEGE

15. Defendants repeat, reiterate and reallege answers to each and every allegation contained in paragraphs "1" through "48" of the Complaint.

16. Defendants deny having knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "50" of the Complaint, except admit at all times relevant to this matter, Ms. Betts was a paying guest of Sixty LES.

17. Defendants deny, upon information and belief, each and every allegation contained in paragraphs "51", "52" and "60" of the Complaint.

18. Defendants deny, upon information and belief, each and every allegation contained in paragraphs "53", "54", "55", "56", "57", "58 (a-f)" and "59" of the Complaint, and respectfully refer all questions of law to this Honorable Court.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE
## ANSWERING DEFENDANTS SET FORTH AND ALLEGE

19. That if the plaintiff sustained the injuries and damages alleged in the Complaint, the same were wholly caused by the culpable conduct of and/or assumption of the risk of the plaintiff and the answering defendants are entitled to judgment dismissing the Complaint.

20. That if the plaintiff sustained the injuries and damages alleged in the Complaint,

A-453

the same were caused, if not in whole, then in part, by the culpable conduct and/or assumption of the risk of the plaintiff and the answering defendants are entitled to judgment assessing and fixing the degree to which the culpable conduct of the plaintiff contributed to the said injuries and damages and the proportion to which such damages shall be diminished thereby.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE PURSUANT TO ARTICLE 16 ANSWERING DEFENDANTS SET FORTH AND ALLEGE

21. In the event that the plaintiff recovers any judgment against the answering defendants, then the defendants demand that any such judgment be diminished in accordance with Article 16 of the CPLR and more particularly Section 1601 thereof.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE ANSWERING DEFENDANTS SET FORTH AND ALLEGE

22. That the Complaint fails to state a cause of action against the answering defendants.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE ANSWERING DEFENDANTS SET FORTH AND ALLEGE

23. Upon information and belief, any part or future costs and/or expenses incurred or to be incurred by the plaintiff for medical care, dental care, custodial care or rehabilitation services, loss of earnings or other economic loss, has been or will with reasonable certainty be placed or indemnified in whole or in part from a collateral source as defined in Section 4545(c) of the New York Civil Practice Law and Rules.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE ANSWERING DEFENDANTS SET FORTH AND ALLEGE

24. That upon information and belief, that if any dangerous or hazardous condition existed at the defendants' premises as alleged in the Complaint, then same was open and obvious to the plaintiff, susceptible to being perceived by the plaintiff utilizing his/her ordinary senses and, as such, answering defendants bore no duty to warn the plaintiff of the existence of said dangerous

A-454

or hazardous condition.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE
## ANSWERING DEFENDANTS SET FORTH AND ALLEGE

25. If any damages are recoverable against the answering defendants, the amount of such damages shall be diminished by the amount of the funds which plaintiff has or shall receive from any available collateral source.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE
## ANSWERING DEFENDANTS SET FORTH AND ALLEGE

26. That upon information and belief, the injuries and/or damages claimed were caused or contributed to by subsequent and/or intervening acts of negligence by parties other than the answering defendants.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE
## ANSWERING DEFENDANTS SET FORTH AND ALLEGE

27. That plaintiff failed to mitigate, obviate, diminish or otherwise act to lessen or reduce the injuries, damages and disabilities alleged in the Complaint.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE
## ANSWERING DEFENDANTS SET FORTH AND ALLEGE

28. That by entering into the activity in which the plaintiff(s) was engaged at the time of the occurrence set forth in the Complaint, said plaintiff knew the hazards thereof and the inherent risks incident thereto and had full knowledge of the dangers thereof; that whatever injuries and damages were sustained by the plaintiff herein as alleged in the Complaint arose from and were caused by reason of such risks voluntarily undertaken by the plaintiff in her activities and such risks were assumed and accepted by her in performing in said activities.

A-455

**AS AND FOR A TENTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

29. Upon information and belief, that the injuries and/or damages, if any, sustained by the plaintiff at the time and place, or on the occasion referred to in the plaintiff's Complaint, and which it is alleged was the cause of the injuries of the plaintiff, were sustained or so suffered or caused by the negligent act or acts of the plaintiff herself.

**AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

30. Recovery is barred in this action, in whole or in part, by the contributory and/or comparative negligence, or other acts, of the plaintiff.

**AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

31. That if the plaintiff sustained injuries and/or damages in the manner alleged, said injuries and/or damages were caused by the negligence of parties over whom the answering defendants were not obligated to exercise supervision or control.

**AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

32. That the answering defendants were without notice of any of the purported condition(s) alleged in the plaintiff's Complaint.

**AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

33. Upon information and belief, the answering defendants were not given due and timely notice of the purported conditions alleged in the plaintiff's Complaint.

**AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

34. That the plaintiff could with due diligence have obtained personal jurisdiction over

A-456

tortfeasors not made parties to this lawsuit, and thus the culpability of such missing or absent tortfeasors is to be apportioned into the total culpability allegedly causing the subject occurrence.

### AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE ANSWERING DEFENDANTS SET FORTH AND ALLEGE

35. That this action may not be maintained because of plaintiff's failure to join all necessary parties in this action, and in the absence of parties who should be a party, this action cannot proceed.

### AS AND FOR A SEVENTEENTH AFFIRMATIVE DEFENSE ANSWERING DEFENDANTS SET FORTH AND ALLEGE

36. That the answering defendants did not owe plaintiff a duty of care.

### AS AND FOR AN EIGHTEENTH AFFIRMATIVE DEFENSE ANSWERING DEFENDANTS SET FORTH AND ALLEGE

37. That the answering defendants did not breach a duty of care.

### AS AND FOR A NINETEENTH AFFIRMATIVE DEFENSE ANSWERING DEFENDANTS SET FORTH AND ALLEGE

38. Upon information and belief, any injuries and/or damages sustained by the plaintiff were not foreseeable.

### AS AND FOR A TWENTIETH AFFIRMATIVE DEFENSE ANSWERING DEFENDANTS SET FORTH AND ALLEGE

39. The massage therapist ("John Doe") was not employed by the defendants, therefore, the defendants are not vicariously liable for the alleged actions of the massage therapist ("John Doe") and the doctrine of respondeat superior does not apply.

### AS AND FOR A TWENTY-FIRST AFFIRMATIVE DEFENSE ANSWERING DEFENDANTS SET FORTH AND ALLEGE

40. Upon information and belief, if the massage therapist's actions were criminal in nature, such criminal actions were unforeseeable by the answering defendants, and therefore, as a

Case 2:20-cv-04742-NRB Document 63-4 Filed 08/21/23 Page 9 of 15

matter of law the answering defendants are entitled to judgment dismissing the Complaint for lack

of negligence.

**AS AND FOR A TWENTY-SECOND AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

41. Injuries or damages, if any, were the result of the sole negligence or other behavior

of the massage therapist "John Doe."

**AS AND FOR A TWENTY-THIRD AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

42. That the plaintiff, through the exercise of reasonable care, could have discovered

the alleged risk, apprehended the danger and avoided the injury.

**AS AND FOR A TWENTY-FOURTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

43. Answering defendants did not make any misrepresentations, material or otherwise,

to the plaintiff or any other party to this lawsuit.

**AS AND FOR A TWENTY-FIFTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

44. Plaintiff neither received nor relied on any representation by the answering

defendants.

**AS AND FOR A TWENTY-SIXTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

45. Answering defendants did not engage in any willful, intentional, or reckless

conduct.

**AS AND FOR A TWENTY-SEVENTH AFFIRMATIVE DEFENSE
ANSWERING DEFENDANTS SET FORTH AND ALLEGE**

46. That in the event plaintiff has or should be in the future, settle any portion of the

claims arising from the allegations contained in plaintiff's Complaint with any currently named or

A-458

still to be named defendant(s), the respective rights of the remaining parties should be determined pursuant to Section 15-108 of the General Obligations Law.

47. Answering defendants reserve the right to plead any additional Affirmative Defenses as they become known or available during the pendency of this litigation.

## JURY DEMAND

Defendants, **SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS LLC and SIXTY HOTEL MANAGER, LLC**, demand a trial by jury as to all issues so triable.

**WHEREFORE**, the defendants, **SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS LLC and SIXTY HOTEL MANAGER, LLC**, demand judgment dismissing the Complaint in its entirety, or in the alternative, for judgment diminishing the damages recoverable by the plaintiff herein, in proportion to the culpable conduct and negligence attributable to the plaintiff, together with the costs and disbursement for this action.

Dated: Huntington, New York
August 20, 2020

SOBEL PEVZNER, LLC

By: _____

CURTIS SOBEL (CS-0964)
*Attorneys for Defendants:*
*SIXTY LOWER EAST SIDE, LLC,*
*SIXTY HOTELS LLC and*
*SIXTY HOTEL MANAGER, LLC*
464 New York Avenue, Suite 100
Huntington, New York 11743
Tel: (631) 549-4677
File No.: H-14394
CSobel@sobelpevzner.com

A-459

TO:    Anne M. Milgram, Esq.
Jamie Gottlieb Furia, Esq.
LOWENSTEIN SANDLER LLP
***Attorneys for Plaintiff:***
***MARGARET BETTS***
1251 Avenue of the Americas
New York, NY 10020
Tel: 212-262-6700
Jfuria@lowenstein.com

Renato Mariotti, Esq.
Holly H. Campbell, Esq.
THOMPSON COBURN LLP
***Attorneys for Plaintiff (Pro Hac Vice)***
***MARGARET BETTS***
55 East Monroe Street – 37th Floor
Chicago, Illinois 60603
Tel: 346-7500
Rmariotti@thompsoncoburn.com
Hcampbell@thompsoncoburn.com

A-460

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
MARGARET BETTS,

                         Plaintiff,

   - against -

SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC
and SIXTY HOTEL MANAGER, LLC,

                        Defendants.
-------------------------------------------------------------------------x

**Civil Action No.:**
**1:20-cv-04772 (NRB)**

**<u>VERIFICATION</u>**

      I, CURTIS SOBEL, an attorney admitted to practice in the Courts of New York State, state that I am the attorney for the defendants in the within action; I have read the foregoing VERIFIED ANSWER WITH JURY DEMAND and know the contents thereof; the same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters I believe it to be true. The reason this verification is made by me and not by the answering defendants, is that the defendants' principal places of business are in a County other than the County wherein I maintain my office.

      The grounds of my belief as to all matters not stated upon my own knowledge are as follows: Contents of file which constitutes attorney's work product.

      I affirm that the foregoing statements are true, under penalties of perjury.

Dated:  Huntington, New York
         August 20, 2020

                               CURTIS SOBEL (CS-0964)

A-461

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
MARGARET BETTS,

                        Plaintiff,                        **Civil Action No.:**
                                                      **1:20-cv-04772 (NRB)**

     - against -

SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC
and SIXTY HOTEL MANAGER, LLC,

                         Defendants.
-------------------------------------------------------------------------x

### DECLARATION OF SERVICE

STATE OF NEW YORK )
                      SS:
COUNTY OF SUFFOLK )

      Lisa M. Lang, hereby declares, pursuant to 28 U.S.C., Section 1746 and Local Civil Rule 1.10 of this Court, that I am not a party to the action; I am over 18 years of age and reside at East Northport, Suffolk County, New York 11731.

      On August 21, 2020, I served the within **VERIFIED ANSWER WITH JURY DEMAND** by depositing a true copy of the same enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York, addressed to each of the following persons at the last known address set forth after each name;

      **AND** by using the EDNY ECF system, which sent notification of such filing to the following:

TO:    Anne M. Milgram, Esq.
        Jamie Gottlieb Furia, Esq.
        LOWENSTEIN SANDLER LLP
        *Attorneys for Plaintiff:*
        *MARGARET BETTS*
        1251 Avenue of the Americas
        New York, NY 10020
        Tel: 212-262-6700
        Jfuria@lowenstein.com

A-462

Renato Mariotti, Esq.
Holly H. Campbell, Esq.
THOMPSON COBURN LLP
*Attorneys for Plaintiff (Pro Hac Vice)*
*MARGARET BETTS*
55 East Monroe Street – 37th Floor
Chicago, Illinois 60603
Tel: 346-7500
Rmariotti@thompsoncoburn.com
Hcampbell@thompsoncoburn.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 21, 2020

LISA M. LANG

A-463

Civil Action No.:  1:20-cv-04772 (NRB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARGARET BETTS,

Plaintiff,

- against -

SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC
and SIXTY HOTEL MANAGER, LLC,

Defendants.

**VERIFIED ANSWER
with JURY DEMAND**

Signature (Rule 130-1.1-a)

*Curtis Sobel*

**CURTIS SOBEL**

**SOBEL PEVZNER, LLC**
*Attorneys for Defendants:*
*SIXTY LOWER EAST SIDE, LLC,*
*SIXTY HOTELS, LLC and SIXTY HOTEL MANAGER, LLC*
464 New York Avenue, Suite 100
Huntington, New York 11743
Office    (631) 549-4677
Facsimile (631) 549-0826
File No.: H-14394

A-464

# EXHIBIT – C

A-465

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARGARET BETTS,

              Plaintiff,

        v.

SIXTY LOWER EAST SIDE, LLC, SIXTY
HOTELS, LLC, and SIXTY HOTEL MANAGER,
LLC,

              Defendants.

Docket No.: 1:20-cv-04772

Hon. Naomi Reice Buchwald

**PLAINTIFF MARGARET BETTS' FIRST**
**REQUESTS FOR ADMISSION TO DEFENDANTS**

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff Margaret Betts propounds the following First Requests for Admission to Defendants Sixty Lower East Side, LLC ("Sixty LES"); Sixty Hotels, LLC; and Sixty Hotel Manager, LLC (collectively, "Defendants"), to be admitted or denied **within thirty (30) days after service hereof**.

**INSTRUCTIONS AND DEFINITIONS**

The following definitions shall be used in construing the meaning of these Requests:

1.     "Action" means the above-captioned action.

2.     "Agent" of an entity means a person or other entity with apparent or actual authority to act on the first entity's behalf for any purpose whatsoever, or any affiliate or representative of the first entity, including but not limited to advisors, attorneys, consultants, employees, experts, fiduciaries, and insurers.

3.     "Complaint" means the Complaint filed in the above-captioned Action on June 22, 2020.

4.      "You," "your," "Defendant" or "Defendants" means any or all of the above-named Defendants in this action, Sixty Lower East Side, LLC ("Sixty LES"); Sixty Hotels, LLC; and Sixty Hotel Manager, LLC; and their employees, officers, agents, partners, attorneys, or anyone else acting on their behalf.

5.      "John Doe" refers to the massage therapist referenced in the Complaint as John Doe.

6.      "Valeryia Vasilets" refers to Valeryia Vasilets and any of her partners, employees, agents, attorneys, or anyone else acting on her behalf or on behalf of any entity owned or managed by her.

7.      "Ms. Betts" refers to Plaintiff Margaret Betts.

8.      The terms "concerning," "regarding" and "relating to" mean describing, discussing, constituting, containing, considering, embodying, evaluating, mentioning, memorializing, supporting, collaborating, demonstrating, proving, evidencing, showing, refuting, disputing, rebutting, controverting, contradicting, made in connection with or by reason of, or derived or arising therefrom, or being in any way legally, logically or factually concerned with the matter described, referred to or discussed.

9.      Pursuant to Fed. R. Civ. P. 36, any matter below will be deemed admitted unless, within 30 days after service hereof, Defendants serve on Plaintiff a written answer or objection addressed to the matter and signed by the party or its attorney.

10.     Pursuant to Local Civil Rule 26.3, Plaintiff incorporates by reference the full text of the Uniform Definitions in Discovery Requests.

11.     Pursuant to Local Civil Rule 26.3(d), the following rules of construction apply to these Requests:

(a) All/Any/Each. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

(b) And/Or. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

(c) Number. The use of the singular form of any word includes the plural and vice versa.

11.    To the extent any Request is objected to, set forth all reasons for your objection. If you claim privilege as a ground for not responding to any Request in whole or in part, describe the factual basis for your claim of privilege, including relevant dates and persons involved, in sufficient detail so as to permit the Court to adjudicate the validity of the claim. If you object in part to any Request, respond to the remainder completely.

12.    Respond to each Request separately and fully in accordance with the Federal Rules of Civil Procedure and the Instructions and Definitions contained herein.

## REQUESTS FOR ADMISSION

1.    Sixty LES advertised massage services through "The Spa at Sixty LES" to guests in October 2018.

2.    Ms. Betts booked an in-room massage in her hotel room at Sixty LES on October 19, 2018 with Sixty LES.

3.    Defendants selected the massage therapist sent to Ms. Betts' room on October 19, 2018 for her in-room massage.

4.    Ms. Betts did not select the massage therapist who provided her in-room massage at Sixty LES on October 19, 2018.

5.      Defendants do not know the last name of John Doe.

6.      Defendants do not possess any identifying information regarding John Doe other than the first name of "Yuri."

7.      Defendants do not know if "Yuri" is John Doe's legal first name.

8.      Defendants did not obtain John Doe's address prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

9.      Defendants do not know or possess any current or former address for John Doe.

10.     Defendants did not obtain a copy of John Doe's identification prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

11.     Defendants do not possess a copy of John Doe's identification.

12.     Defendants do not possess a copy of John Doe's massage therapist license.

13.     Defendants did not confirm John Doe was a licensed massage therapist prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

14.     Defendants do not possess any documents evincing that they confirmed John Doe was a licensed massage therapist prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

15.     Defendants did not interview John Doe prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

16.     Defendants did not conduct or obtain a background check of any kind on John Doe prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

17.     Defendants do not possess any documents evincing that they conduced or obtained a background check of any kind on John Doe prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

- 4 -

18.     Defendants did not take any actions to determine whether any prior complaints had been lodged against John Doe prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

19.     Defendants do not possess any documents evincing that they took any actions to determine whether any prior complaints had been lodged against John Doe prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

20.     Defendants did not obtain proof of John Doe's insurance prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

21.     Defendants had no knowledge of John Doe's employment history prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

22.     Defendants do not possess any documents regarding John Doe's employment history prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

23.     Defendants did not have a written agreement with John Doe at any time.

24.     Defendants have no evidence of any written communications with John Doe.

25.     Defendants did not provide any tax-related documents to John Doe at any time.

26.     Defendants did not provide any training to John Doe at any time.

27.     Defendants do not possess any documents evincing that that provided any training to John Doe at any time.

28.     Defendants never had a direct phone number for John Doe.

29.     Defendants do not know or possess any current or former phone number for John Doe.

30.     Defendants did not supervise the in-room massage that John Doe provided to Ms. Betts October 19, 2018.

31.     Defendants did not have a written contract with Valeryia Vasilets at any time.

32.     Defendants did not conduct or obtain a background check of any kind on Valeryia Vasilets prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

33.     Defendants do not possess documents evincing that they conducted or obtained a background check of any kind on Valeryia Vasilets prior to Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

34.     John Doe was not Valeryia Vasilets' employee for the purposes of providing Ms. Betts' in-room massage at Sixty LES on October 19, 2018.

35.     When John Doe arrived at Sixty LES to provide massage therapy services to Ms. Betts on October 19, 2018, no Sixty LES employee asked John Doe to provide any identification or other proof of his identity.

36.     The individual(s) at Sixty LES who booked Ms. Betts' massage did not tell Ms. Betts that John Doe was not a Sixty LES employee.

37.     Defendants gave John Doe access to the elevator at Sixty LES that opened directly into Ms. Betts' suite.

38.     Defendants did not report Ms. Betts' reported assault to law enforcement.

39.     Defendants did not directly contact John Doe following Ms. Betts' assault.

40.     When Sixty LES sent John Doe to Ms. Betts' room, it was aware that John Doe would not be under Defendants' supervision while providing Ms. Betts with massage therapy services.

41.     Defendants' website does not disclose that services provided by The Spa at Sixty LES are performed by third parties.

- 6 -

42.     Defendants have no records documenting their investigation of Ms. Betts' reported assault.

43.     Defendants have no records documenting Ms. Betts' reported assault at Sixty LES or Ms. Betts' report of her assault to Defendants.

44.     Defendants did not conduct or obtain background checks of any kind on massage therapists providing services at Sixty LES prior to October 20, 2018.

45.     Defendants did not obtain copies of licenses for any massage therapist who provided massage services at Sixty LES prior to October 20, 2018.

46.     Defendants did not confirm that any massage therapist who provided massage services at Sixty LES was a licensed massage therapists prior to October 20, 2018.

47.     Defendants had no written contracts with any massage therapist who provided massage services at Sixty LES prior to October 20, 2018.

48.     Defendants did not take any actions to determine whether any prior complaints had been lodged against any of the massage therapist who provided massage services at Sixty LES prior to October 20, 2018.

49.     Defendants do not possess any documents evincing that they obtained criminal background checks, employment histories, histories of complaints, or verifications of massage therapy licenses for any massage therapist who provided massage services at Sixty LES prior to October 20, 2018.

50.     Defendants had no written policies related to selecting massage therapists for massage services provided at Sixty LES prior to October 20, 2018.

51.     It was not Defendants' usual practice to inform guests that the massage services provided at the hotel were not provided by hotel employees prior to October 20, 2018.

52.    Defendants do not possess any documents evincing that it was their usual practice to inform guests that the massage services provided at the hotel were not provided by hotel employees prior to October 20, 2018.

Dated: February 16, 2021

**MARGARET BETTS**

By: */s/ Renato Mariotti*
       One of her Attorneys

       Renato Mariotti
       Holly H. Campbell
       THOMPSON COBURN LLP
       55 East Monroe St., 37th Floor
       Chicago, Illinois 60603
       (312) 346-7500
       rmariotti@thompsoncoburn.com
       hcampbell@thompsoncoburn.com

       Anne M. Milgram
       Jamie Gottlieb Furia
       Lowenstein Sandler LLP
       1251 Avenue of the Americas
       New York, New York 10020
       (212) 262-6700
       amilgram@lowenstein.com
       jfuria@lowenstein.com

       *Attorneys for Plaintiff*

A-473

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2021, I caused the foregoing to be served via email on the following counsel of record:

Curtis Sobel
Sobel Law Group, LLC
464 New York Avenue
Huntington, NY 11743
P: (631)-549-4677
F: (631)-549-0826
csobel@sobellawgroup.com

By: */s/ Renato Mariotti*

- 9 -

A-474

# EXHIBIT – D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MARGARET BETTS,

                  Plaintiff,

     - against -

SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC
and SIXTY HOTEL MANAGER, LLC,

                  Defendants.

------------------------------------------------------------------------x

**Civil Action No.:**
**1:20-cv-04772 (NRB)**

**DEFENDANTS'**
**RESPONSE TO PLAINTIFF'S**
**REQUESTS FOR ADMISSION**

Assigned Justice:
Hon. Naomi Reice Buchwalk, J.S.D.J.

Defendants, **SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC and HOTEL MANAGER, LLC**, ("SIXTY LES") by their attorneys SOBEL PEVZNER, LLC, as and for its response to plaintiff's Requests for Admission, dated February 16, 2021, state upon information and belief as follows:

1.    Defendants do not have sufficient information to interpret the use of the word "advertised" by plaintiff, and therefore deny sufficient knowledge to respond to that term. However, defendants admit that spa services were offered to guests in October 2018.

2.    Defendants object to the extent this request for admission uses the word "with" as defendants do not have specific information regarding the plaintiff's state of mind, but admits that the plaintiff requested an in room massage from employees of SIXTY LES on October 18, 2018.

3.    Defendants deny this request for admission based upon the testimony of Valeryia Vasilets who testified that she selected the massage therapist referenced in this request.

4.    Admit.

5.    Defendants deny this request for admission as defendants have previously provided the last name of John Doe to the plaintiff, and it is "Astakhov."

6.     Defendants deny this request for admission as defendants have previously provided the last name of John Doe to the plaintiff, and it is "Astakhov."

7.     Defendants deny this request for admission as defendants have previously provided plaintiff with information which included Iouri Astakhov's first and last name.

8.     Admit.

9.     Defendants deny this request for admission as defendants do possess information developed from public available internet sources that purports to include addresses for Iouri Astakhov.

10.    Defendants admit this request for admission except to the extent that the testimony of witnesses have confirmed "John Does" identity was known to them.

11.    Defendants do not have sufficient information to interpret the use of the word "identification" by plaintiff, and therefore deny sufficient knowledge to respond to that term. Notwithstanding, defendants have provided information to the plaintiff sufficient for them to perform the same available investigation as was performed by defense counsel.

12.    Defendants do not have sufficient information to interpret the use of the word "possess" by plaintiff, and therefore deny sufficient knowledge to respond to that term. Notwithstanding, defendants have provided information to the plaintiff sufficient for them to perform the same available investigation as was performed by defense counsel.

13.    Defendants deny this request for admission to the extent defendants contacted Valeryia Vasilets prior to October 19, 2018, who represented that her massage therapists were licensed.

14.    Admit.

15.    Defendants object to this request for admission as defendants cannot ascertain plaintiff's meaning of the use of the word "interview." Notwithstanding, this individual was known to hotel staff and was presented as a licensed massage therapist by Valeryia Vasilets prior to October 19, 2018.

16.    Admit.

17.    Admit.

18.    Defendants object to this request for admission as defendants cannot ascertain plaintiff's meaning of the use of the term "actions." Notwithstanding, Iouri Astakhov had provided services to other hotel guests with no prior complaints. Moreover, testimony of the parties have established that following the delivery of services by this individual, inquiry was made to both the plaintiff and prior recipients of services with no complaints being made.

19.    Defendants object to this request for admission as defendants cannot ascertain plaintiff's meaning of the use of the term "actions." Notwithstanding, defendants admit that they do not possess any documents responsive to this request other than what has been previously provided to plaintiff, none of which indicate a prior complaint.

20.    Defendants cannot admit nor deny this request for admission as defendants cannot ascertain plaintiff's meaning of the use of the term "proof." Notwithstanding, defendants are unaware of any insurance.

21.    Defendants cannot admit nor deny this request for admission as defendants cannot ascertain plaintiff's meaning of the use of the term "employment history." Notwithstanding, defendants admit they were not aware of "John Doe's" employment history other than what was testified to by Valeryia Vasilets.

22.    Defendants do not possess any documents relating "John Doe's" employment history.

23.    Admit.

24.    Defendants cannot admit nor deny this request for admission as defendants cannot ascertain plaintiff's meaning of the use of the term "evidence." Notwithstanding, defendants have no documents reflecting written communications with "John Doe."

25.    Defendants cannot admit nor deny this request for admission as defendants cannot ascertain plaintiff's meaning of the use of the term "tax-related." Notwithstanding, defendants do not currently possess any documents responsive to this request other than what has been previously provided to plaintiff.

26.    Admit.

27.    Defendants admit they did not provide any training to "John Doe" at any time so they do not possess documents responsive to this request.

28.    Defendants do not have sufficient information to respond to this request for admission as eight witnesses were questioned on behalf of the defendants and this question was never posed to any of the witnesses by the plaintiff during questioning.

29.    Defendants deny this request for admission as defendants do possess information developed from public available internet sources and defendants have provided information to the plaintiff sufficient for them to perform the same available investigation as was performed by defense counsel.

30.    Defendants admit that plaintiff did not request supervision of her in-room massage, and therefore none was offered by hotel staff.

31.    Admit.

32.    Defendants do not have sufficient information to interpret the use of the word "background check" by plaintiff, and therefore deny sufficient knowledge to respond to that term. Notwithstanding, evidence already adduced demonstrates Valeryia Vasilets status was known to the defendants.

33.    Defendants do not have sufficient information to interpret the use of the word "background check" by plaintiff, and therefore deny sufficient knowledge to respond to that term.

Notwithstanding, all documents in defendants possession regarding Valeryia Vasilets have been disclosed.

34.     Pursuant to the testimony of Valeryia Vasilets, "John Doe" was not her employee.

35.     Defendants do not possess any other information to respond to this request for admission other than the testimony of eight disclosed witnesses who have described in various detail as to what took place on October 19, 2018.

36.     Defendants admit that plaintiff did not request information from the hotel staff as to whether "John Doe" was a hotel employee.

37.     Based upon the testimony of the parties, Ms. Betts was alerted to the effect that "John Doe" was present for the purpose of an in-room massage and she authorized elevator access to "John Doe," so to that extent defendants admit this request for admission.

38.     Defendants deny this request for admission to the extent that hotel staff was contacted by law enforcement prior to the defendants' opportunity to independently report the alleged incident. Defendants thereafter received a Subpoena and fully complied with same.

39.     Defendants deny this request for admission to the extent that it requests defendants to admit that an assault took place.  Notwithstanding, defendants admit that they did not contact "John Doe" after Ms. Betts alleged an assault took place.

40.     Defendants object to this request for admission as defendants cannot ascertain plaintiff's meaning of the use of the term "supervision."  Notwithstanding, defendants admit this request for admission to the extent that plaintiff specifically requested the massage be performed in her room and did not invite nor request defendants to be present at the time of her massage,  so to that extent defendants admit they were aware that they would not be watching the plaintiff get massaged in her room.

41.     It is testified by defendants witness, Ben Edwards that sufficient information was provided to hotel guests that disclosed services being performed by third parties.  Defendants are not able to specifically state what content was or was not on the then version of the hotel website.  Further, this request for admission does not contain a time frame so defendants cannot admit nor deny this request since the hotel has been open since the date of construction.

42.     Defendants deny this request for admission to the extent defendants possess records relating to the investigation which are protected from disclosure by the attorney client privilege.

43.     Defendants deny this request for admission to the extent that defendants have already exchanged all relevant information in their possession relating to plaintiff's claimed assault.

44.     Defendants do not have sufficient information to interpret the use of the word "background check" by plaintiff, and therefore deny sufficient knowledge to respond to that term. Notwithstanding, all documents in defendants possession responsive to this request have been disclosed.

45.     Defendants deny this request for admission to the extent that all documents responsive to this request have been provided to plaintiff.

46.     Defendants deny this request for admission which is supported by the testimony of eight witnesses and previously disclosed documentation. Defendants do not possess any additional information with regard to this request.

47.     Admit.

48.     Defendants cannot admit nor deny this request for admission as this request is overly broad in a way that is too unclear for defendants to reasonably understand plaintiff's term "take any actions."

49.     Defendants deny this request for admission to the extent that all documents responsive to this request have been provided to plaintiff.

A-481

**50.** Admit.

**51.** Defendants deny this request for admission except to the extent that the eight witnesses who have testified in response to this question have described their usual practice with guests concerning massage services, and to that extent defendants can neither deny nor admit this request for admission. Upon information and belief, the spa menu available to all hotel guests was in plaintiff's room and advised as such. A copy of the spa menu is annexed at Exhibit "A."

*52.* Defendants deny this request for admission except to the extent that the eight witnesses who have testified in response to this question have described their usual practice with guests concerning massage services, and to that extent defendants can neither deny nor admit this request for admission. Upon information and belief, the spa menu available to all hotel guests was in plaintiff's room and advised as such. (See, Exhibit "A").

Defendants reserve the right to supplement these responses as necessary and in accordance with Rule 26 of the Federal Rules of Civil Procedure.

Dated: Huntington, New York
April 1, 2021

SOBEL PEVZNER, LLC

By:

CURTIS SOBEL (CS-0964)
**Attorneys for Defendants:**
**SIXTY LOWER EAST SIDE, LLC,**
**SIXTY HOTELS LLC and**
**SIXTY HOTEL MANAGER, LLC**
464 New York Avenue, Suite 100
Huntington, New York 11743
Tel: (631) 549-4677
File No.: H-14394
CSobel@sobelpevzner.com

TO:   Anne M. Milgram, Esq.
Jamie Gottlieb Furia, Esq.
LOWENSTEIN SANDLER LLP
*Attorneys for Plaintiff:*
*MARGARET BETTS*
1251 Avenue of the Americas
New York, NY 10020
Tel: 212-262-6700
Jfuria@lowenstein.com

Renato Mariotti, Esq.
Holly H. Campbell, Esq.
THOMPSON COBURN LLP
*Attorneys for Plaintiff (Pro Hac Vice)*
*MARGARET BETTS*
55 East Monroe Street – 37th Floor
Chicago, Illinois 60603
Tel: 346-7500
Rmariotti@thompsoncoburn.com
Hcampbell@thompsoncoburn.com

# EXHIBIT – A



Tucked beneath the lobby of SIXTY LES; The SPA at SIXTY LES is a 1,200 square foot oasis of renewal and relaxation available exclusively to hotel guests. Our spa and fitness areas combine aspects of privacy and modern luxury. Complimentary fitness and sauna facilities are available 24 hours a day, seven days a week. Advance reservations, via our concierge team, are required to secure spa services in our single spa treatment room.

## MASSAGE

|  | 60 MINUTES | 90 |
|---|---|---|
| *CUSTOMIZED MASSAGE* (Also available in your room) | $150 | $225 |

Your therapist will create a customized session using a mixture of Swedish, Deep Tissue, Sports, and other massage techniques.

Please Inquire for pricing of specialty modalities such as Pre-natal, Thai, and Shiatsu.

## FACIALS | BY THE COLLAGEN BAR

THE collagen BAR

*ESSENTIAL* (approximately 50 minutes)                    $150

A deep cleansing and refreshing facial; features a decongesting & hydrating mask of organic seaweed, collagen and silicon.

*MAX REJUVENATION* (approximately 50 minutes)            $230

A designer peel and elite 5-layer custom mask. This individually customized treatment is results driven and individually focused to address all of your skin's concerns.

*COLLAGENIZER® FACIAL TREATMENT* (approximately 50 minutes)    $280

Increase your skin's firmness, collagen content, hydration, and reduce fine lines, wrinkles, and sagging skin; all without cosmetic injections or "down-time". Features the proprietary technology of Dermoelectroporation which uses the skin's water based intercellular channels to promote Transdermal delivery.

conciergeles@sixtyhotels.com | 212.542.8690 | In-Room Phones: Touch "Concierge"

# SPA SERVICES AVAILABLE IN YOUR ROOM

We consult with independent professionals who specialize in mobile spa treatments.
Please allow at least 24 hours advance notice for any appointment inquiries.

| | |
|---|---|
| *MAKE UP APPLICATION* | $ Priced upon inquiry |
| *BLOW-OUTS & UP-DOS* | $ Priced upon inquiry |
| *MANICURE & PEDICURE* | $ Priced upon inquiry |
| *OTHER CUSTOM SPA SERVICE REQUESTS* | $ Priced upon inquiry |

## HOURS

SPA TREATMENTS | 10AM-8PM (after hours pricing upon request)
FITNESS & SAUNA | 24 HOURS

## RESERVATIONS

Scheduling spa appointments at least one hour prior to your arrival is recommended, to avoid disappointment. Therapists are called to the hotel upon your request.

## ACCESS

The Spa Level is located directly below the hotel lobby, and may be accessed via the middle elevator, in the lobby, using the 'spa' call button and your guest room key.

## PAYMENT & GRATUITY

All charges will be applied to your hotel bill. Discretionary gratuities are not included in our pricing. For excellent service a customary gratuity ranges from 15-20%.

## ARRIVAL & CHECK IN

IN-SPA | check in with the concierge, on the ground floor.
IN-ROOM | The concierge will call to announce the arrival of your therapist.
LATE ARRIVALS | In the case of a late arrival, treatments may be shortened to honor the following guest. Honoring full treatment for late arrivals may increase pricing.

## CANCELLATION POLICY

Cancellations or changes must be made by 7PM the evening prior to your session. Failure to give sufficient notice will result in a 50% charge. Cancellations or changes with less than 4 hours notice, or a no-show, will result in a full charge.

## DUETS OR COUPLES

Our Spa is designed as an individual retreat. For duet or side-by-side services, we can extend the use of a hotel suite, if available. Alternatively, you may wish to discuss an upgrade to your existing hotel reservation.

conciergeles@sixtyhotels.com  |  212.542.8690  |  In-Room Phones: Touch "Concierge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
MARGARET BETTS,

                    Plaintiff,

    - against -

SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC
and SIXTY HOTEL MANAGER, LLC,

                    Defendants.
-------------------------------------------------------------------------x

**Civil Action No.:**
**1:20-cv-04772 (NRB)**

## DECLARATION OF SERVICE

STATE OF NEW YORK )
                SS:
COUNTY OF SUFFOLK )

Lisa M. Lang, hereby declares, pursuant to 28 U.S.C., Section 1746 and Local Civil Rule 1.10 of this Court, that I am not a party to the action; I am over 18 years of age and reside at East Northport, Suffolk County, New York 11731.

On April 1, 2021, I served the within **DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS** by depositing a true copy of the same enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York, addressed to each of the following persons at the last known address set forth after each name *and via electronic mail*:

TO:        Renato Mariotti, Esq.
            Holly H. Campbell, Esq.
            THOMPSON COBURN LLP
            ***Attorneys for Plaintiff (Pro Hac Vice)***
            ***MARGARET BETTS***
            55 East Monroe Street – 37th Floor
            Chicago, Illinois 60603
            Tel: 346-7500
            *Rmariotti@thompsoncoburn.com*
            *Hcampbell@thompsoncoburn.com*

Anne M. Milgram, Esq.
Jamie Gottlieb Furia, Esq.
LOWENSTEIN SANDLER LLP
*Attorneys for Plaintiff:*
*MARGARET BETTS*
1251 Avenue of the Americas
New York, NY 10020
Tel: 212-262-6700
*Jfuria@lowenstein.com*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 1, 2021

LISA M. LANG

A-488

## Lisa Lang

| | |
|---|---|
| **From:** | Lisa Lang |
| **Sent:** | Thursday, April 1, 2021 4:55 PM |
| **To:** | Mariotti, Renato; 'Campbell, Holly H.'; jfuria@lowenstein.com |
| **Cc:** | Curtis Sobel |
| **Subject:** | Betts v. Sixty Lower East Side, LLC, et al. |
| **Attachments:** | DEFS - Resp to PLTs Requests for Admission 4-1-21.pdf |

Counselors:

Attached please find a courtesy copy of defendants' Response to Plaintiff's Requests for Admission with respect to the above-referenced matter.

Thank you,

*Lisa M. Lang*
Lisa M. Lang, Paralegal
SOBEL PEVZNER, LLC
Attorneys at Law
464 New York Avenue, Suite 100
Huntington, New York 11743
P. 631-549-4677 Ext. 204
F. 631-549-0826
llang@sobelpevzner.com

NOTICE: The information contained in this e-mail is attorney privileged and confidential information, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient or the employee of the agent of the intended recipient, you are hereby notified that any distribution or copying of the communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by telephone and return the original message to the sender at the above address by mail. Thank you.

1

A-489

Civil Action No.:  1:20-cv-04772 (NRB)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARGARET BETTS,

Plaintiff,

- against -

SIXTY LOWER EAST SIDE, LLC, SIXTY HOTELS, LLC
and SIXTY HOTEL MANAGER, LLC,

Defendants.

**DEFENDANTS'**
**RESPONSE TO PLAINTIFF'S**
**FIRST REQUEST FOR**
**PRODUCTION OF DOCUMENTS**

Signature (Rule 130-1.1-a)

*Curtis Sobel*

**CURTIS SOBEL**

**SOBEL PEVZNER, LLC**
*Attorneys for Defendants:*
*SIXTY LOWER EAST SIDE, LLC,*
*SIXTY HOTELS, LLC and SIXTY HOTEL MANAGER, LLC*
464 New York Avenue, Suite 100
Huntington, New York 11743
Office     (631) 549-4677
Facsimile (631) 549-0826
File No.: H-14394

A-490

# EXHIBIT – E

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

MARGARET BETTS,                    )
                                   )
              Plaintiff,           )
                                   )
     v.                            )    1:20-cv-04772
                                   )    (NRB)
SIXTY LOWER EAST SIDE, LLC;        )
SIXTY HOTELS, LLC; and             )
SIXTY HOTEL MANAGER, LLC,          )
                                   )
              Defendants.          )
_____)

The videotaped deposition of EDWARD MAYNARD, taken
on behalf of the plaintiff in the above-entitled
case before Debra L. Kleszyk, a Certified Shorthand
Reporter within and for the State of Illinois,
taken remotely via videoconference on March 1,
2021, commencing at 11:15 Eastern Standard Time,
pursuant to the Federal Rules of Civil Procedure.
The witness appeared at 684 Riverside Drive,
Apartment G-1, New York, New York.

Page 2

A P P E A R A N C E S

THOMPSON COBURN LLP
BY:  MR. RENATO MARIOTTI
     MS. HOLLY H. CAMPBELL
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
(312) 346-7500
rmariotti@thompsoncoburn.com
hcampbell@thompsoncoburn.com

     Appeared via videoconference on behalf
     of the plaintiff

SOBEL PEVZNER, LLC
BY:  MR. CURTIS SOBEL
464 New York Avenue, Suite 100
Huntington, New York 11743
(631) 549-4677
csobel@sobelpevzner.com

     Appeared via videoconference on behalf
     of the defendants and the deponent

ALSO PRESENT:
MR. JUSTIN BOND, videographer
     appeared via videoconference

```
                                              Page 3

                          I N D E X


WITNESS:  EDWARD MAYNARD

EXAMINATION                                    PAGE

     By Mr. Mariotti                              4




                    INDEX OF EXHIBITS

EXHIBIT            DESCRIPTION              MARKED

Exhibit 1         paid out receipt            20

Exhibit 2         Sixty LES invoice           26

Exhibit 3         Sobel Pevzner, LLC           28

                  March 11, 2019, letter

                  to Valeriya Vasilets




                    STIPULATION

The parties stipulated to waive any objections to

the validity of the oath administered remotely and

waived any objections to proceeding via video-

conference.
```

A-494

Page 4

THE VIDEOGRAPHER:  Good morning.  Today is March 1, 2021.  We're on the record at 11:15 a.m.  Today we'll take the videotaped deposition in case number 1:20-cv-04772.  This deposition is being held remotely.

Counsel, please state your appearance and affiliation for the record.

MR. MARIOTTI:  Renato Mariotti and Holly Campbell from Thompson Coburn on behalf of the plaintiff.

MR. SOBEL:  Curtis Sobel from Sobel Pevzner on behalf of the defendants.

THE VIDEOGRAPHER:  Thank you.

Would you please swear the witness.

(The witness was duly sworn.)

EDWARD MAYNARD,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MARIOTTI

Q.   All right.  Thank you for your time, Mr. Maynard.  I'm going to ask you some questions this morning, and I think the first one is if you'd

Page 5

please state your name and spell your full name for the record.

A.   Edward Maynard.  It's E-d-w-a-r-d, M-a-y-n-a-r-d.

Q.   All right.  As I mentioned, I'll be asking you some questions today.  We have a court reporter who is on this platform, and she's going to be taking down everything that we say.  But she can only take down verbal responses, so to help her out I would just ask that you give verbal answers to my questions.

A.   Understood.

Q.   And do you understand you're legally obligated to give truthful answers to my questions?

A.   Yes, I do.

Q.   If at any point you don't understand a question, would you please let me know?

A.   Of course.

Q.   If you don't remember something when I ask you but you do remember it later on when I'm asking another question, would you please let me know at that time?

A.   Yes.

Q.   All right.  We're very liberal about giving breaks around here.  If at any point you

Page 6

need a break, just let me know.  All -- my only request to you is that you answer whatever question is pending before we take a break.

A.    No problem.

Q.    Okay.  Where are you taking this deposition from today, sir?

A.    My New York apartment.

Q.    Is anyone in the room with you?

A.    Sometimes.

Q.    Okay.

A.    My children.

Q.    An absolute joy, I am sure.

A.    I kicked them out, but who knows if they reappear.

Q.    Okay.  I just will ask if an adult enters the room during the deposition, would you just let us know when they do?

A.    Of course.

Q.    Thank you.  Do you have any documents with you today, sir?

A.    No.

Q.    Okay.  Do you understand that you cannot communicate with anyone during this deposition outside of this digital platform that we're all on?

A.    Understood.

Page 7

Q.    Okay.  I'm going to ask you a few personal questions today, particularly relating to your ability to give testimony.

How old are you, sir?

A.    Fifty-seven.

Q.    And are you currently taking any medications that could affect your memory?

A.    No.

Q.    Is there any reason why you would not be able to give truth -- truthful, complete answers today?

A.    There is no reason.

Q.    Okay.  Have you ever been deposed before?

A.    I have.

Q.    At any depositions involving Sixty LES?

A.    No.

Q.    Have you ever testified in court in a lawsuit?

A.    I have not.

Q.    What did you do to prepare for this deposition today?

A.    I had a conversation with my attorney so he could explain the process and confirm that I was on board.

Page 8

Q.   Great.  Did you review any documents to prepare for this deposition?

A.   I did not.

Q.   What is your current address?

A.   684 Riverside Drive, Apartment G-1, New York, New York 10031.

Q.   And how long have you lived there, sir?

A.   Two or three years.

Q.   Okay.  What is your highest level of education?

A.   College graduate.

Q.   And which school did you go to?

A.   Paul Smith's College in the Adirondacks in upstate New York.

Q.   Great.  It's a beautiful area.

A.   If you like -- if you like winter a lot, like ten months a year.

MR. SOBEL:  It truly is --

BY MR. MARIOTTI:

Q.   I live in Chicago, so.

A.   Oh, okay, so.

Q.   I'm a glutton for punishment when it comes to winter.

A.   Yeah, that's for sure.

Q.   What degree did you receive, sir?

A-499

Page 9

A.    Associate in Applied Science.

Q.    Okay.  Do you have any other licenses or certifications?

A.    No, I do not.

Q.    Okay.  Are you currently employed?

A.    I'm acting as a consultant.

Q.    Okay.  And what -- who do you consult for?

A.    Revelo Hospitality.

Q.    Okay.  And what kind of company is that, sir?

A.    It's an equity build that buys hotels and then resells them to give back the investors their money.

Q.    Okay.  And how long have you been consulting for them?

A.    Nine months.

Q.    Okay.  Have you ever worked at a company called Sixty Hotels?

A.    Yes.  Of course.  I was the president of Sixty Hotels.

Q.    Okay.  I have to ask even though some-times I know the answers to the questions.  All right?

A.    Understood.

A-500

Page 10

Q.    When did you -- when did you first start working at Sixty Hotels?

A.    I don't recall.  I want to say September 2017, but that might be -- I don't recall specifically.  I'm guessing.

Q.    Okay.  And were you the president the entire time you worked at Sixty?

A.    I was.

Q.    And was that -- what were your respon-sibilities as president?

A.    The general managers reported to me, along with a number of other key personnel from the corporate office.  And my role was to enhance the performance of the hotels in order to improve profitability.

Q.    Okay.  And does Sixty Hotels or at least during your tenure did they own multiple hotels?

A.    Yes.

Q.    And how many hotels did Sixty own?

A.    At our highest point, probably one, two, three, four, five hotels maybe.

Q.    Okay.  And where were those hotels located?

A.    Three in New York, one in Beverly Hills, and one in Miami.

A-501

Page 11

Q.    Great locations.

A.    Mm-hmm.

Q.    And did you -- and your job was over-seeing all of the hotels.  Is that fair to say?

A.    Mm-hmm.  Yes.

Q.    Are you familiar with a hotel called Sixty Lower East Side?

A.    Yes.  On Allen Street.

Q.    Okay.  And how would you describe that hotel, sir?

A.    It was one of the hotels in the portfolio.  It's -- was designed to fit in with the ambience of the Lower East Side, and it was I think our largest asset.

Q.    And you say "the ambience of the Lower East Side."  What is that --

A.    It's a little grungy.  So, you know, there was a lot of exposed concrete and, you know, wasn't like opulent in terms of design.

Q.    Okay.  Was it supposed to be a high-end hotel?

A.    I would call it a full-service hotel, not necessarily high end.

Q.    What does that mean, full-service?

A.    Well, I think, you know, we rate hotels

Page 12

a bunch of different ways.  And when you say "high-end," to me that means luxury.  It is not definitely a luxury hotel.

Q.   Okay.

A.   I would say it's a mid-range hotel in terms of its service culture.  And, you know, I rate hotels as well in terms of limited service and full service, and this was a full-service hotel, meaning they had bellmen, doormen, concierge, front desk, housekeeping, et cetera.

Q.   Okay.  During the time you worked at Sixty, did any of the hotels use outside vendors or independent contractors?

A.   Yes.

Q.   Did you have any involvement with those vendors or independent contractors?

A.   It depends which particular project that you're discussing.  If it was design -- from a design perspective, I dealt with the vendors for that, you know, aspect of my job.  But from a day-to-day perspective, not really.  Like we used window washer, you know, people that clean the outsides of the windows.  And hotels have the latitude to be able to select the vendor of their choosing and contract with them and accomplish the

A-503

Page 13

project at hand.

Q.   Okay.  What was Sixty's process for hiring or selecting vendors or independent contractors?

A.   It depends on the particular discipline of the contractor.  Each -- each, you know, particular third-party contractor, the process may have been different.  Like when we selected an IT company, for example, that was one process.  Or when we -- when the property selected, you know, on-property contractors, that may be a different process.  So it depends on which discipline you're referring to.

Q.   Well, can you give me a sense, what were the vendors where -- or contractors where there would be the most scrutiny that would be given to their hiring or selection?

A.   I would have a hard time answering that question because I didn't -- you know, on-property contractors, I wasn't involved in their selection.  So I don't know the due diligence process that was used for that particular aspect.

Q.   Okay.

A.   But if you talk about IT, you know, we vetted the company, we got recommendations, we

A-504

Page 14

looked at pricing comparables, we looked at the contract, we raised it up the ladder to the owners at a certain point for that particular third-party contractor.  So that was a heavily scrutinized third-party contractor, as an example.

Q.    Got it.  So, for example, for IT you said you took some steps to vet the IT vendor.

A.    Mm-hmm.

Q.    How -- what steps were those?

A.    Recommendations from other people that used the company.

Q.    Okay.  Did you interview different potential vendors as well?

A.    Yeah.

Q.    And did you look at their websites and other materials related --

A.    Exactly.

Q.    -- to the contractors?

A.    Mm-hmm.  Mm-hmm.

Q.    Did Sixty ever conduct background checks for hiring any vendors or independent contractors?

A.    Not that I'm aware of.

Q.    Okay.  How did Sixty pay vendors and independent contractors?

A.    I assume they were paid via -- because

A-505

Page 15

this wasn't my day-to-day, I'm just guessing.

Q.    Okay.

A.    But I'm pretty -- I feel pretty confident that probably the vendor would have submitted an invoice, the property manager would have processed the invoice, and then the on-property accounting team would have cut a check to pay the vendor.

Q.    Did the hotel ever have any issues with any of its vendors or independent contractors to your recollection?

A.    Not that I am aware of.

Q.    I'd like to discuss Sixty LES specifically.  Are you familiar with the spa operations at Sixty LES?

A.    Yes.

Q.    Okay.  I'd like to discuss the spa operations around October 2018.  What spa services did Sixty LES offer around October 2018?

A.    I don't know.  I wasn't involved in the day-to-day operation of that property.

Q.    Did Sixty LES's spa have full-time employees back in October 2018?

A.    Not that I'm aware of.

Q.    Did they have any part-time employees?

A-506

Page 16

A.    Not that I'm aware of.

Q.    And do you know in October of 2018 how Sixty LES obtained massage therapists for the spa services at all?

A.    I assume they called the spa service company that they had used because, in my tenure, we never, what do you call it, mandated how they were to perform their services.  So, to my recollection or knowledge, they probably just did what they've always done.

Q.    And is it fair to say that the selection of, you know, contractors or vendors for spa services was done at the hotel level, not at the --

A.    Yes --

Q.    -- corporate level?

A.    -- absolutely.

Q.    Did Sixty LES advertise its -- the spa services to its guests while you worked there?

A.    I'm not sure.  I don't know if they -- you know, I don't know if they did or not.

Q.    And did you have in your job responsibilities, which I appreciate were at a pretty high level, did you have any responsibilities that involved the spa or the in-room spa services at --

A.    None --

A-507

Page 17

Q.    -- Sixty LES?

A.    -- no.

Q.    Okay.  Are you familiar with a person named Valeriya Vasilets?

A.    Valeriya?

Q.    Yes.

A.    No, I'm not.

Q.    Are you familiar with a hotel guest named Margaret Betts or Maggie Betts?

A.    Yes --

Q.    Okay.

A.    -- because of my preparation with the attorney.  And I recall an incident arising with her as a guest.

Q.    And what do you recall regarding that incident, sir?

A.    I believe that she was a guest at LES. And as -- and she -- I believe that she raised an allegation of potential sexual abuse by her massage therapist.  And because Nick Riley, who was the general manager was my direct report, I sort of recall him shooting me an e-mail and saying -- you know, giving me the details of the incident.

And as you may or may not know, in hotels we face allegations on a regular basis

Page 18

because we deal with the public.  So I did like I did with any allegation, I presented it -- or I pushed it over to my director of finance who had direct relations with our insurance company.

And that's how we would have handled this situation to get, you know, an expert involved.

Q.   And who was the director of finance at the time?

A.   I'm guessing it was probably Bernard Campbell.

Q.   Okay.  And who was your insurance company at the time?

A.   Excuse me just one second.

Q.   Of course.

A.   Okay.  Sorry about that.

Would you repeat the question?

Q.   Yes.  What was your insurance company at the time?  You mentioned an insurance company.

A.   I don't recall.

Q.   Okay.  Do you know whether or not there was any investigation of the -- of the allegations that Ms. Betts raised?

A.   I'm guessing there probably was because whenever we had an incident in the hotel we

A-509

Page 19

always -- the process should have been that the property documented it on an incident -- incident factfinding form so that we had proper documentation to hand over to an insurance company should that be required.

Q.    Okay.  What else would be part of the kind of usual process with dealing with an allegation of that -- of that type?

A.    We take information regarding the allegation and then, depending on the advice that the insurance company gave us, that's how we would proceed.

Q.    Okay.  Do you -- do you personally have any knowledge about Ms. Betts's room massage during her --

A.    I do not.

Q.    Do you know anything about the massage therapist who allegedly assaulted Ms. Betts?

A.    I do not.

Q.    I'm going to show you now what I have marked as Exhibit 1.  I -- I am going to share with you -- hold on one second.  I'll share it through a document on my screen.

Okay.  And I'm going to ask that we treat this document -- that we treat this

Page 20

document as marked as Exhibit 1.

(Exhibit 1 was marked.)

BY MR. MARIOTTI:

Q.    Do you see this document on the screen in front of you, sir?

A.    I do.

Q.    Okay.  This obviously -- this has a defendant's exhibit label at the top.  This is just the only copy of the record I've received.  But I'm marking it as Exhibit 1 in this particular deposition.

Do you recognize this document, sir?

A.    I only recognize it because of my 30-plus years of being in the hospitality business and being a professor at New York University teaching a hotel management course of which I explain a pay -- paid out.  So I understand this to be a paid out.  That's the only thing that I recognize regarding this particular document.

Q.    Okay.  And what is the purpose of a paid out slip like this one?

A.    To debit a folio and to take cash from your drawer and hand it to a third party.

Q.    And here it says 60-minute spa massage

Page 21

$150.  Would this indicate that $150 in cash was paid out by the hotel for Ms. Betts's massage?

A.    I'm guessing, yes.

Q.    Do you know why Sixty LES paid cash directly to massage therapists?

A.    Some third-party contractors, it's always been the practice.  And, although, if you were to ask me, I'm not aware of who was paid by check and who was paid by cash.

Q.    Okay.

A.    But it's not an uncommon practice within our industry.

Q.    And would the hotel provide tax forms related to the cash payments to the massage therapists?

A.    I assume not.

Q.    Now, you mentioned -- I'm going to switch off of this for a moment.

Now, you mentioned that at some point you became aware of this allegation by Ms. Betts and that you were told I think you said via e-mail from Mr. Riley.  Is that -- is that accurate?

A.    Yes.  I assume.  And I'm only -- I'm only guessing.  I just have a slight recollection

A-512

Page 22

of it but nothing in detail.

Q.    Okay.  Did you ever speak with Ms. Betts after she reported this alleged --

A.    I did not.

Q.    -- assault?

And do you know for -- one way or the other whether or not the complaint was documented in some way?

A.    I do not, no.

Q.    Do you know what the practice would be, specifically what type of form or document --

A.    I'm guessing that a document named an incident -- an incident form may have been used to document it or it would have been documented in a pass on log.

Q.    We spoke a minute ago about how a complaint like this would usually be handled.  Did Sixty -- back in October 2018, did Sixty LES have any written policies regarding investigating guest complaints?

A.    Probably not.

Q.    Any unwritten policy --

A.    We were sort of doing -- we were doing -- you know, we were trying to get our SOPs in order, and I don't know if that was one that we

A-513

Page 23

were able to accomplish or not.

Q.    Do you know any specific steps that the hotel took to investigate the assault, the alleged assault?

A.    I do not know specifically.

Q.    Okay.  And are you aware of any communications that Mr. Riley had with others regarding this incident?

A.    No, of course not.

Q.    Okay.  And do you know anything about the results or follow-up from any investigation that was undertaken?

A.    No, I do not.

Q.    And do you know anything about how -- how any investigation was documented?

A.    No.  I remember passing this on as an open case, you know, because we had a list of cases that were either ongoing, closed, or whatever.  And I probably -- and I'm quite confident I probably passed this on to Ruthann Ledwick [sic] who -- to pick up some of the duties upon my departure.

Q.    Okay.  Who would have information about the investigation and the documentation and the investigation?

A.    Either the general manager, who's no

A-514

Page 24

longer with the company, or the director of finance, who's no longer with the company.

But I'm quite confident the insurance company would have had something as well because I'm -- I don't know for a fact, but I assume that it was, you know, forwarded on to the insurance company and they would have requested documentation.

Q.   Do you know whether or not Ms. Betts was ever informed by Sixty LES that the massage therapist was not an employee of the hotel?

A.   I don't know.

Q.   And do you know whether or not the hotel reported these allegations to the police?

A.   I don't know.

Q.   Okay.  Are you aware of any law enforcement or government investigation into this alleged assault?

A.   I am not.

Q.   Okay.  And do you know anything about the hotel's cooperation with the NYPD investi- gation?

A.   I do not know.

Q.   Do you know who was responsible for complying with subpoenas, law enforcement

Page 25

subpoenas, at Sixty LES at that time?

A.   It would have been the general manager who was in place at the time who probably presented it to either myself or the director of -- the corporate director of finance to ensure validity.

Q.   Okay.  And regarding the security video, the security footage at the hotel, what do you know about the security video at Sixty LES Hotel, if anything?

A.   I know they have cameras, and I assume they digitally record and they retain those recordings for a specific period of time.  And that's only what I assume.  I've never inspected it to ensure that they're compliant.

Q.   Okay. All right.  I had to ask.  So you don't know anything about, for example, the storage of security camera footage, anything of that nature?

A.   No.

Q.   Do you know whether or not the NYPD or the district attorneys office requested interviews of anyone at Sixty Hotels?

A.   Not that I'm aware of.

Q.   Okay.  And do you know who at Sixty was in communication with the NYPD or district

Page 26

attorneys office?

A.    If anyone, I assume it would have been the general manager.  But, again, in our business, sometimes people communicate without authorization.

Q.    I totally --

A.    So I don't really know.

Q.    Fair.  Fair point.

To your knowledge, did Sixty ever provide the name of the massage therapist to law enforcement?

A.    I don't know.

Q.    Okay.  I'm going to bring up a document that I am going to ask that we treat as marked as Exhibit 2.

(Exhibit 2 was marked.)

BY MR. MARIOTTI:

Q.    And this is -- it says Sixty LES at the top, it has Ms. Betts' name and address here, and it says invoice and it's got a number of charges underneath.  Do you see that, sir?

A.    I do.

Q.    Do you recognize this exhibit?

A.    Do I recognize what?

Q.    This exhibit, sir.

A.    Yes.  It's a copy of a guest folio.

Page 27

Q.    Okay.  And is that like a hotel bill essentially or --

A.    Yes --

Q.    Okay.

A.    -- exactly.

Q.    And have you seen this particular bill before?

A.    No.

Q.    Okay.  In the second line, it says paid out $150.

A.    Right.

Q.    What does this line mean?

A.    I assume it is the cash charge -- or the cash payment to the massage therapist.

Q.    Okay.

A.    Because of the document that you showed me previously.

Q.    Okay.  And then I'm going to go to the second page here.  And it says, you know, 150 -- minus $150 guest recovery posted to lost interface from resv_name_ID.  Does that indicate that the hotel refunded Ms. Betts for the cost of the massage?

A.    According to what you showed me, it looks like that's the case, yes.

Page 28

Q.    And I take it you weren't involved in that decision in any way?

A.    No.

Q.    Okay.  You didn't discuss anything really about how the hotel was going to respond to Ms. Betts' allegations?

A.    Nope.

Q.    Okay.  I'm going to show you another exhibit.

Okay.  All right.  Miss, I'm going to ask that we treat this as marked as Exhibit 3.

(Exhibit 3 was marked.)

BY MR. MARIOTTI:

Q.    And have you seen this exhibit before, sir?

A.    No, I -- not to my recollection.

Q.    Okay.  And I'm going to direct your attention to the third paragraph.  It says:  "As you are aware, we [sic] have" -- and this is directed to a Ms. Valeriya Vasilets.

A.    Okay.

Q.    And it's on behalf of Sixty Hotels and Sixty Lower East Side.  It says:

"As you are aware, you have been providing massage services on an

A-519

Page 29

as-needed basis to the hotel via your employed massage therapists.  On October 19, 2018, Sixty LES contacted you to send one of your massage therapists to the hotel for a guest, Margaret Betts.  A massage therapist named Yuri was sent to the hotel.  Ms. Betts is claiming that while she was receiving a massage in her hotel by Yuri she was inappropriately touched and sexually assaulted."

What was -- what was Sixty's basis for asserting in this letter that the massage therapist was Ms. Vasilets' employee?  Do you have any knowledge of that?

A.    No, I do not.

Q.    Okay.  And, to your knowledge, why did Sixty tender this claim to Ms. Vasilets' insurer after Ms. Vasilets informed Mr. Riley that the massage therapist was not her employee?

A.    I don't know.

Q.    Okay.  Have you spoken with anyone -- I'm going to take this down.

Have you spoken with anyone at Sixty LES about Ms. Betts' allegation?

Page 30

A.    No.

Q.    Is there anyone else you've discussed this case with that we haven't already mentioned?

A.    Not that I'm aware of.

Q.    Okay.  Do you know if anyone else at Sixty LES spoke with Ms. Betts about the assault?

A.    Not that I'm aware of.

Q.    How -- when you were at Sixty LES, how would you typically communicate with co-workers?

A.    It depends what co-worker.  If it was a direct report, often by e-mail.  If it was an hourly or on-line associate, it probably was in person.

Q.    And did you -- did you have a Sixty LES e-mail address when you worked there?

A.    Yes.

Q.    Okay.  And what was your e-mail address, do you recall?

A.    I'm guessing it may have been emaynard@sixtyhotels.com or edwardmaynard@sixtyhotels.com, something like that.

Q.    Okay.  And did you use that account to communicate with co-workers and others at Sixty Hotels?

A.    Sure.  Yes.

A-521

Page 31

Q.    And did you use any personal e-mail accounts for company business?

A.    No.

Q.    To your knowledge, has Sixty Hotels ever received complaints or been notified of other incidents of sexual assault at Sixty LES Hotel?

A.    Not that I'm aware of.

Q.    Okay.  To your knowledge, has Sixty Hotels ever received any other complaints related to massage therapists at Sixty LES Hotel?

A.    No.

Q.    Okay.  All right.  To your knowledge, has the hotel ever received complaints or been notified of criminal conduct by hotel employees or other -- or vendors?

A.    Not that I'm aware of.

Q.    Okay.  Have you -- have you done -- have you worked at other hotel or hospitality companies other than --

A.    Of course --

Q.    -- the ones you've consulted for?

A.    -- Yes.

Q.    And what -- what companies were those, sir?

A.    Marriott, Starwood, W, Westin,

A-522

Page 32

Millennium, Princess Hotels, On The Ave Hotel.  I can keep going if you'd like.

Q.    Wow.  You're -- you've got -- you've hit the --

A.    Thirty-five years.

Q.    -- every single one there.  Well done.

A.    Ian Schrager Hotels.

Q.    So how would you compare -- let me ask you this.  How would you compare the management of the spa at Sixty LES with the management of spas at other hotels --

MR. SOBEL:  Just note my objection to the question.  I think it calls for an opinion.

But with that objection, please feel free to answer, Mr. Maynard.

BY MR. MARIOTTI:

Q.    I'm just asking descriptively, how would it be different?

A.    I don't think it's any different unless the hotel staffed full-time, you know, associates.  But --

Q.    Mm-hmm.

A.    -- most experiences that I've had in other hotels it's third-party referred.

Q.    Okay.  And, just to be crystal clear,

Page 33

you had -- you had no responsibilities relating to
the hotel spa services in October 2018.  Correct?

    A.    I did not.

    Q.    And I know that after this incident
Sixty LES changed its -- how it handled its spa
services.  Were you involved in that decision?

    A.    I may or may not have been.  I don't
recall.  I don't -- I'm not even sure what they
would have changed.  But I'd have to be reminded
what the change was.

    Q.    All right.  Why don't I -- let me --
give me a few minutes.  I want to make sure I have
no other questions --

    A.    Okay.

    Q.    -- for you.  Okay.  Take a short break.

         THE VIDEOGRAPHER:  We'll go off the
record at 11:48.

                    (A break was taken from
                     11:48 a.m. until 11:52 a.m.)

         THE VIDEOGRAPHER:  We're back on the
record 11:52.

BY MR. MARIOTTI:

    Q.    All right.  Mr. Maynard, I just have a
few questions for you.

              Do you recall anything regarding

A-524

Page 34

any of the substance of the e-mail that Mr. Riley sent you regarding the incident with Ms. Betts?

A.    I do not.

Q.    What do you recall regarding the e-mail retention policy of Sixty Hotels during your time there?

A.    That I allowed to the jurisdiction of the director of finance to manage.

Q.    Understood.  All right.  I have no further questions.

Do you have any, Mr. Sobel?

MR. SOBEL:  No, I don't.

Thank you, Edward, very much.

THE WITNESS:  Thank you, guys.

MR. MARIOTTI:  Thank you, Mr. Maynard.

THE VIDEOGRAPHER:  Okay.  We're off the record at 11:53.

(The following further
proceedings were held
off the video record:)

MR. SOBEL:  All right.  Debbie, the usual.

MR. MARIOTTI:  Same here.  We don't need the video.  Just an electronic transcript.

THE COURT REPORTER:  Mr. Sobel, do you

A-525

Page 35

want to reserve signature on behalf of Mr. Maynard?

MR. SOBEL:  Yes.

(The deposition was concluded

at 11:54 a.m.)

(Signature was reserved.)

--oo0oo--

Page 36

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, DEBRA L. KLESZYK, a Certified

Shorthand Reporter of the State of Illinois,

CSR License 084-002981, do hereby certify:

That previous to the commencement of the

examination of the aforesaid witness, the witness

was duly sworn by me to testify the whole truth

concerning the matters herein;

That the foregoing deposition transcript

was stenographically reported by me and was there-

after reduced to typewriting under my personal

direction and constitutes, to the best of my

ability, a true and accurate record of the

testimony given and the proceedings had at the

aforesaid deposition;

That the said deposition was taken before

me remotely via videoconference at the time and

place specified;

That I am not a relative or employee or

attorney or counsel for any of the parties herein,

nor a relative or employee of such attorney or

counsel for any of the parties hereto, nor am I

Page 37

interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Elk Grove Village, Illinois, this 10th day of March, 2021.

DEBRA L. KLESZYK

Certified Shorthand Reporter

License No. 084-002981

Page 38

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

March 15, 2021

To: Curtis Sobel, Esq.

Case Name: Betts, Margaret v. Sixty Lower East Side, LLC, et al.

Veritext Reference Number: 4476998

Witness:  Edward Maynard    Deposition Date:  3/1/2021

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

A-529

Page 39

                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS

        ASSIGNMENT REFERENCE NO: 4476998
        CASE NAME: Betts, Margaret v.
                   Sixty Lower East Side, LLC, et al.
        DATE OF DEPOSITION: 3/1/2021
        WITNESS' NAME: Edward Maynard
        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
        I have made no changes to the testimony
as transcribed by the court reporter.


_____          _____
Date                      Edward Maynard
        Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

        They have read the transcript;
        They signed the foregoing Sworn
                Statement; and
        Their execution of this Statement is of
                their free act and deed.

        I have affixed my name and official seal

this _____ day of_____, 20_____.


        _____
        Notary Public
        _____
        Commission Expiration Date

Page 40

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4476998
CASE NAME: Betts, Margaret v.
            Sixty Lower East Side, LLC, et al.
DATE OF DEPOSITION: 3/1/2021
WITNESS' NAME: Edward Maynard
      In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
      I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
      I request that these changes be entered
as part of the record of my testimony.

      I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.
_____          _____
Date                       Edward Maynard

      Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
      They have read the transcript;
      They have listed all of their corrections
            in the appended Errata Sheet;
      They signed the foregoing Sworn
            Statement; and
      Their execution of this Statement is of
            their free act and deed.
      I have affixed my name and official seal
this _____ day of_____, 20_____.
                  _____
                  Notary Public

                  _____
                  Commission Expiration Date

A-531

Page 41

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4476998

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

Date                   Edward Maynard

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

_____

Notary Public

_____

Commission Expiration Date

**[04772 - aware]**                                                           Page 1

**0**

**04772**  1:5 4:4
**084-002981**  36:7 37:9

**1**

**1**  1:15,19 3:11 4:2 8:5 19:21 20:1,2 20:10
**100**  2:11
**10031**  8:6
**10th**  37:4
**11**  3:13
**1100**  38:1
**11743**  2:11
**11:15**  1:16 4:3
**11:48**  33:17,19
**11:52**  33:19,21
**11:53**  34:17
**11:54**  35:4
**15**  38:4
**150**  21:1,1 27:10 27:19,20
**1820**  38:2
**1875**  37:8
**19**  29:3
**1:20**  1:5 4:4

**2**

**2**  3:12 26:14,15
**20**  3:11 39:16 40:22 41:22
**2017**  10:4
**2018**  15:18,19,23 16:2 22:18 29:3 33:2
**2019**  3:13
**2021**  1:16 4:2 37:5 38:4
**216-523-1313**  38:3
**26**  3:12

**28**  3:13

**3**

**3**  3:13 28:11,12
**3/1/2021**  38:8 39:3 40:3
**30**  20:15
**312**  2:5
**346-7500**  2:5
**37th**  2:4

**4**

**4**  3:5
**44114**  38:2
**4476998**  38:7 39:2 40:2 41:2
**464**  2:11

**5**

**549-4677**  2:12
**55**  2:4

**6**

**60**  20:25
**60603**  2:5
**631**  2:12
**684**  1:18 8:5

**a**

**a.m.**  4:3 33:19,19 35:4
**ability**  7:3 36:16
**able**  7:10 12:24 23:1
**absolute**  6:12
**absolutely**  16:16
**abuse**  17:19
**accomplish**  12:25 23:1
**account**  30:22
**accounting**  15:7
**accounts**  31:2
**accurate**  21:23 36:16

**acknowledge** 39:11 40:16
**act**  39:14 40:20
**acting**  9:6
**action**  37:2
**address**  8:4 26:18 30:15,17 38:15
**adirondacks**  8:13
**administered**  3:20
**adult**  6:15
**advertise**  16:17
**advice**  19:10
**affect**  7:7
**affiliation**  4:7
**affixed**  39:15 40:21
**aforesaid**  36:9,18
**ago**  22:16
**al**  38:6 39:3 40:3
**allegation**  17:19 18:2 19:8,10 21:20 29:25
**allegations**  17:25 18:22 24:14 28:6
**alleged**  22:3 23:3 24:18
**allegedly**  19:18
**allen**  11:8
**allowed**  34:7
**ambience**  11:13 11:15
**answer**  6:2 32:15
**answering**  13:18
**answers**  5:10,14 7:10 9:23
**apartment**  1:19 6:7 8:5
**appear**  39:11 40:15
**appearance**  4:7

**appeared**  1:18 2:7 2:13,20
**appended**  40:11 40:18
**applied**  9:1
**appreciate**  16:22
**area**  8:15
**arising**  17:13
**asking**  5:6,21 32:17
**aspect**  12:20 13:22
**assault**  22:5 23:3,4 24:18 30:6 31:6
**assaulted**  19:18 29:11
**asserting**  29:13
**asset**  11:14
**assignment**  39:2 40:2 41:2
**associate**  9:1 30:12
**associates**  32:20
**assume**  14:25 16:5 21:16,24 24:6 25:10,13 26:2 27:13
**attached**  40:7
**attention**  28:18
**attorney**  7:23 17:13 36:23,24
**attorneys**  25:21 26:1
**authorization**  26:4
**authorize**  40:11
**ave**  32:1 38:1
**avenue**  2:11
**aware**  14:22 15:12 15:24 16:1 21:8 21:20 23:6 24:16 25:23 28:19,24 30:4,7 31:7,16

**[back - currently]**                                                  Page 2

| | |
|---|---|

**b**

**back** 9:13 15:23 22:18 33:20 38:15
**background** 14:20
**basis** 17:25 29:1 29:12
**beautiful** 8:15
**behalf** 1:12 2:7,13 4:9,12 28:22 35:1
**believe** 17:17,18
**bellmen** 12:9
**bernard** 18:11
**best** 36:15
**betts** 1:3 17:9,9 18:23 19:18 21:21 22:2 24:9 26:18 27:22 28:6 29:6,8 29:25 30:6 34:2 38:6 39:3 40:3
**betts's** 19:14 21:2
**beverly** 10:24
**bilities** 16:22
**bill** 27:1,6
**board** 7:25
**bond** 2:19
**break** 6:1,3 33:15 33:18
**breaks** 5:25
**bring** 26:12
**build** 9:12
**bunch** 12:1
**business** 20:15 26:3 31:2
**buys** 9:12

**c**

**c** 2:1
**ca** 38:25
**call** 11:22 16:7
**called** 4:18 9:19 11:6 16:5

**calls** 32:13
**camera** 25:17
**cameras** 25:10
**campbell** 2:4 4:9 18:11
**case** 1:13 4:4 23:17 27:25 30:3 38:6 39:3 40:3
**cases** 23:17
**cash** 20:23 21:1,4 21:9,14 27:13,14
**certain** 14:3
**certificate** 36:1 40:11
**certification** 39:1 40:1
**certifications** 9:3
**certified** 1:13 36:3 36:5 37:9
**certify** 36:7
**cetera** 12:10
**change** 33:10 38:13,14 40:8 41:3
**changed** 33:5,9
**changes** 38:12 39:7 40:7,9
**charge** 27:13
**charges** 26:19
**check** 15:7 21:9
**checks** 14:20
**chicago** 2:5 8:20
**children** 6:11
**choosing** 12:25
**civil** 1:17 39:5 40:5
**claim** 29:18
**claiming** 29:8
**clean** 12:22
**clear** 32:25

**cleveland** 38:2
**closed** 23:18
**coburn** 2:3 4:9
**college** 8:11,13
**comes** 8:23
**commencement** 36:8
**commencing** 1:16
**commission** 39:19 40:25 41:25
**communicate** 6:23 26:4 30:9,23
**communication** 25:25
**communications** 23:7
**companies** 31:18 31:23
**company** 9:10,18 13:9,25 14:11 16:6 18:4,13,18,19 19:4,11 24:1,2,4,7 31:2
**comparables** 14:1
**compare** 32:8,9
**complaint** 22:7,17
**complaints** 22:20 31:5,9,13
**complete** 7:10
**completed** 38:15
**compliant** 25:14
**complying** 24:25
**concerning** 36:11
**concierge** 12:9
**concluded** 35:3
**concrete** 11:18
**conduct** 14:20 31:14
**conference** 3:22
**confident** 15:4 23:19 24:3

**confirm** 7:24
**constitutes** 36:15
**consult** 9:7
**consultant** 9:6
**consulted** 31:21
**consulting** 9:16
**contacted** 29:3
**contract** 12:25 14:2
**contractor** 13:6,7 14:4,5
**contractors** 12:13 12:16 13:4,11,15 13:20 14:18,21,24 15:10 16:12 21:6
**conversation** 7:23
**cooperation** 24:21
**copy** 20:9 26:25
**corporate** 10:13 16:15 25:5
**correct** 33:2
**corrections** 38:12 40:17
**cost** 27:22
**counsel** 4:6 36:23 36:25
**county** 39:10 40:15
**course** 5:18 6:18 9:20 18:15 20:17 23:9 31:20
**court** 1:1 5:6 7:18 34:25 39:7
**criminal** 31:14
**crystal** 32:25
**csobel** 2:12
**csr** 36:7
**culture** 12:6
**current** 8:4
**currently** 7:6 9:5

**[curtis - fair]**                                                                        Page 3

| | | | |
|---|---|---|---|
| **curtis**  2:10 4:11 38:5 | 40:1,3 | **documents**  6:19 8:1 | **ensure**  25:5,14 |
| **cut**  15:7 | **depositions**  7:16 | **doing**  22:23,23 | **entered**  40:9 |
| **cv**  1:5 4:4 | **describe**  11:9 | **doormen**  12:9 | **enters**  6:16 |
| **d** | **description**  3:10 | **drawer**  20:24 | **entire**  10:7 39:5 40:5 |
| **d**  3:1 5:3,3,4 | **descriptively** 32:17 | **drive**  1:18 8:5 | **entitled**  1:12 |
| **date**  38:8 39:3,9 39:19 40:3,13,25 41:20,25 | **design**  11:19 12:18 12:19 | **due**  13:21 | **equity**  9:12 |
| **day**  12:21,21 15:1 15:1,21,21 37:4 39:16 40:22 41:22 | **designed**  11:12 | **duly**  4:16,19 36:10 | **errata**  38:13,18 40:7,10,18 41:1 |
| **days**  38:18 | **desk**  12:10 | **duties**  23:21 | **esq**  38:5 |
| **deal**  18:1 | **detail**  22:1 | **e** | **essentially**  27:2 |
| **dealing**  19:7 | **details**  17:23 | **e**  2:1,1 3:1 5:3 17:22 21:22 30:11 30:15,17 31:1 34:1,4 | **et**  12:10 38:6 39:3 40:3 |
| **dealt**  12:19 | **different**  12:1 13:8 13:11 14:12 32:18 32:19 | | **exactly**  14:17 27:5 |
| **dear**  38:10 | **digital**  6:24 | **east**  1:6 2:4 11:7 11:13,16 28:23 38:6 39:3 40:3 | **examination**  3:4 4:21 36:9 |
| **debbie**  34:21 | **digitally**  25:11 | | **examined**  4:19 |
| **debit**  20:23 | **diligence**  13:21 | **eastern**  1:16 | **example**  13:9 14:5 14:6 25:16 |
| **debra**  1:13 36:5 37:8 | **direct**  17:21 18:4 28:17 30:11 | **education**  8:10 | **excuse**  18:14 |
| **decision**  28:2 33:6 | **directed**  28:20 | **edward**  1:11 3:3 4:17 5:3 34:13 38:8 39:4,9 40:4 40:13 41:20 | **executed**  40:10 |
| **deed**  39:14 40:20 | **direction**  36:15 | | **execution**  39:14 40:19 |
| **deemed**  38:19 | **directly**  21:5 37:1 | **edwardmaynard** 30:21 | **exhibit**  3:10,11,12 3:13 19:21 20:1,2 20:8,10 26:14,15 26:22,24 28:9,11 28:12,14 |
| **defendant's**  20:8 | **director**  18:3,8 24:1 25:4,5 34:8 | **either**  23:18,25 25:4 | |
| **defendants**  1:8 2:14 4:12 | **discipline**  13:5,12 | **electronic**  34:24 | |
| **definitely**  12:3 | **discuss**  15:13,17 28:4 | **elk**  37:4 | **exhibits**  3:9 |
| **degree**  8:25 | **discussed**  30:2 | **email**  38:17 | **experiences**  32:23 |
| **department**  38:22 | **discussing**  12:18 | **emaynard**  30:20 | **expert**  18:6 |
| **departure**  23:21 | **district**  1:1,1 25:21,25 | **employed**  9:5 29:2 | **expiration**  39:19 40:25 41:25 |
| **depending**  19:10 | **documen**  19:3 | **employee**  24:11 29:14,20 36:22,24 | **explain**  7:24 20:18 |
| **depends**  12:17 13:5,12 30:10 | **document**  19:23 19:25 20:1,4,12,20 22:11,12,14 26:12 27:16 | **employees**  15:23 15:25 31:14 | **exposed**  11:18 |
| **deponent**  2:14 | | **enclosed**  38:11 | **f** |
| **deposed**  7:13 | | **enforcement** 24:17,25 26:10 | **face**  17:25 |
| **deposition**  1:11 4:4,5 6:6,16,23 7:22 8:2 20:11 35:3 36:12,18,19 38:8,11 39:1,3 | **documentation** 23:23 24:8 | **enhance**  10:13 | **fact**  24:5 |
| | **documented**  19:2 22:8,14 23:15 | | **factfinding**  19:3 |
| | | | **fair**  11:4 16:11 26:7,7 |

[familiar - invoice]                                                    Page 4

**familiar** 11:6 15:14 17:3,8
**federal** 1:17
**feel** 15:3 32:15
**fifty** 7:5
**finance** 18:3,8 24:2 25:5 34:8
**find** 38:11
**first** 4:19,25 10:1
**fit** 11:12
**five** 10:21 32:5
**floor** 2:4
**folio** 20:23 26:25
**follow** 23:11
**following** 34:18
**follows** 4:20
**footage** 25:7,17
**foregoing** 36:12 39:13 40:18
**form** 19:3 22:11 22:13
**forms** 21:13
**forward** 38:15
**forwarded** 24:6
**four** 10:21
**free** 32:15 39:14 40:20
**front** 12:9 20:5
**full** 5:1 11:22,24 12:8,8 15:22 32:20
**further** 34:10,18

**g**

**g** 1:19 8:5
**gation** 24:22
**general** 10:11 17:21 23:25 25:2 26:3
**give** 5:10,14 7:3,10 9:13 13:14 33:12

**given** 13:16 36:17
**giving** 5:25 17:23
**glutton** 8:22
**go** 8:12 27:18 33:16
**going** 4:24 5:7 7:1 19:20,21,24 21:17 26:12,13 27:18 28:5,8,10,17 29:23 32:2
**good** 4:1
**government** 24:17
**graduate** 8:11
**great** 8:1,15 11:1
**grove** 37:4
**grungy** 11:17
**guessing** 10:5 15:1 18:10,24 21:3,25 22:12 30:19
**guest** 17:8,14,17 22:19 26:25 27:20 29:5
**guests** 16:18
**guys** 34:14

**h**

**h** 2:4
**hand** 13:1 19:4 20:24 37:4
**handled** 18:6 22:17 33:5
**hard** 13:18
**hcampbell** 2:6
**heavily** 14:4
**held** 4:5 34:19
**help** 5:9
**hereto** 36:25
**hereunto** 37:3
**high** 11:20,23 12:2 16:22
**highest** 8:9 10:20

**hills** 10:24
**hiring** 13:3,17 14:21
**hit** 32:3
**hmm** 11:2,5 14:8 14:19,19 32:22
**hold** 19:22
**holly** 2:4 4:9
**hospitality** 9:9 20:15 31:18
**hotel** 1:7 11:6,10 11:21,22 12:3,5,8 15:9 16:13 17:8 18:25 20:17 21:2 21:13 23:3 24:11 24:13 25:7,8 27:1 27:22 28:5 29:1,5 29:7,9 31:6,10,13 31:14,18 32:1,20 33:2
**hotel's** 24:21
**hotels** 1:6 9:12,19 9:21 10:2,14,16,17 10:19,21,22 11:4 11:11,25 12:7,12 12:23 17:25 25:22 28:22 30:24 31:4 31:9 32:1,7,11,24 34:5
**hourly** 30:12
**housekeeping** 12:10
**huntington** 2:11

**i**

**ian** 32:7
**illinois** 1:14 2:5 36:6 37:4
**improve** 10:14
**inappropriately** 29:10

**incident** 17:13,16 17:23 18:25 19:2 19:2 22:13,13 23:8 33:4 34:2
**incidents** 31:6
**included** 38:13
**incorporated** 40:12
**independent** 12:13 12:16 13:3 14:21 14:24 15:10
**index** 3:9
**indicate** 21:1 27:21
**indicating** 38:13
**indirectly** 37:1
**industry** 21:12
**information** 19:9 23:22
**informed** 24:10 29:19
**inspected** 25:13
**insurance** 18:4,12 18:18,19 19:4,11 24:4,7
**insurer** 29:18
**interested** 37:1
**interface** 27:20
**interview** 14:12
**interviews** 25:21
**investi** 24:21
**investigate** 23:3
**investigating** 22:19
**investigation** 18:22 23:11,15,23 23:24 24:17
**investors** 9:13
**invoice** 3:12 15:5,6 26:19

A-536

[involved - morning]                                                      Page 5

**involved**  13:20 15:20 16:24 18:7 28:1 33:6
**involvement**  12:15
**involving**  7:16
**issues**  15:9

**j**

**job**  11:3 12:20 16:21
**joy**  6:12
**jurisdiction**  34:7
**justin**  2:19

**k**

**keep**  32:2
**key**  10:12
**kicked**  6:13
**kind**  9:10 19:7
**kleszyk**  1:13 36:5 37:8
**know**  5:17,22 6:1 6:17 9:23 11:17 11:18,25 12:6,20 12:22 13:6,10,19 13:21,24 15:20 16:2,12,19,20,20 17:23,24 18:6,21 19:17 21:4 22:6 22:10,24,25 23:2,5 23:10,14,17 24:5,6 24:9,12,13,15,20 24:23,24 25:7,10 25:16,20,24 26:6 26:11 27:19 29:21 30:5 32:20 33:4
**knowledge**  16:9 19:14 26:8 29:15 29:17 31:4,8,12
**knows**  6:13

**l**

**l**  1:13 36:5 37:8
**label**  20:8
**ladder**  14:2
**largest**  11:14
**latitude**  12:24
**law**  24:16,25 26:9
**lawsuit**  7:19
**ledwick**  23:20
**legal**  38:1 41:1
**legally**  5:13
**les**  3:12 7:16 15:13 15:15,19 16:3,17 17:1,17 21:4 22:18 24:10 25:1 25:8 26:17 29:3 29:25 30:6,8,14 31:6,10 32:10 33:5
**letter**  3:13 29:13 38:19
**level**  8:9 16:13,15 16:23
**liberal**  5:24
**license**  36:7 37:9
**licenses**  9:2
**limited**  12:7
**line**  27:9,12 30:12 38:13 40:7 41:3
**list**  23:17
**listed**  40:7,17
**listing**  40:7
**little**  11:17
**live**  8:20
**lived**  8:7
**llc**  1:6,6,7 2:10 3:13 38:6 39:3 40:3
**llp**  2:3
**located**  10:23

**locations**  11:1
**log**  22:15
**long**  8:7 9:15
**longer**  24:1,2
**look**  14:15
**looked**  14:1,1
**looks**  27:25
**lost**  27:20
**lot**  8:16 11:18
**lower**  1:6 11:7,13 11:15 28:23 38:6 39:3 40:3
**luxury**  12:2,3

**m**

**m**  5:4
**madam**  38:10
**maggie**  17:9
**mail**  17:22 21:22 30:11,15,17 31:1 34:1,4
**manage**  34:8
**management**  20:17 32:9,10
**manager**  1:7 15:5 17:21 23:25 25:2 26:3
**managers**  10:11
**mandated**  16:7
**march**  1:15 3:13 4:2 37:5 38:4
**margaret**  1:3 17:9 29:6 38:6 39:3 40:3
**mariotti**  2:3 3:5 4:8,8,22 8:19 20:3 26:16 28:13 32:16 33:22 34:15,23
**marked**  3:10 19:21 20:1,2 26:13,15 28:11,12

**marking**  20:10
**marriott**  31:25
**massage**  16:3 17:19 19:14,17 20:25 21:2,5,14 24:10 26:9 27:14 27:23 28:25 29:2 29:4,6,9,13,20 31:10
**materials**  14:16
**matters**  36:11
**maynard**  1:11 3:3 4:17,24 5:3 32:15 33:23 34:15 35:1 38:8 39:4,9 40:4 40:13 41:20
**mean**  11:24 27:12
**meaning**  12:9
**means**  12:2
**medications**  7:7
**memory**  7:7
**mentioned**  5:5 18:19 21:17,19 30:3
**miami**  10:25
**mid**  12:5
**midwest**  38:17 41:1
**millennium**  32:1
**minus**  27:20
**minute**  20:25 22:16
**minutes**  33:12
**mm**  11:2,5 14:8,19 14:19 32:22
**moment**  21:18
**money**  9:14
**monroe**  2:4
**months**  8:17 9:17
**morning**  4:1,25

A-537

**[multiple - previously]**                                    Page 6

**multiple**  10:17

**n**

**n**  2:1 3:1 5:4
**name**  5:1,1 26:9 26:18 27:21 38:6 39:3,4,15 40:3,4 40:21
**named**  17:4,9 22:12 29:7
**nature**  25:18
**necessarily**  11:23
**need**  6:1 34:23
**needed**  29:1
**never**  16:7 25:13
**new**  1:1,19,19 2:11 2:11 6:7 8:6,6,14 10:24 20:16
**nick**  17:20
**nine**  9:17
**nope**  28:7
**notarized**  38:14
**notary**  38:25 39:10,18 40:15,23 41:23
**note**  32:12 38:12
**notified**  31:5,14
**nrb**  1:5
**number**  4:4 10:12 26:19 38:7,13
**numbers**  40:7
**nypd**  24:21 25:20 25:25

**o**

**oath**  3:20
**objection**  32:12,14
**objections**  3:19,21
**obligated**  5:14
**obtained**  16:3
**obviously**  20:7

**october**  15:18,19 15:23 16:2 22:18 29:3 33:2
**offer**  15:19
**office**  10:13 25:21 26:1
**official**  39:15 40:21
**oh**  8:21
**ohio**  38:2
**okay**  6:5,10,15,22 7:1,13 8:9,21 9:2 9:5,7,10,15,18,22 10:6,16,22 11:9,20 12:4,11 13:2,23 14:12,23 15:2,17 17:3,11 18:12,16 18:21 19:6,13,24 20:7,21 21:10 22:2 23:6,10,22 24:16,20 25:6,15 25:24 26:12 27:1 27:4,9,15,18 28:4 28:8,10,17,21 29:17,22 30:5,17 30:22 31:8,12,17 32:25 33:14,15 34:16
**old**  7:4
**ones**  31:21
**ongoing**  23:18
**oo0oo**  35:6
**open**  23:17
**operation**  15:21
**operations**  15:15 15:18
**opinion**  32:13
**opulent**  11:19
**order**  10:14 22:25
**outcome**  37:1

**outside**  6:24 12:12
**outsides**  12:23
**owners**  14:2

**p**

**p**  2:1,1
**page**  3:4 27:19 38:13,15 40:7 41:3
**paid**  3:11 14:25 20:18,19,21 21:2,4 21:8,9 27:9
**paragraph**  28:18
**part**  15:25 19:6 40:9
**particular**  12:17 13:5,7,22 14:3 20:10,20 27:6
**particularly**  7:2
**parties**  3:19 36:23 36:25
**party**  13:7 14:3,5 20:24 21:6 32:24
**pass**  22:15
**passed**  23:20
**passing**  23:16
**paul**  8:13
**pay**  14:23 15:8 20:18
**payment**  27:14
**payments**  21:14
**pending**  6:3
**people**  12:22 14:10 26:4
**perform**  16:8
**performance**  10:14
**period**  25:12
**person**  17:3 30:13
**personal**  7:2 31:1 36:14

**personally**  19:13 39:11 40:15
**personnel**  10:12
**perspective**  12:19 12:21
**pevzner**  2:10 3:13 4:12
**phone**  38:3
**pick**  23:21
**place**  25:3 36:21
**plaintiff**  1:4,12 2:8 4:10
**platform**  5:7 6:24
**please**  4:6,14 5:1 5:17,21 32:14 38:11,11
**plus**  20:15
**point**  5:16,25 10:20 14:3 21:20 26:7
**police**  24:14
**policies**  22:19
**policy**  22:22 34:5
**portfolio**  11:12
**posted**  27:20
**potential**  14:13 17:19
**practice**  21:7,11 22:10
**preparation**  17:12
**prepare**  7:21 8:2
**present**  2:18
**presented**  18:2 25:3
**president**  9:20 10:6,10
**pretty**  15:3,3 16:22
**previous**  36:8
**previously**  27:17

**[pricing - scrutinized]**                                            Page 7

**pricing**  14:1
**princess**  32:1
**probably**  10:20
  15:4 16:9 18:10
  18:24 22:21 23:19
  23:19 25:3 30:12
**problem**  6:4
**procedure**  1:17
  39:5 40:5
**proceed**  19:12
**proceeding**  3:21
**proceedings**  34:19
  36:17
**process**  7:24 13:2
  13:7,9,12,21 19:1
  19:7
**processed**  15:6
**production**  38:15
  38:17,22
**professor**  20:16
**profitability**  10:15
**project**  12:17 13:1
**proper**  19:3
**property**  13:10,11
  13:19 15:5,7,21
  19:2
**provide**  21:13
  26:9
**providing**  28:25
**public**  18:1 39:10
  39:18 40:15,23
  41:23
**punishment**  8:22
**purpose**  20:21
**pursuant**  1:17
**pushed**  18:3

**q**

**question**  5:17,21
  6:2 13:19 18:17
  32:13

**questions**  4:24 5:6
  5:11,14 7:2 9:23
  33:13,24 34:10
**quite**  23:19 24:3

**r**

**r**  2:1 5:3,4
**raised**  14:2 17:18
  18:23
**range**  12:5
**rate**  11:25 12:7
**read**  39:5,6,12
  40:5,6,17
**reading**  38:19
**really**  12:21 26:6
  28:5
**reappear**  6:14
**reason**  7:9,12
  38:14 40:8 41:3
**recall**  10:3,4 17:13
  17:15,22 18:20
  30:18 33:8,25
  34:4
**receipt**  3:11 38:18
**receive**  8:25
**received**  20:9 31:5
  31:9,13
**receiving**  29:9
**recognize**  20:12
  20:14,20 26:22,23
**recollection**  15:11
  16:9 21:25 28:16
**recommendations**
  13:25 14:10
**record**  4:2,7 5:2
  20:9 25:11 33:17
  33:21 34:17,20
  36:16 40:9
**recordings**  25:12
**recovery**  27:20
**reduced**  36:14

**reference**  38:7
  39:2 40:2
**referenced**  39:11
  40:15
**referred**  32:24
**referring**  13:13
**refunded**  27:22
**regarding**  17:15
  19:9 20:20 22:19
  23:8 25:6 33:25
  34:2,4
**regular**  17:25
**related**  14:16
  21:14 31:9
**relating**  7:2 33:1
**relations**  18:4
**relative**  36:22,24
**remember**  5:19,20
  23:16
**reminded**  33:9
**remotely**  1:15
  3:20 4:5 36:20
**renato**  2:3 4:8
**repeat**  18:17
**report**  17:21 30:11
**reported**  10:11
  22:3 24:14 36:13
**reporter**  1:14 5:7
  34:25 36:3,6 37:9
  39:7
**request**  6:2 40:9
  40:11
**requested**  24:7
  25:21
**required**  19:5
  38:25
**resells**  9:13
**reserve**  35:1
**reserved**  35:5
**respon**  10:9

**respond**  28:5
**responses**  5:9
**responsi**  16:21
**responsibilities**
  16:23 33:1
**responsible**  24:24
**results**  23:11
**resv**  27:21
**retain**  25:11
**retention**  34:5
**returned**  38:18
**revelo**  9:9
**review**  8:1 38:12
  39:1 40:1
**right**  4:23 5:5,24
  9:24 25:15 27:11
  28:10 31:12 33:11
  33:23 34:9,21
**riley**  17:20 21:22
  23:7 29:19 34:1
**riverside**  1:18 8:5
**rmariotti**  2:6
**role**  10:13
**room**  6:8,16 16:24
  19:14
**rules**  1:17 39:5
  40:5
**ruthann**  23:20

**s**

**s**  2:1 38:15 40:8,8
  41:3
**saying**  17:22
**says**  20:25 26:17
  26:19 27:9,19
  28:18,23
**school**  8:12
**schrager**  32:7
**science**  9:1
**screen**  19:23 20:4
**scrutinized**  14:4

**[scrutiny - think]**                                              Page 8

**scrutiny** 13:16
**seal** 39:15 40:21
**second** 18:14
  19:22 27:9,19
**security** 25:6,7,8
  25:17
**see** 20:4 26:20
**seeing** 11:4
**seen** 27:6 28:14
**select** 12:24
**selected** 13:8,10
**selecting** 13:3
**selection** 13:17,20
  16:11
**send** 29:4
**sense** 13:14
**sent** 29:7 34:2
**september** 10:3
**service** 11:22,24
  12:6,7,8,8 16:5
**services** 15:18
  16:4,8,13,18,24
  28:25 33:2,6
**set** 37:3
**seven** 7:5
**sexual** 17:19 31:6
**sexually** 29:11
**share** 19:21,22
**sheet** 38:13 40:7
  40:10,18 41:1
**shooting** 17:22
**short** 33:15
**shorthand** 1:13
  36:3,6 37:9
**show** 19:20 28:8
**showed** 27:16,24
**shown** 38:16
**sibilities** 10:10
**sic** 23:20 28:19
**side** 1:6 11:7,13,16
  28:23 38:6 39:3

40:3
**signature** 35:1,5
  37:8 38:14
**signed** 39:13 40:18
**signing** 38:19
**sincerely** 38:21
**single** 32:6
**sir** 6:6,20 7:4 8:7
  8:25 9:11 11:10
  17:16 20:5,13
  26:20,24 28:15
  31:24 38:10
**situation** 18:6
**sixty** 1:6,6,7 3:12
  7:16 9:19,21 10:2
  10:7,16,19 11:7
  12:12 14:20,23
  15:13,15,19,22
  16:3,17 17:1 21:4
  22:18,18 24:10
  25:1,8,22,24 26:8
  26:17 28:22,23
  29:3,18,25 30:6,8
  30:14,23 31:4,6,8
  31:10 32:10 33:5
  34:5 38:6 39:3
  40:3
**sixty's** 13:2 29:12
**sixtyhotels.com**
  30:20,21
**slight** 21:25
**slip** 20:22
**smith's** 8:13
**sobel** 2:10,10 3:13
  4:11,11,11 8:18
  32:12 34:11,12,21
  34:25 35:2 38:5
**sobelpevzner.com**
  2:12
**solutions** 38:1
  41:1

**sops** 22:24
**sorry** 18:16
**sort** 17:21 22:23
**southern** 1:1
**spa** 15:14,17,18,22
  16:3,5,12,17,24,24
  20:25 32:10 33:2
  33:5
**spas** 32:10
**speak** 22:2
**specific** 23:2 25:12
**specifically** 10:5
  15:14 22:11 23:5
**specified** 36:21
**spell** 5:1
**spoke** 22:16 30:6
**spoken** 29:22,24
**staffed** 32:20
**standard** 1:16
**start** 10:1
**starwood** 31:25
**state** 1:14 4:6 5:1
  36:6 39:10 40:15
**statement** 39:13
  39:14 40:19,19
**states** 1:1
**stenographically**
  36:13
**steps** 14:7,9 23:2
**stipulated** 3:19
**stipulation** 3:18
**storage** 25:16
**street** 2:4 11:8
**submitted** 15:5
**subpoenas** 24:25
  25:1
**subscribed** 39:10
  40:14 41:21
**substance** 34:1
**suite** 2:11 38:2

**superior** 38:1
**supposed** 11:20
**sure** 6:12 8:24
  16:19 30:25 33:8
  33:12
**swear** 4:14
**switch** 21:18
**sworn** 4:16,19
  36:10 39:10,13
  40:14,18 41:21

**t**

**take** 4:3 5:9 6:3
  19:9 20:23 28:1
  29:23 33:15
**taken** 1:11,15
  33:18 36:19
**talk** 13:24
**tation** 19:4
**tax** 21:13
**teaching** 20:17
**team** 15:7
**ten** 8:17
**tender** 29:18
**tenure** 10:17 16:6
**terms** 11:19 12:6,7
**testified** 4:20 7:18
**testify** 36:10
**testimony** 7:3
  36:17 39:6,7 40:6
  40:9,12
**thank** 4:13,23 6:19
  34:13,14,15
**therapist** 17:20
  19:18 24:11 26:9
  27:14 29:6,14,20
**therapists** 16:3
  21:5,15 29:2,5
  31:10
**thing** 20:19
**think** 4:25 11:13
  11:25 21:21 32:13

[think - yuri]                                                    Page 9

32:19
**third**  13:7 14:3,5
  20:24 21:6 28:18
  32:24
**thirty**  32:5 38:18
**thompson**  2:3 4:9
**thompsoncobur...**
  2:6,6
**three**  8:8 10:21,24
**time**  1:16 4:23
  5:22 10:7 12:11
  13:18 15:22,25
  18:9,13,19 25:1,3
  25:12 32:20 34:5
  36:20
**times**  9:23
**today**  4:1,3 5:6 6:6
  6:20 7:2,11,22
**told**  21:21
**top**  20:8 26:18
**totally**  26:5
**touched**  29:11
**transcribed**  39:7
**transcript**  34:24
  36:12 38:11,12
  39:5,12 40:5,11,17
**treat**  19:25,25
  26:13 28:11
**true**  36:16
**truly**  8:18
**truth**  7:10 36:10
**truthful**  5:14 7:10
**trying**  22:24
**two**  8:8 10:20
**type**  19:8 22:11
**typewriting**  36:14
**typically**  30:9

**u**

**uncommon**  21:11
**underneath**  26:20

**understand**  5:13
  5:16 6:22 20:18
**understood**  5:12
  6:25 9:25 34:9
**undertaken**  23:12
**united**  1:1
**university**  20:16
**unwritten**  22:22
**upstate**  8:14
**use**  12:12 30:22
  31:1
**usual**  19:7 34:22
**usually**  22:17

**v**

**v**  1:5 38:6 39:3
  40:3
**valeriya**  3:14 17:4
  17:5 28:20
**validity**  3:20 25:5
**vasilets**  3:14 17:4
  28:20 29:14,18,19
**vendor**  12:24 14:7
  15:4,8
**vendors**  12:12,16
  12:19 13:3,15
  14:13,21,23 15:10
  16:12 31:15
**verbal**  5:9,10
**veritext**  38:1,7
  41:1
**veritext.com.**
  38:17
**vet**  14:7
**vetted**  13:25
**video**  3:21 25:6,8
  34:20,24
**videoconference**
  1:15 2:7,13,20
  36:20
**videographer**  2:19
  4:1,13 33:16,20

34:16
**videotaped**  1:11
  4:3
**village**  37:4

**w**

**w**  5:3 31:25
**waive**  3:19
**waived**  3:21 38:19
**want**  10:3 33:12
  35:1
**washer**  12:22
**way**  22:6,8 28:2
**ways**  12:1
**websites**  14:15
**westin**  31:25
**whereof**  37:3
**window**  12:22
**windows**  12:23
**winter**  8:16,23
**witness**  1:18 3:3
  4:15,16,18 34:14
  36:9,9 37:3 38:8
  38:11 39:1,4,11
  40:1,4,15
**witness'**  38:14
**worked**  9:18 10:7
  12:11 16:18 30:15
  31:18
**worker**  30:10
**workers**  30:9,23
**working**  10:2
**wow**  32:3
**written**  22:19

**x**

**x**  3:1

**y**

**y**  5:4
**yeah**  8:24 14:14
**year**  8:17

**years**  8:8 20:15
  32:5
**york**  1:1,19,19
  2:11,11 6:7 8:6,6
  8:14 10:24 20:16
**yuri**  29:7,10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
              VERITEXT LEGAL SOLUTIONS
     COMPANY CERTIFICATE AND DISCLOSURE STATEMENT


Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.
```

A-543

# EXHIBIT – F

A-544

## In the Matter Of:

## BETTS vs SIXTY LOWER EAST SIDE

1:20-cv-04772-NRB

## BRENTON KRUMPFES

*January 19, 2021*



800.211.DEPO (3376)
*EsquireSolutions.com*

A-545

BRENTON KRUMPFES                                        January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                        1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARGARET BETTS,                    )
                                   )
                Plaintiff,         )
                                   ) Index No.
        -vs-                       ) 1:20-cv-04772-NRB
                                   )
SIXTY LOWER EAST SIDE, LLC,        )
SIXTY HOTELS, LLC, and            )
SIXTY HOTELS MANAGER, LLC,         )
                                   )
                Defendants.        )

REMOTE DEPOSITION OF BRENTON KRUMPFES

Taken Via Zoom Videoconference

January 19, 2021

Chicago, Illinois

     The remote oral deposition of BRENTON KRUMPFES, called by the Defendants for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and a Certified Shorthand Reporter of the State of Illinois, on January 19, 2021, commencing at 2:33 p.m.



BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                     2

APPEARANCES:
All parties appearing via Zoom videoconference


ON BEHALF OF THE PLAINTIFF:

        THOMPSON COBURN, LLP
        55 East Monroe Street, 37th Floor
        Chicago, Illinois  60603
        312-346-7500
        BY:  RENATO MARIOTTI, ESQ.
             rmariotti@thompsoncoburn.com
             HOLLY H. CAMPBELL, ESQ.
             hcampbell@thompsoncoburn.com



ON BEHALF OF THE DEFENDANTS:

        SOBEL PEVZNER, LLC
        464 New York Avenue, Suite 100
        Huntington, New York  17743
        631-549-4677
        BY:  CURTIS SOBEL, ESQ.
             csobel@sobelpevzner.com




REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968



BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                      3

                           I N D E X

BRENTON KRUMPFES                              EXAMINATION

       BY MR. SOBEL...................   5
       BY MR. MARIOTTI...............   69



                      E X H I B I T S

              NO EXHIBITS MARKED OR REFERRED TO



A-548

BRENTON KRUMPFES                                          January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                          4

THE COURT REPORTER:  My name is Corinne Marut. I am an Illinois State Notary Public and Certified Shorthand Reporter.

This deposition is being held via videoconference equipment.  The witness and the reporter are not in the same room.  The witness will be sworn in remotely pursuant to agreement of all parties.  The parties stipulate that the testimony is being given as if the witness was sworn in person.

Will you please state your appearances and your stipulation to the remote swearing in of the witness.

MR. SOBEL:  Okay.  Curtis Sobel from Sobel Pevzner for the Defendants.

MR. MARIOTTI:  Renato Mariotti and Holly Campbell from Thompson Coburn on behalf of the Plaintiff.

THE COURT REPORTER:  Do you stipulate to the remote swearing in of the witness?

MR. SOBEL:  Yes.  We do.

MR. MARIOTTI:  Yes.

THE COURT REPORTER:  Mr. Krumpfes, would you raise your right hand, please, sir.



A-549

BRENTON KRUMPFES                          January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                          5

(WHEREUPON, the witness was duly sworn.)

THE WITNESS:  I do.

THE COURT REPORTER:  Thank you.

BRENTON KRUMPFES, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SOBEL:

Q.    Okay.  Mr. Krumpfes, my name is Curtis Sobel.  You and I have never met.  But this is a -- what's called a deposition.

Have you ever been deposed before?

A.    I have not.

Q.    Okay.  As with many of the witnesses in this case, this is a first time around.  So, this is my chance to ask you some questions.  You're not a party to this litigation.  We are asking you questions as what's called a non-party.

A.    Okay.

Q.    If you have any concerns, you don't understand my question, you don't hear my question, please let me know.  I'll repeat or rephrase it for you.  Okay?



800.211.DEPO (3376)
EsquireSolutions.com

A-550

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    6

A.     Understood.

Q.     All right.  Just, unfortunately, while we do things with our hands and nodding a head during day-to-day activity, we need you to keep your answers verbal as opposed to just an indication in any other way.  Fair enough?

A.     I understand, yes.

Q.     Okay.  And if you hear an objection from either Mr. Mariotti or Ms. Campbell, please wait before you give any answer.  In fact, generally wait, take a beat after you hear my question, even though you probably know the answer, so that --

A.     Okay.

Q.     -- Corey can take it down accurately.  Fair enough?

A.     Sounds good.

Q.     We are not here to trick you.  We are not here to do anything but just ask you a bunch of questions.

A.     Okay.

Q.     And we'll get through this today pretty promptly.  Fair enough?

A.     Sounds good.

Q.     You understand that you're obligated to



A-551

BRENTON KRUMPFES                                      January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                        7

tell the truth.  You've been sworn to tell the truth, and that's what you are going to do today, correct?

A.    I will, yes.

Q.    Have you met with anybody in preparation for your testimony today?

A.    No, I just did a -- well, I did a practice Zoom call with Renato yesterday to do all this and, yes, I talked to him yesterday.

Q.    And during that Zoom call, that preparation call, did you discuss probably what I was going to be asking or why don't you describe for me what happened?

MR. MARIOTTI:  I'm going to object because I have an attorney-client relationship with him.

MR. SOBEL:  Do you really?

MR. MARIOTTI:  Yeah, I do.  So I'm going to object.

MR. SOBEL:  Then no.  I didn't realize you had an attorney-client relationship, Renato.

MR. MARIOTTI:  Yeah.

MR. SOBEL:  Okay.

BY MR. SOBEL:

Q.    So, why don't you describe that for me,



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A-552

BRENTON KRUMPFES                              January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                              8

Mr. Krumpfes.  Is Mr. Mariotti your attorney in this matter?

A.    Well, he's been my attorney before for other things not related to this.

Q.    Okay.  Do you have any current matters pending with Mr. Mariotti representing you?

THE WITNESS:  How would you describe that, Renato?

MR. MARIOTTI:  Yeah, I'm also representing him for purposes of this deposition as well, but solely for purposes of this deposition.

MR. SOBEL:  Okay, that's fine.

BY MR. SOBEL:

Q.    As long as I have clarity on that, Mr. Krumpfes, that's fine.

A.    Okay.

Q.    But aside from that, without describing the nature of the matter, is Mr. Mariotti currently representing you in any matter as your attorney?

A.    He's represented me in matters before which have been resolved.  But, obviously, like I check in with him from time to time and I'm looking at new issues, like, you know, business ventures, which I might be using him, but yeah.



A-553

BRENTON KRUMPFES                                January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                             9

MR. MARIOTTI:  Don't describe at all what --

THE WITNESS:  Okay.

MR. MARIOTTI:  -- what our conversation was. I don't think any of that is relevant, so I'm going to ask that we move on.

MR. SOBEL:  That's fine, Renato.

BY MR. SOBEL:

Q.    Okay.  So, Mr. Krumpfes, give me a bit of your background, if you would, your educational background, what you do for a living.  Just kind of describe that for me, if you would.

A.    I grew up in the west suburbs of Chicago.  Education, I went through, got a degree in finance from Indiana University, graduated around 2002.

And ever since then I've been in the trading industry.  I worked on the floor of the exchanges, and now I have my own proprietary trading firm.  I'm a partner at a proprietary trading firm I should say.

Q.    Okay.  And what degree do you currently -- what degree did you get from college? I'm sorry.

A.    A Bachelor's in finance.



A-554

BRENTON KRUMPFES                              January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                             10

Q.    And that was from IU?

A.    That's correct.

Q.    Pretty decent football program coming around, right?

A.    This year, yeah.

Q.    About time.

A.    We may lose our quarterback.

Q.    I had a nephew graduate from there.  So, it's been a subject of conversation.

And tell me, what do you do in your day-to-day life now for your occupation?

A.    I go to work.  I trade energy futures and derivatives and basically focus on that.  And, you know, I -- typically I would be going into an office in the city in Chicago, but obviously with COVID we have been working at home more now.  But basically I manage a portfolio, an energy portfolio.

Q.    Okay.  Are you married, single?  Tell me a little bit about yourself.

A.    Divorced and I have two kids.

Q.    How old are your children?

A.    10 and 8.

Q.    And do you live with anybody at the



A-555

BRENTON KRUMPFES                                          January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                          11

present time?

A.    My girlfriend, yes.

Q.    And who is that?

A.    Jennifer Stevens.

Q.    Can you describe for me currently your relationship with Margaret Betts, the Plaintiff in this case?

A.    Currently?  I don't talk to her very regularly anymore.  I'd say probably it's more like Merry Christmas, Happy Thanksgiving, Happy New Year type relationship where, yes, she is still a friend but I don't interact with her on a regular basis anymore at all.

Q.    Okay.  How about going back to October of 2018, how would you describe your relationship at that time?

A.    We're friends.  We lived in the same building downtown in Chicago and we were friends. We hung out.  We'd see each other and, you know, it was a friendly relationship.

Q.    Okay.  At any point during your relationship with Maggie Betts or Margaret Betts would you consider -- would you have considered yourself romantic partners?



800.211.DEPO (3376)
EsquireSolutions.com

A-556

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    12

A.    Like I would never have considered her my girlfriend.  Try to like -- exactly what you mean by the question.  Would be like was she my girlfriend, no.

Q.    Okay.  Were there times where you were intimate?

A.    I mean, I think there was, you know, maybe a time here or there we were out at a party and maybe kissed, but not like -- define intimate.  I don't know.  But just like, you know, nothing like serious, nothing where we were dating or anything like that.

Q.    Okay.

MR. MARIOTTI:  Let me just say.  Just caution the witness.  If you don't understand what he is getting at --

THE WITNESS:  Okay.

MR. MARIOTTI:  -- you don't know what a term is, you can ask him and then he will explain it.

THE WITNESS:  Okay.

BY THE WITNESS:

A.    I don't know.  It's more of like she was like one of my -- I'd describe our relationship more just like be a close friend of the opposite



BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    13

sex, you know.  Yeah.

BY MR. SOBEL:

Q.    I mean, words mean different -- as
Mr. Mariotti has cautioned you, words mean
different things to different people.  So, if you
don't --

A.    That's why --

              (Simultaneous crosstalk and

              clarification requested by the

              reporter.)

BY MR. SOBEL:

Q.    If you don't understand what I'm asking
you or you need some clarification, by all means.
We'd like a nice clean record.  Just ask me, "What
do you mean, Mr. Sobel?  What do you mean?"  You
know.  "I don't understand."  Fair enough?

A.    Yes, sir.

Q.    Okay.  So, you know that we've asked you
here today and we're taking you out of your
schedule to answer questions about a weekend or an
incident or an event that occurred allegedly in New
York City on October 19, 2018.  You know that's why
you're here, correct?

A.    Yes, I do.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A-558

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    14

Q.    So, I'm going to try and take you back, you know, because everybody has schedules and I want to try and get right to what we're talking about here.  All right?

A.    Okay.

Q.    Now, did you travel to the New York area with the Plaintiff, Margaret Betts, on the 18th of October, 2018?

A.    I -- I don't know the exact date, to be honest, but I did travel with her to New York.  We first flew to Connecticut and then we took an Uber from Connecticut to New York City.

Q.    Okay.

A.    The following day.

Q.    And what led up, just generally, what led up to the trip to New York that weekend?  Did you talk about it?  Was it a vacation?  Did you have some mixed business?  Why don't you describe that?

A.    Sure.  So, I first was going to Connecticut, to Stamford, Connecticut, to meet some brokers that I do business with in the energy space.

And, you know, the week before I was,



A-559

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    15

you know, I was hanging out with Maggie and some other people in the building at her place. Basically, "Oh, I'm going to go to Connecticut and then I'm going to go to New York City afterwards like to meet some other people I do business with."

She said that she was wondering if she could come with because her mom and her sister were going to be in New York City that Saturday night or Friday night. I can't remember if it was Friday or Saturday. But she was going to meet up with them.

So, basically she was like, "Well, can I come with you?" And then, you know, "I'm going to see" -- she was going to see her -- one of her friends and her sister and her mom. So, that was like the purpose of the trip.

I was going to go originally by myself just for business in the first place.

Q.    Had you already planned to go to Connecticut? Let's start there. Had you already planned to go to Connecticut that weekend?

A.    Yes, I had.

Q.    And had you planned also to go to New York City prior to discussion with Ms. Betts?

A.    Yes.



A-560

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    16

Q.    Now, how did it come to pass that a reservation was made by Ms. Betts at Hotel Sixty Lower East Side, if you know?

A.    I don't.  I believe that I got the tickets, and then she was the one -- I don't know how she booked the room or anything like that.  But she found the room and she wanted to get the suite because it's like -- the room was like, you know, multiple rooms within a room, you know.

So, she found it and she booked it.  I don't know how she chose that place.

Q.    Okay.  And I assume is it fair to say that you had conversations with her as a friend before traveling from New York to Connecticut or to New York?

A.    Conversations about what?

Q.    About accommodations, where you'd be staying, things of that nature?

A.    Oh.  Yeah, I assume we did.  She said she got the hotel and she said that it was a suite and that we would each have our own separate rooms, bedrooms.

Q.    Okay.  So, at some point before you traveled to New York, you understood anyway that



A-561

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    17

you and Maggie Betts or Margaret Betts would be staying in the same suite albeit in different rooms.  Is that fair?

A.    Correct.

Q.    Yes.

A.    Separate rooms, yeah.

Q.    What other -- do you have a recollection specifically now as to any other discussions you had with the Plaintiff regarding the accommodations once you got to New York?

A.    No.  I just -- I never -- I remember I didn't remember the name of the hotel.  I remember in the car I asked her like, "Where exactly are we staying," like, "What part of Manhattan?"  But that was pretty much about it.

Q.    And did there come a point in time where you got to -- you flew into New York?

A.    No.

Q.    Do you remember where you flew into?

A.    No, we flew into Connecticut.  The airport, White -- I think it was White Plains.

Q.    Okay.

A.    Then we went from White Plains to Stamford, Connecticut.



800.211.DEPO (3376)
EsquireSolutions.com

A-562

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    18

Q.    Did you take a private or commercial airline?

A.    Commercial.

Q.    All right.  And when you got --

A.    I believe it was Delta, but I don't know for sure.

Q.    Okay.  And when you got to Stamford, just generally tell me what you did.

A.    So, one of my brokers I do business with picked us up.  We got there and we were supposed to meet at -- I don't even know the name of the place. It was like an Irish like pub-type place.  I don't know.

We met there.  And we just hung out with, you know, some people I do business with. And I think at one point she might -- she went to the hotel, and then eventually later I went back to hotel, not in New York, but a hotel in Connecticut.

But it wasn't -- my business meetings like are usually just like where are you going, you have dinner and you have drinks afterwards and that's about it.

Q.    Okay.  And did you both -- did you consume alcohol that evening when you were in



800.211.DEPO (3376)
EsquireSolutions.com

A-563

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                              19

Connecticut, on that Thursday the 18th?

A.    Yeah.

Q.    Okay.  Were you present when Ms. Betts had drinks that night?

MR. MARIOTTI:  Objection to the extent it assumes that she did have drinks that night.

BY MR. SOBEL:

Q.    Yeah?

A.    What am I supposed to do here?

MR. MARIOTTI:  Just you can answer the question.  I just -- I made an objection about the assumption that she did drink.

BY THE WITNESS:

A.    Yeah, she had drinks.

BY MR. SOBEL:

Q.    Okay.  And, generally speaking, why don't you tell me what else happened on the night in Connecticut as best you recall.

A.    Well, we -- we hung out there at the -- I don't remember the name of the place.  I'm sorry. I haven't been back there, you know, since except for one time.

But I don't remember the name of the place, and I -- we just hung out and we talked to a



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A-564

Case 1:20-cv-04772-NRB    Document 63-8    Filed 01/12/23    Page 22 of 92

BRENTON KRUMPFES                                      January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                      20

bunch of, you know, friends that I do business with and met some other people and that was it. It was just sort of a social gathering for the most part.

Q. Okay. There came a point in time where you took an Uber into New York City, correct?

A. No. That night we went and stayed in a hotel in Connecticut. We did not go into -- the night we got in Connecticut we stayed in Connecticut. We did not take an Uber until the following day.

Q. Did you and Ms. Betts stay in separate rooms in Connecticut?

A. Yes, we had two rooms.

Q. Okay. And did you stay in those separate rooms that night?

A. Yes. I mean, I think she -- I think -- I don't know who got the rooms there. We had two rooms and then -- yeah, we stayed in separate rooms.

And then she came -- I think they were like -- I believe that they were joining rooms, like together, you know. And then she came and, you know, knocked on the door or whatever in the morning and she came in.



800.211.DEPO (3376)
EsquireSolutions.com

A-565

BRENTON KRUMPFES                                           January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                          21

And I actually got up, and I went to see somebody else in Connecticut that day.

Q.    At some point in time you got into -- you went into New York City the following day. That would have been Friday the 19th.  Fair?

A.    Yes.  That would have been Friday afternoon.

Q.    Okay.  Anything else, did you -- well, withdrawn.

Did you and Margaret Betts spend the time -- well, withdrawn.

Did you take the Uber together into New York City?

A.    Yes.

Q.    Okay.  Was anybody else present with you during that Uber ride?

A.    No.  It was just us and a driver.

Q.    Okay.  Did you have any meetings that Ms. Betts took part in or was present for while you were in Connecticut?

A.    No.  She -- I think she stayed at her room, I believe, and then I went to meetings in -- I didn't go to meetings.  I went to like somebody else's office basically that I do business with, a



A-566

Case 1:20-cv-04772-NRB    Document 63-8    Filed 01/12/23    Page 24 of 92

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    22

broker I do business with.

Q.    Okay.  Were you friendly with -- well, withdrawn.

Did you have the kind of relationship with Ms. Betts prior to that trip where she would tell you if she was taking any medications or anything of that nature?

A.    Not really.  I mean, I never really got into like -- I tried to like not to talk to -- like get too into stuff like that, to be honest.

But did I know that she was ever on medication?  Well, yes.  I don't know what exactly they were or the dosage or anything.

Q.    Okay.  But were you aware that she was generally taking medications on a regular basis --

A.    Yeah.

Q.    -- at or about that time?

A.    Yes.

Q.    Okay.  Do you know what, if any, those medications were at that time that she was taking on a regular basis?

A.    Honestly, I really don't know for sure what it is.  I know she was on medications.  What exactly they specifically were, I don't know.  I



A-567

BRENTON KRUMPFES                                        January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                        23

know one of them was -- I mean, the only one I can remember for sure might be Adderall, but that's it.

I don't want to -- I don't really know what exactly the names were of all of them.

Q.    And at or about that time did you have the kind of friendship with Ms. Betts where you knew that she was undergoing therapy on a regular basis?

A.    I did.

Q.    Or was that not something -- okay.

A.    I did know that.

Q.    Was that something that you had discussed with her?

A.    I knew about -- I knew that she was going through therapy, yes.

Q.    Okay.

A.    I didn't know -- I was like -- the thing is our relationship at that point was more like we were friends and like she would like to vent to me about certain things.

But like, honestly, like I tried to always, you know, make things positive and change the subject.

MR. MARIOTTI:  One thing I want to interject



A-568

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                     24

and say, Mr. Krumpfes, is you should just -- he is the one asking questions.  You answer them.

        THE WITNESS:  Okay.

        MR. MARIOTTI:  You don't want to give speeches here.  Just let him ask you --

        THE WITNESS:  Okay.

        MR. MARIOTTI:  He is going to ask you whatever questions he's got.

        THE WITNESS:  Okay.

        MR. MARIOTTI:  Just listen to those and answer those questions.

        THE WITNESS:  Okay.

BY MR. SOBEL:

        Q.    Okay.  So, but I mean -- and, generally speaking, this is not an indictment of Ms. Betts. But generally speaking at the time that you traveled to Connecticut and New York, you were aware that she was going through therapy for whatever -- for whatever she was going through therapy for.  Is that fair to say?

        MR. MARIOTTI:  I'm going to object; asked and answered.  You've already asked him about therapy. He said he was aware of it.

BY MR. SOBEL:



A-569

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    25

Q.    Okay.  And you were aware at or about that time that she was taking various medications. Fair enough?

A.    Yes.

MR. MARIOTTI:  He already testified to that. Object; asked and answered.

MR. SOBEL:  He did.  And if you like, Renato, I can go through the list of medications.  I'm trying to --

MR. MARIOTTI:  That's fine.  That's fine. Let's move on.

BY MR. SOBEL:

Q.    Did Ms. Betts ever discuss with you the nature of the therapy that she was going through at or prior to October 19 of 2018?

A.    The nature of her therapy, can you -- like what does that mean?

Q.    Did she ever discuss with you in any way, "Hey, I'm seeing a therapist for this," and get into what in sum and substance she was seeing a therapist for?

A.    I mean, she told me she was talking to her therapist and she'd see him, you know, a couple times a week.



A-570

Case 1:20-cv-04772-NRB    Document 63-8    Filed 01/12/23    Page 28 of 92

Q.    Did she ever share with you what she was getting therapy for?  Again, I'm not indicting her for getting therapy.

A.    No.

Q.    I'm just asking what you recall.

A.    Honestly, like this is two and a half years ago.  But I remember one thing was anxiety. That's pretty much it.

Q.    Okay.  Did she ever discuss with you her finances, with you, her finances and any issues relating to her finances?

A.    She did.  Sometimes she talked about how, you know, she had a -- I don't know who he was, but the only thing I know is she had some guy through the family that she talked to.

Q.    Did you ever handle any of her finances or investments?

A.    No, I did not.

Q.    Did she ever --

A.    Sorry.  She asked me what I thought about, you know, the stock market sometimes.  And I would just like, you know, give her my opinion because she was just trying to ask conversations about my world, like my working thing.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A-571

Case 1:20-cv-04772-NRB     Document 63-8     Filed 01/12/23     Page 29 of 92

BRENTON KRUMPFES                                          January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                          27

But did I ever manage any of her money? No, absolutely not.

Q.    Okay.

A.    I don't manage friends' or family's money actually just because...

But, no, I did not manage it.  She'd ask me like what I thought about the stock market every now and then.  That was more casual conversation. And I know that she had a full-time financial money manager through her dad or mom or something.

Q.    Did you know in 2018 what the source of the finances were, where this money came from?

A.    The source of her finances like her money?  It's from her parents I assumed, and she's told me it's from her parents too.

Q.    Okay.  But up until the present time, including the present time, have you ever acted in any professional capacity handling any of Ms. Betts' finances?

A.    No, I have not.

Q.    Has she asked you to?

A.    I think jokingly she's asked me to before.  It would be like, you know, "Hey, will you manage some of the money at my firm?"  And the



A-572

BRENTON KRUMPFES                                  January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                   28

answer has been no.

Q.    Okay.  And why was that answer no, just out of curiosity?

A.    We're not allowed to take outside money even if I wanted to.  We're a proprietary trading firm, not a hedge fund.  Basically we don't have the license to do that.  So...

Also, just I don't like mixing friends with family when it comes to that.  Done it before in other ventures and it hasn't worked out, so I just don't do it.

Q.    That's probably wise.

Okay.  So, at some point you take an Uber into New York.  Let's just get back into that weekend.  You take an Uber into New York.

Tell me, did the Uber take you right to the hotel, Hotel Sixty LES?

A.    It did, yes.

Q.    And when you got out of the Uber, did you walk into the hotel?

A.    We did.

Q.    Was anybody with you and Ms. Betts at that point?

A.    I don't think so.  I think her friend



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A-573

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    29

came at one point, but I don't think anybody was with us at that point.

Q.    And as you walked into the hotel, what was your expectation as far as the length of stay? How long were you going to be there?

A.    Till Sunday.

Q.    Had you made any plans for dinner, entertainment or anything else while you were in New York as of the time you entered the hotel?

A.    I did.  I think it was -- I don't remember which night it was, but Friday or Saturday night.  I think it was Saturday night.  I met some people that I do business with, some brokers.

Q.    You had already planned to do that?

A.    Yes.

Q.    All right.  Was Ms. Betts part of that plan?

A.    I think it was up in the air because she had a friend that she was supposed to meet, which she did end up meeting.  I think she was from Brooklyn.  I forget her name.

And then -- she like -- you know, it's obviously one of those situations where we were going to go, I think there was a bar on the roof of



A-574

BRENTON KRUMPFES                                     January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    30

the place or whatever, which I was going to meet them at and I sort of just assumed she was going to be with her friend and also that I thought she had planned to see her mom and her sister.

So, at that time, no, it was not firm plans, but obviously if she was all alone and she wanted to come up there with us, it would have been fine.

Q.     Okay.  From the point you left Connecticut up until the point you got to the hotel, did you observe Ms. Betts take any medication?

A.     I did not.

Q.     During that same time frame, did you observe Ms. Betts consume any alcohol?

A.     I did not.

Q.     When you got to the hotel, was the room ready, the room that was booked?  Or if you can, describe for me what then occurred.

A.     I do not think the room was ready.  I believe we went -- we had to wait for a little while.  Like I think we went to some like little lunch place that was in the hotel maybe up one floor.



A-575

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    31

But it wasn't ready immediately, no.  I don't remember, recall how long it took.  But I guess between a half hour and an hour and a half before the room was ready.

Q.    Okay.  And, so, during lunch did you consume any alcohol?

A.    Honestly, I don't know.

Q.    Were you on any medications at the time?

A.    No.

Q.    And I mean any medications whatsoever.

A.     I can't remember.  I did have a period where I could have been on Cymbalta, but I don't think I was.  What was the exact -- because I usually don't start that until November because I take it for seasonal depression.

But if you said the trip was in October, then I don't think I would have been on it.  But that would have been the only thing.

Q.    Okay.  Were you diagnosed as having seasonal affective disorder prior to that time frame?

A.    Yeah, yes.

Q.    And you took Cymbalta to help you get through the Chicago winters?



A-576

BRENTON KRUMPFES                                      January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                      32

A.     Yeah, basically.

Q.     It's unusual.

A.     Yeah.  I was prescribed it about I'd say eight or nine years before that.  So...

Q.     Okay.

A.     Yeah.  But I don't take --

Q.     You don't remember when you started taking Cymbalta in your annual cycle?

A.     No, I don't.  But it would be close to that time, but it really doesn't affect me.

Q.     Okay.  Did you observe Ms. Betts consume any alcohol at lunch?

A.     Honestly I don't remember if we had alcohol or not at lunch.  Because this was a Friday evening, correct?  Or no.  Was it lunchtime or was it -- I forgot when we arrived.  Probably after lunch when we arrived.  We went to a lunch place. But I don't know for sure.

Q.     I think it's generally agreed it was a Friday.

A.     Yeah, it was a Friday, but I don't know -- but I don't know if we actually ate lunch there.  This thing is a lunch place.

Q.     Okay.



A-577

Case 1:20-cv-04772-NRB    Document 63-8    Filed 01/12/23    Page 35 of 92

BRENTON KRUMPFES                                January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                              33

A.      I don't.

Q.      When you checked in -- do you remember the check-in process?

A.      No, I do not.  She checked in.

Q.      Were you given your own key?

A.      Yes, I believe I was given my own key. I don't think I was there, though, while she was actually doing the check-in process.  So...

I think I was on the phone upstairs on the -- at the restaurant place, but I don't -- I was not talking -- I do not believe I was talking with the cashier, but I don't know for sure, or the front desk.

Q.      At any time were you present in the -- during the -- well, why don't we do this.

At any time were you present during the check-in process for the room that Ms. Betts had taken out that weekend?

A.      Sure.  I'm sure I was probably there at the beginning and then I probably walked away.

Q.      Okay.  Do you have any specific recollection as you sit here today as to what Ms. Betts said to the people in the hotel or what the people in the hotel said back to Ms. Betts



800.211.DEPO (3376)
EsquireSolutions.com

A-578

BRENTON KRUMPFES                                January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                            34

regarding checking into the room?

A.    I do not.

Q.    Did there come a point in time where you separately, without Ms. Betts present, had a conversation with anybody at the hotel?

A.    I might have.  I'm not sure.  I really don't remember.

Q.    Okay.  During the check-in process do you have any recollection as you sit here today as to your conversation with anybody at the hotel?

A.    I do not.  I honestly just don't really remember too much from that long ago.

Q.    Okay.  Did there come a point in time where you went up to the room?

A.    Yes.

Q.    And did you go up to the room at the same time as Ms. Betts?

A.    I believe so, yes.  I don't -- I don't really remember little details like this from so long ago, to be honest.

Q.    It's not that surprising.  I'm just asking as best you remember.

A.    Yeah.  No, I definitely went up to the room.  I believe I would have gone up with her, but



A-579

BRENTON KRUMPFES                                January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                              35

I don't know 100 percent sure.

I remember like we couldn't figure out how the elevator worked at one point, too.  It's all very like -- I just don't remember from that long ago.

Q.    Do you -- at any time up until the point you got into the room, do you have any specific recollection of Ms. Betts requesting a massage?

A.    I honestly don't know for sure.  She might have said she wanted to get a massage, but I don't really remember.

Q.    Do you remember if that was said to you as a general kind of "I wanted to get a massage," or was it said to the hotel or something else?

A.    I'm sorry.  I don't -- I don't really remember.  I'm not sure if she even asked me if -- I know at one point she said she wanted a massage, but I'm not sure if she said that to me on Friday or on Saturday.  I don't remember.

Q.    Do you remember anything else about, up until the point where you got into the room, a discussion about Ms. Betts getting a massage?

A.    I remember having a discussion with her that she wanted one, but I don't remember the exact



A-580

BRENTON KRUMPFES                                           January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                           36

time or day when she said that.

Q.    Did you have any conversations with any hotel personnel about Ms. Betts getting a massage?

A.    I honestly do not remember.  I don't think I would have.  I don't see why I would have. But I don't remember.

Q.    Did you ask for a massage?

A.    No, I did not.

Q.    Okay.  At any time during the weekend or during that stay at the hotel did you receive a massage?

A.    I did not.

Q.    There comes a point in time where you get into the hotel room itself?

A.    Yes.

Q.    Describe the hotel room or suite that you were staying in that weekend.

A.    It was really nice, you know, nicer than I -- than I thought it would be.  We walked in and like there is one big room in the middle and then if you walk in to the left, there was like a kitchen little area I think.

And then Maggie was -- I think stayed in either one of the rooms on the first floor.  And



A-581

Case 1:20-cv-04772-NRB     Document 63-8     Filed 01/12/23     Page 39 of 92

BRENTON KRUMPFES                          January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                          37

then there was a second floor that went up to the room that I stayed in.  Sort of a...

Q.    And when you got to the room, did you select the rooms that you'd be staying in that night?

A.    Yeah, I just walked up and just liked that one and I think she wanted the, quote, "the bigger one" downstairs, which I didn't mind.  So...

Q.    What time did you get to the room?

A.    I do not recall.  It's so long ago.  I have no idea what time it was.  I could be off by hours if I told you.  So, I don't know what time.

Q.    Okay.  So, that was October of 2018.  Do you remember if it was in the afternoon?

A.    Yes.  No, it was in the afternoon or evening.

Q.    Okay.  Had you already made plans for dinner at the time you got to the room?

A.    I had plans to meet some friends, but I do not think Maggie and I had plans.  I don't remember for sure.

Q.    Okay.  Why don't you tell me everything you did from the point where you got into the room that evening.



A-582

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    38

A.    I know I just -- I made some phone calls, and I remember like sitting in the room; and then I think eventually I believe her friend came over from Brooklyn.  I don't remember her name.  And that's all I remember.

I know we went out to dinner with her one night, and we went to a -- we walked to a restaurant nearby.  Try to remember if that was Friday night or Saturday night.  I'm not 100 percent sure.  I believe it was Friday night.

And that was it.  And then later I went and saw some brokers.

MR. MARIOTTI:  I'm going to say --

BY MR. SOBEL:

Q.    I'm going to try and -- I'm sorry.

MR. MARIOTTI:  That's fine.  I think your question was very broad and vague.

MR. SOBEL:  Of course it was.

MR. MARIOTTI:  I didn't object to it.  I think it's safe to say that doesn't encapsulate everything he remembers about everything that happened.

MR. SOBEL:  No.  It was just to try and set a framework so we can further inquire.



800.211.DEPO (3376)
EsquireSolutions.com

A-583

BRENTON KRUMPFES                           January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                          39

BY MR. SOBEL:

Q.    So, Mr. Krumpfes --

A.    I'm sorry.  It's so long ago.  I barely remember all this stuff, you know.  Like I never thought I'd have to remember it.  So, it's like very, very vague in my mind.

Q.    You know, we as attorneys expect everybody to have an absolute memory of every single thing that ever happened as if they're great historians, but we do realize we are just asking you questions.

A.    Yeah.

Q.    So, let me try and -- let me try and get you to focus on that Friday night.  Okay?

A.    Okay.

Q.    You got into the room.  Give me a rough, as best you can tell me, what time do you think you got into the room, midafternoon, late afternoon, something else?

A.    I would say it would be late afternoon, early evening by the time we finally got in there.  Maybe -- honestly, I have no idea.  I don't know.

I remember that Friday that I went to an office in Stamford.  I think I was there for till



A-584

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    40

about maybe lunchtime.  Then I got an Uber.  If I had to take a wild guess, total guess --

MR. MARIOTTI:  I'm going to instruct the witness not to make a guess.  You already asked that question before and he gave an answer that he doesn't remember.  So, why don't we move on?

MR. SOBEL:  All right.

BY MR. SOBEL:

Q.    So, Mr. Krumpfes, there comes -- does there come a point in time where you have a recollection of you and Ms. Betts going into the room for the first time?  Let's try that.  Do you remember when you did --

A.    I remember -- the only thing I remember is I believe that we could not figure out how the elevator worked and opened into the room.  So, that would probably be my recollection of trying to...

I specifically remember that the elevator was like it opens into the place.  It's not a typical elevator.  And I remember that behind me that there was another room and I could hear noise from that, from that beyond the elevator, but that's pretty much it.

Q.    Did there come a point in time where you



A-585

Case 1:20-cv-04772-NRB    Document 63-8    Filed 01/12/23    Page 43 of 92

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    41

recall -- well, withdrawn.

Did there ever come a point in time where you became aware that Ms. Betts had requested an in-room massage?

A.    Yes.

Q.    All right.  And when did you first become aware that she had requested an in-room massage?

A.    I believe that she got the massage on Saturday, and she -- I remember that I was basically -- she said -- she asked if I wanted a massage.  I said no.  And I wanted to basically go take a nap in my room because I was out with brokers the night before.  You know, we were at the bar upstairs or whatever.

And all I remember is that she -- I heard the -- I didn't hear, but I heard her talking to somebody and then she goes, "Hey, dude, you sure you don't want a massage?"  I'm like, "No, I don't want a massage.  I'm good, thank you."  And I went and -- went back to sleep, taking a nap.

Q.    And do you remember the date and time that that conversation took place?

A.    She asked me if I wanted a massage.  I



A-586

Case 1:20-cv-04772-NRB    Document 63-8    Filed 01/12/23    Page 44 of 92

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    42

remember I was laying down and she was like yelling if I wanted a massage, and I'm guessing it's probably in the hour before the massage actually happened.

Q.    Okay.  And do you remember what day that was?

A.    I believe it was Saturday.

Q.    Okay.

A.    But I don't know for sure.  I think she got the massage on -- yeah, she got the massage on Saturday.

Q.    Do you remember anything else about that conversation?

A.    No.  She just said, you know, she wanted a massage.  She asked me if I wanted one.  I said, "No, I'm fine."

Q.    Okay.  Did you see a massage therapist enter the suite that night?

A.    I did not.

Q.    That day.

A.    I did not see it.

Q.    Okay.  Did you ever see a massage therapist in the suite while you were there that weekend?



800.211.DEPO (3376)
EsquireSolutions.com

A-587

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    43

A.      I did not.

Q.      Did you ever hear any voices in the suite that were unfamiliar to you?

A.      I did not.

Q.      Did there ever come a point in time where you became aware that Ms. Betts had received a massage?

A.      Yes.  When I woke up, you know, a couple hours later, I went downstairs and I knew -- she told me she had a massage, yes.

Q.      Okay.  Let's just go through this.

There came a point in time after you got into the suite that you took a nap?

A.      Right.

Q.      Okay.  Napping is underrated.  I appreciate a nap.

You took a nap.  And did you take a nap in the room that you had decided, upstairs in that suite, that you were going to be using?

A.      That's correct.

Q.      Did you close the door when you took your nap?

A.      I believe so.  I think I was -- I think it was one of those like sliding open doors.  I



A-588

BRENTON KRUMPFES                                January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                44

don't know if I closed it all the way.  Honestly, I don't remember.

Q.    Okay.  Did you use earbuds?  How did you sleep?  Did you use anything to help you sleep?

A.    No.

Q.    Headphones, earbuds, anything like that.  Okay.

And there came a point in time you just woke up from your nap.  Is that correct?

A.    Correct.

Q.    And then you went into the general area of the suite.  Is that correct?

A.    Correct.

Q.    And do you know what day and approximately what time that that occurred?

A.    I do not for sure.  Like I told you before a couple times, like it's -- I'm totally guessing here on like times and all that because I just don't remember from two and a half years ago like times.

What I'm worried about, Renato, if I could ask, say something real quick, is that I don't want to say a time and be off for a few hours and then look like I'm lying or something.  I



BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    45

really just don't remember the times.

Q.    Nobody wants you to guess.  I agree with your counsel.  Nobody wants you to guess here.  So, if you don't understand -- if you don't remember something, say, "I don't remember."  That's fair.

A.    I don't remember.

MR. MARIOTTI:  It's totally acceptable to say if you remember or not.  If he asks you the same thing after you've said "I don't remember," I will try to catch it next time.  But if you don't remember, that's fine.  Just say it.  Don't guess.

BY THE WITNESS:

A.    I don't remember the time, but then sometimes he -- you want me to guess in my best judgment what time frame it was and I'm like I don't know.  So, it's like I don't remember the details from that long ago that well.  But I do not remember.

BY MR. SOBEL:

Q.    You got plenty of lawyers on this Zoom.  So, don't worry.  Somebody is going to pick it up.  I'm really just asking you as best you recall.

A.    I do not remember the time specifically.

Q.    There came a point where you had woken



A-590

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                               46

up from your nap.  You're sitting in a general area
of the suite, correct?

A.    Correct.

Q.    And is it at that point where Maggie or
Ms. Betts comes up to you and says, "I had my
massage"?

A.    Yes.  Yes.

Q.    Okay.  And tell me everything you recall
about that initial conversation.

A.    I could tell something was off with her.
She seemed, you know, a little like upset,
distraught.  I really couldn't figure out what was
going on.

And, honestly, I didn't know if it was
something, you know, because like her mom and her
sister didn't show up.  So, I didn't know if it was
that, like why she was upset at first.

Honestly, I really didn't know what was
going on at first.

Q.    Okay.

A.    And then she mentioned, you know,
like the -- I forget exactly what she said.  But
she said like the massage was strange or different
or something happened.



A-591

BRENTON KRUMPFES                                          January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                          47

And, honestly, at that point I just didn't really know what to say.

Q.   Okay.  So, you perceived something in terms of her behavior, but what I'm really asking is specifically what did she say to you and if you have a specific recollection as to that.

MR. MARIOTTI:  And I'm going to object to the extent that he did just say that she said something to him.

MR. SOBEL:  Well, with all due respect, I don't know that he did.

MR. MARIOTTI:  I'm going to object to your characterization of his testimony.

BY MR. SOBEL:

Q.   I'd like to know if you have a specific recollection as to what Ms. Betts said to you at that moment.

A.   I do not have a specific recollection of her exact words, but she did say something about the massage.  And she was very vague about it.

And I remember I tried like asking her, like, "What happened" like a couple times, like, and she just sort of didn't say anything.

And at that point I didn't know what to



800.211.DEPO (3376)
EsquireSolutions.com

A-592

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    48

do, and I said -- then sort of getting a sense of what's going on, I said maybe it's a good idea that she talks to her girlfriend about it, you know, the one from -- I don't remember her name.  But she's from -- the other girl.

Q.    And where were you when that conversation took place?

A.    In the general area.

Q.    What was Ms. Betts -- how was she attired?  What was she wearing?

A.    She was -- I mean, I don't remember what she was wearing.  She was in clothes, obviously.  I don't know exactly what it was.  I don't remember if it was a robe or not.  I don't recall.

Q.    Okay.  But you remember that she was in clothing of some sort?

A.    Yes.  She definitely was not naked, no.

Q.    And have you told me everything that you recall about that conversation?

A.    Yes.

Q.    Okay.

A.    I don't recall pretty much at all.  I just told her to talk to her friend and do that, because obviously it's more of a situation that



A-593

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    49

being a guy friend is different than a girl friend.

Q.    Okay.  And did you see the -- where Ms. Betts came from before that conversation took place, where within the suite?

A.    I did not, no.

Q.    Was there anybody else in the suite at the time the conversation took place?

A.    There was not anybody else there, no.

Q.    Did you ever see the massage therapist that had come to the suite?

A.    I did not.

Q.    At any point up until the present time have you ever seen the massage therapist that was in the suite?

A.    I've never seen him.  I have no idea what he looks like.

Q.    Okay.  How do you know that it was a man?

A.    Because she said it was a man.

Q.    Okay.  Anything else did she say about his appearance or anything else?

A.    No.  I mean, the only other thing she told me, I believe, that he was Russian.

Q.    Okay.



A-594

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    50

A.    Thought he was Russian, and that's about it.  Like -- no.  I don't even know what color hair he has or anything.

Q.    Had you ever been -- had you ever traveled with Ms. Betts before and stayed in a hotel?

A.    No, I have not.

Q.    Do you have any knowledge as to her preferences regarding massage therapists, be they female, male, in-room or in the spa, anything of that nature?

A.    I do not.

Q.    Okay.  Now, do you know approximately, and I mean approximately, what time that conversation took place?

A.    Between me and her about the massage?

Q.    Correct.

A.    Like I said, I'd be guessing when it comes to times, but it was before dinner.  So...

Before dinner.  How about we say that?

Q.    Did anybody else enter the suite before dinner?

A.    I do not remember if her friend -- if anybody did, it would have been her friend from



A-595

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    51

Brooklyn.

Q.     Do you know the name of the friend that you're referring to?

A.     No, I do not.

Q.     Even by nickname?

A.     No, I do not.

Q.     Did there come a point in time where her friend did come to the suite?

A.     Yes.

Q.     And were you present during any conversation that took place between Ms. Betts and her friend?

A.     I did not really get into a lot of specific conversations.  Like I said, her friend is somebody I guess she's known for a very long time, for most of her life, and I only knew her at that point for maybe a year or so, maybe a year and a half.  So, I think the conversation, like I just wanted to let them talk amongst themselves.

Q.     Okay.  Did you overhear any of those conversations?

A.     No, not really.  I let them have -- I mean, I could hear their -- no, I did not -- I don't recall any specifics from that conversation.

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A-596

BRENTON KRUMPFES                         January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                         52

Q.    Okay.  Do you remember anything about those conversations that you may have overheard, anything at all?

A.    I do not.  I'm sorry.  I don't.

Q.    That's fine.  Again, you don't have to apologize for your testimony.  You're just doing the best you can.

Now, did there come a point in time where you went out to dinner that day or that evening?

A.    I believe we did go out to dinner that evening.  The three of us went out to dinner one night.  I'm not sure if that was Friday night or Saturday night.  I do not know that for sure which night it was.  But there was a night that the three of us went out to dinner.

Q.    Were you present when Ms. Betts spoke to anybody at the hotel regarding any aspect of the massage?

A.    I do not -- I don't think so.  I do remember her calling the hotel and talking on the phone to somebody.  That's all I really remember.

Q.    Do you remember if that conversation took place before or after the massage?



A-597

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    53

A.    Well, obviously, I think she called the hotel to set up the massage and I believe she -- like I think I remember her doing that when I was laying down, you know, and she was maybe talking to him pretty loudly.  But I do believe she called somebody after the massage.

Q.    Let's stay with the conversation --

A.    I don't recall specifics, but yeah.

MR. SOBEL:  I'm sorry, Corey.  Did you get that?

(WHEREUPON, the record was read by the reporter as follows:

A.  I don't recall specifics, but yeah.)

BY MR. SOBEL:

Q.    Let's stay with the conversation before the massage.  Do you have -- why don't you tell me everything you recall about that conversation between Ms. Betts and the hotel about getting a massage?

A.    Yeah, that was when I think she was booking the massage and then I could hear her, be like, "BK" -- that's what I go by, BK.  She's like, "BK, are you sure you don't want a massage?"



A-598

Case 1:20-cv-04772-NRB     Document 63-8     Filed 01/12/23     Page 56 of 92

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                      54

I'm like, "No, I do not want a massage." That's pretty much what I remember.

Q.   Okay.  Do you remember her -- anything else about that conversation as you sit here today?

A.   I do not.

Q.   Did you -- were you able to overhear the hotel's side of that conversation via speaker phone or anything else?

A.   No.

Q.   Okay.  The conversation -- now, you indicated, I think, that there was a subsequent conversation about the massage.  Is that correct?

A.   I believe there was, yes.

Q.   Do you remember when that took place?

A.   I think it was after the massage.  I don't remember specifics, like I said, two and a half years ago but...

And then I remember her talking to her friend.  That's it.

Q.   Let's stay with just the conversation. Was that on the phone between Ms. Betts and the hotel after the massage?

A.   I believe it was on the phone.

Q.   And were you able to hear any portion of



800.211.DEPO (3376)
EsquireSolutions.com

A-599

BRENTON KRUMPFES                              January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                            55

the hotel's side of that via speaker phone?

A.    I was not.

Q.    And what do you recall -- tell me everything you recall about Ms. Betts' side of that conversation that you heard at that time.

A.    I just remember her saying that she was going to call the hotel and talk to them.  And that was all I heard.  And like I basically did not stand around and listen to her talk.

Q.    Okay.  So, but that was a conversation Ms. Betts had with you about making a phone call, correct?

A.    Correct, yes.

Q.    Were you present during her conversation with the hotel?

A.    I do not -- I don't think so.

Q.    Okay.  Now, her friend from Brooklyn, I know you don't remember her name.  Did you ever speak to her friend regarding any aspect of this massage?

A.    Yes.  I do remember like briefly like she asked me if I knew what was going on.  I'm like, "No, I really don't know, you know, what's going on."



A-600

BRENTON KRUMPFES                                    January 19, 2021
BETTS vs SIXTY LOWER EAST SIDE                                    56

And, you know, I -- you know, I just -- I think I might have called her and just said, you know, "Hey, can you" -- or text her or something like that.

But I don't -- I'm sure -- I'm sure I talked to her. I don't remember the specifics of what I probably said, though.

A lot of it was just "I don't know what's going on. Like I was asleep. I was in the other room. I'm on a different floor. I didn't see anybody." That's what I said, you know.

Q.    It sounds to me as if that was in response to something.

Why don't you tell me what you remember of that conversation or conversations you had with her friend from Brooklyn regarding the massage that Ms. Betts received? Do the best you can.

MR. MARIOTTI:  I'm going to object because he already said he didn't remember anything but what he just told you and you keep asking him again about stuff he doesn't remember.

MR. SOBEL:  This is the second time I'm asking him.

MR. MARIOTTI:  Which is prompting him to



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com